1  C. Brooks Cutter (SBN 121407)
   bcutter@cutterlaw.com
2  John R. Parker, Jr. (SBN 25776)
   jparker@cutterlaw.com
3  Celine Cutter (SBN 312622)
   ccutter@cutterlaw.com
4  **CUTTER LAW P.C.**
   401 Watt Ave., Sacramento, CA 95864
5  Phone: (916) 290.9400
   Fax: (916) 588.9330
6

7              **UNITED STATES DISTRICT COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9  UNITED STATES OF AMERICA

   and
10
   THE STATES OF ARKANSAS,              **UNDER SEAL**
11 CALIFORNIA, COLORADO,
   CONNECTICUT, DELAWARE, THE
12 DISTRICT OF COLUMBIA, FLORIDA,       Case No.: 2-18-cv-02124-FMO-AFM
   GEORGIA, HAWAII, ILLINOIS,
13 INDIANA, IOWA, LOUISIANA,
   MARYLAND, MASSACHUSETTS,             **FIRST AMENDED COMPLAINT**
14 MICHIGAN, MINNESOTA, MISSOURI,       **FOR DAMAGES AND DEMAND**
   MONTANA, NEVADA, NEW JERSEY,         **FOR JURY TRIAL TO BE FILED IN**
15 NEW MEXICO, NEW YORK, NORTH          **CAMERA AND UNDER SEAL**
   CAROLINA, OKLAHOMA, RHODE            **PURSUANT TO 31 U.S.C. § 3730 (B)**
16 ISLAND, TENNESSEE, TEXAS,            **(2)**
   VERMONT, VIRGINIA, AND
17 WASHINGTON

18 ex rel.

   JEFFREY BELL AND ANDREW
19 SCHMID,

20 ―――――――――――――――――――――――――――――――――
   FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
   CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 1

Relators,

vs.

BIOTRONIK INC., BIOTRONIK SE & CO. KG, MS HOLDING II SE, BEYOND REPS, LLC, SET SOLUTION, INC., MKM HEALTHCARE SOLUTIONS, LLC, PRECISION MEDICAL, INC.,

Defendants

## TABLE OF CONTENTS

CONTENTS ..................................................................................................2

I. INTRODUCTION ........................................................................................5

II. PARTIES, JURISDICTION, AND VENUE ............................................9

III. NATURE OF ACTION ...........................................................................14

IV. OFF-LABEL MARKETING SCHEMES and misleading safety data ...............18

      *1. Improper sale of loop recorder devices.* ...........................................20

      *2. Improper sale of MRI-conditional pacemaker and defibrillator devices.* ...............................................................................................27

      *3. Improper early replacement of pacemaker and defibrillator devices.* ...............................................................................................53

      *4. Improper addition of remote monitoring to most Biotronik devices.* 68

      *5. Improper and untrue safety claims* ....................................................74

V. BIOTRONIK'S VIOLATIONS OF THE ANTI-KICKBACK STATUTE ............87

      *1. Expensive meals, golf, Major League Baseball, Strip Clubs, and entertaining spouses as kickbacks* ....................................................90

      *2. Entertaining Dr. Jerry Floro and his Wife with Golf, Dinners, and Parties as Kickbacks* ..............................................................................118

      *3. Christmas Parties, Birthday Parties, Retirement Parties, and Happy Hours as Kickbacks* ..............................................................................123

*4. Training Payments* ........................................................... 131

*5. Nepotistic hiring* ............................................................ 160

*6. Speaking fees as kickbacks* ........................................... 164

*7. Grant payments as kickbacks* ......................................... 165

*8. Investing with physician customers and vacationing with physician customers as kickbacks* ...................................................... 167

*9. Paying physician customers to participate in sham research as kickbacks* ................................................................................ 175

VI. ILLEGALLY ACCESSING CONFIDENTIAL PATIENT DATA TO SWITCH DEVICES, AND PROGRAMMING COMPETITOR DEVICES ................. 179

VII. BIOTRONIK HAS CAUSED AND IS CAUSING FALSE CLAIMS TO BE SUBMITTED FOR REIMBURSEMENT TO THE UNITED STATES AND THE STATES ........................................................................ 191

VIII. RETALIATION ................................................................ 192

*A. Retaliation Against Relator Jeffrey Bell* ....................... 193

*1. Death threats against Relator Jeffrey Bell* ..................... 196

*2. Requiring Relator Jeffrey Bell to Work More Hours and Days than other Sales Representatives* ................................................... 202

*3. Biotronik Retaliated Against Relator Jeffrey Bell for Telling Management that Training Payments to Physicians were Excessive, and that Payments to Medical Assistants were Illegal* .......................... 205

*4. Biotronik Retaliated Against Relator Jeffrey Bell by Refusing to Pay Contractually Obligated Sales Commissions* .......................... 209

*5. Biotronik Reneged on an Offer to Pay Relator Jeffrey Bell a Large, Ongoing Commission for Recruiting a Competing Sales Representative with a Large Group of Physician Customers* ................................. 213

*B. Retaliation Against Relator Andrew Schmid* ................. 215

IX. CONCLUSION ................................................................. 222

X. CAUSES OF ACTION ....................................................... 222

FIRST CAUSE OF ACTION ................................................... 222

SECOND CAUSE OF ACTION ................................................ 223

THIRD CAUSE OF ACTION ...................................................................224

FOURTH CAUSE OF ACTION ................................................................225

FIFTH CAUSE OF ACTION .....................................................................226

PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT ............227

SIXTH CAUSE OF ACTION .....................................................................229

SEVENTH CAUSE OF ACTION ...............................................................232

EIGHTH CAUSE OF ACTION ..................................................................235

NINTH CAUSE OF ACTION.....................................................................238

TENTH CAUSE OF ACTION ....................................................................242

ELEVENTH CAUSE OF ACTION .............................................................245

TWELFTH CAUSE OF ACTION................................................................249

THIRTEENTH CAUSE OF ACTION .........................................................253

FOURTEENTH CAUSE OF ACTION ........................................................256

FIFTEENTH CAUSE OF ACTION ............................................................259

SIXTEENTH CAUSE OF ACTION ............................................................262

SEVENTEENTH CAUSE OF ACTION ......................................................265

EIGHTEENTH CAUSE OF ACTION .........................................................268

NINETEENTH CAUSE OF ACTION .........................................................272

TWENTIETH CAUSE OF ACTION ...........................................................275

TWENTY-FIRST CAUSE OF ACTION ......................................................278

TWENTY-SECOND CAUSE OF ACTION ..................................................282

TWENTY-THIRD CAUSE OF ACTION .....................................................286

TWENTY-FOURTH CAUSE OF ACTION ..................................................290

TWENTY-FIFTH CAUSE OF ACTION ......................................................293

TWENTY-SIXTH CAUSE OF ACTION ......................................................297

TWENTY-SEVENTH CAUSE OF ACTION ................................................301

TWENTY-EIGHTH CAUSE OF ACTION ...................................................304

TWENTY-NINTH CAUSE OF ACTION .....................................................307

THIRTIETH CAUSE OF ACTION .............................................................311

THIRTY-FIRST CAUSE OF ACTION ...................................................................314

THIRTY-SECOND CAUSE OF ACTION .............................................................317

THIRTY-THIRD CAUSE OF ACTION .................................................................321

THIRTY-FOURTH CAUSE OF ACTION .............................................................324

THIRTY- FIFTH CAUSE OF ACTION .................................................................327

THIRTY-SIXTH CAUSE OF ACTION ..................................................................332

THIRTY-SEVENTH CAUSE OF ACTION ...........................................................335

THIRTY-EIGHTH CAUSE OF ACTION ..............................................................338

THIRTY-NINTH CAUSE OF ACTION .................................................................341

FORTIETH CAUSE OF ACTION ..........................................................................342

FORTY-FIRST CAUSE OF ACTION ....................................................................344

FORTY-SECOND CAUSE OF ACTION ...............................................................344

FORTY-THIRD CAUSE OF ACTION ...................................................................345

FORTY-FOURTH CAUSE OF ACTION ...............................................................346

FORTY-FIFTH CAUSE OF ACTION ....................................................................347

FORTY-SIXTH CAUSE OF ACTION ....................................................................348

FORTY-SEVENTH CAUSE OF ACTION .............................................................349

FORTY-EIGHTH CAUSE OF ACTION.................................................................352

XI.     DEMAND FOR JURY TRIAL ...................................................................354

## I. INTRODUCTION

1.      Relators JEFFREY BELL (previously identified as "John Doe No. 1" in the original Complaint in this matter) and ANDREW SCHMID (previously identified as "John Doe No. 2" in the original Complaint in this matter) are informed and believe, and thereon contend the following against Defendants Biotronik Inc.,

Biotronik SE & Co. KG, MS Holding II SE, Beyond Reps, LLC, Set Solution, Inc., MKM Healthcare Solutions, LLC, and Precision Medical, Inc.

2.      Biotronik caused false claims for payment to be submitted to government healthcare programs for implantable cardiac devices, and for medical equipment and care associated with the use of those devices. The claims for payment are false because the devices are not legally marketed devices but are illegally marketed due to off-label promotions, and payment of kickbacks. Such illegally marketed devices are precluded by law from serving as the basis of a legitimate claim for insurance or other payment.

3.      This action concerns false and fraudulent Medicare, Medicaid, other federal and state health care systems, and private insurance claims for reimbursement for the surgical implantation of Biotronik's medical devices (Subject Devices), which are illegally marketed under the federal Anti-Kickback Statute 42 U.S.C. § 1320a-7b, because they are marketed and sold in exchange for something of value.

4.      Starting in at least 2011, and continuing up until present time, Biotronik has defrauded Medicaid, Medicare, TriCare, and other public and private insurance payors by:

a) promoting and selling products that were not indicated for the patients in which they were implanted;

b) promoting and selling products with inflated safety claims whereas the devices were failing at a much faster rate than what Biotronik has been telling the public and their physician customers;

c) supplying kickbacks of expensive dinners, parties, sporting events, trips to strip clubs and monetary payments; and

d) changing or replacing products more frequently than necessary;

e) bundling expensive and unnecessary products with devices that were not used by physicians for patient care or any other purpose;

f) through nepotistic hiring of physicians' family members;

g) employing and managing sales representatives and other field representatives to obtain agreements from physicians to switch their patients to Biotronik devices;

h) Biotronik sales representatives investing in businesses with physician customers and vacationing with physician customers as an inducement for physicians to buy more Biotronik devices;

i) Biotronik paid physicians to participate in research studies without requiring that they keep up with their own research paperwork, making the payments an inducement to implant devices rather than a legitimate payment for real research; and

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 7

j)  broadly violate HIPAA regulations to effectuate the patient device switches through widespread violations of patient confidentiality including without limitation the following:

- Biotronik representatives taking lists of all of a given physician's patients from the hospitals and directing the physicians to effect device replacements;

- Biotronik representatives obtaining agreements from physician customers to allow Biotronik personnel to handle regularly-scheduled checks of all competitor devices, and then allowing physicians to fraudulently bill for "technical" services provided for free by Biotronik; and

- Biotronik representatives directly giving false data to their physician customers to effectuate early change-out replacements of competitor devices, and to effectuate the switch to a Biotronik device.

5.  On behalf of the United States of America, the States of Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, Washington, and the District of

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 8

Columbia (collectively, "the States"), Relator Jeffrey Bell, intend to file this a qui tam complaint against Defendants Biotronik Inc. and Beyond Reps, LLC, and alleges the following.

## II. PARTIES, JURISDICTION, AND VENUE

6.      Relator Jeffrey Bell began working as a contracted sales representative for Biotronik in 2015 and has sold and serviced pacemaking devices for various medical device companies since 2001. Relator Jeffrey Bell became a Biotronik employee on January 1, 2018. He works in Tucson, Arizona and is managed by Biotronik Regional Sales Director, Rich Rimmer, who works from Phoenix, Arizona, and covers other territories outside of Arizona including Colorado.

7.      Relator Andrew Schmid is a citizen of the United States. Relator Andrew Schmid worked in medical device sales and servicing for Biotronik starting in 2006 through March 13, 2019. He currently works for a different medical device manufacturer.

8.      While working for the Defendant Biotronik, Relators developed firsthand knowledge of the acts set forth in this Complaint concerning the activities of the Defendants named in this complaint. Relators' knowledge and information is independent of, and materially adds to publicly disclosed information regarding Biotronik's cardiac rhythm management device business. Relators are the original

1  source of all the allegations contained in this Complaint. There has been no public

2  disclosure of the allegations contained in this complaint prior to filing this case.

3      9.      Relators are citizens of the United States. Relators have inside knowledge

4  that is independent of and materially adds to publicly disclosed information regarding

5  Biotronik's business related to medical devices.

6      10.     The Relators became aware of the Defendants' false claim schemes

7  alleged herein due to Relators' positions as original sources. The Relators commenced

8  this *qui tam* action against the Defendants for the schemes at issue based upon

9  Relators' personal experiences and industry insider information. Relators, as insiders

10  with Biotronik, have access to pricing and reimbursement information such as

11  proprietary computer files revealing the kickback and off-label sales schemes, prices,

12  and volume of sales by Biotronik. Relators directly witnessed and observed

13  Biotronik's introduction of the medical devices into the stream of commerce. Relators

14  were aware that Medicare and Medicaid intended to reimburse Biotronik for medical

15  devices based on a belief that the devices were legitimately sold and that the devices

16  were not encumbered by illegal kickback and off-label promotion schemes at the

17  Government's expense.

18      11.     Defendant Biotronik, Inc. is an Oregon Corporation with a principal

19  place of business at 6024 Jean Road, Lake Oswego, Oregon 97035. Defendant

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 10

1   Biotronik SE & Co. KG is a German corporation with its principal place of business at

2   Woermannkehre 1, 12359 Berlin, Germany. On information and belief, Biotronik, Inc.

3   and Biotronik SE are sister companies owned by the same parent, MS Holding II SE,

4   a Germany company with its principal place of business at Wittenbergplatz 1, 10789,

5   Berlin, Germany (collectively, "Biotronik").

6       12.     Defendant Beyond Reps, LLC, is an Arizona Domestic L.L.C. The

7   company's principal address is 1776 N Scottsdale Rd #11669, Phoenix, AZ 85016.

8   The company has one principal on record. The principal is Andrew Nash from

9   Phoenix AZ. Andrew Nash is also a Biotronik independent sales representative.

10      13.     Defendant Set Solutions, Inc., is an Arizona corporation. The company's

11  principal address is 4222 North 62nd Place, Scottsdale, Scottsdale, AZ 85251. The

12  company has 1 principal on record. The principal is Andrew Nash from Scottsdale,

13  AZ. All references to Andrew Nash as a Biotronik independent sales representative in

14  this document also refer to Set Solutions, Inc.

15      14.     Defendant MKM Healthcare Solutions, LLC, is an Arizona corporation.

16  The company's principal address is 6360 N. Placita Arista, Tucson, AZ 85718. The

17  company has 1 principal on record. The principals are Michael McCormick and Kelly

18  McCormick from Tucson, AZ. All references to Michael McCormick as a Biotronik

19  independent sales representative in this document also refer to MKM Healthcare

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 11

1  Solutions, LLC.

2      15.     Defendant Precision Medical, Inc., is a California corporation. The

3  company's principal address is 6487 Havenwood Circle, Huntington Beach, CA

4  92648. The CEO is William A. Blair from Huntington Beach, CA. All references to

5  William ("Bill") Blair as a Biotronik independent sales representative in this

6  document also refer to Precision Medical, Inc.

7      16.     Throughout this Complaint, Biotronik, Inc. is referred to as "Defendant"

8  or "Biotronik."

9      17.     Biotronik is a global medical device company. Biotronik cardiac rhythm

10  management devices include pacemakers, implantable defibrillators and leads, as well

11  as external remote monitoring systems for patients with cardiac arrhythmias.

12      18.     Defendants do business in the Central District of California and Biotronik

13  maintains offices in the Central District of California. Defendants also caused false

14  claims to be made or certified in the Central District of California.

15      19.     At all times relevant to this Complaint, Biotronik manufactured,

16  marketed, sold, licensed to be sold, and caused Subject Devices to be implanted into

17  thousands of patients, through a network of sales representatives who called on

18  doctors, hospitals and other health care providers throughout the United States, and

19  who were present in the operating rooms of a large percentage of the hospitals in the

20

United States, every day, and were physically present at virtually every surgical procedure relating to Biotronik's cardiac rhythm management products.

20.     Relators also bring this action on behalf of the States of Arkansas, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington, or any applicable subdivision thereof (hereinafter, collectively referred to as the "States") under the Federal False Claims Act, 31 U.S.C. §§ 3729-3732; as well as the False Claims Acts of the above listed States.

21.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. §§ 3729 and 3732, which provide that the United States District Courts shall have exclusive jurisdiction of actions brought under the False Claims Act, and FCA multi-defendant jurisdiction pursuant to 31 U.S.C. §3732(a). Pendent and supplemental jurisdiction over the claims pursuant to the State FCA's are conferred by 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b). Venue and jurisdiction are proper in the United States District Court, for the Central District of California pursuant to 28 U.S.C. § 1391(c) and 31 U.S.C. § 3732 (a).

22.     Pursuant to the requirements of the False Claims Act 31 U.S.C. § 3729 et

seq., and similar state and city statutes, the Relators have provided the government with a confidential disclosure statement and exhibits to substantiate the allegations.

## III. NATURE OF ACTION

23.     This is a qui tam action under 31 U.S.C. Sec. 3729, et seq. of the False Claims Act ("FCA") filed by the Relators in the name of the United States Government and themselves, to recover penalties and damages arising from Defendants' violations of federal requirements concerning contracts with agencies of the United States, specifically the Medicare, Medicaid and TriCare healthcare programs.  This is also a qui tam action under various state and local False Claims Acts, brought by the Relators on behalf of the States to recover damages and penalties arising from Defendants' violations of State laws.

24.     Biotronik has engaged in a scheme of creating and causing illegal false claims to be submitted to Medicaid, Medicare, TriCare, and other healthcare programs by promoting and selling products that were not indicated for the patients they were implanted in; by changing products more frequently than necessary; and by bundling expensive products that doctors were not using.

25.     Biotronik has also engaged in a scheme of illegal kickbacks that included Biotronik paying to induce or reward a person for purchasing, ordering, arranging for,

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 14

1  or recommending the purchase of unapproved devices. Biotronik has engaged in a

2  scheme of illegal kickbacks related to golf outings, baseball games, expensive

3  restaurants, payments for spouses, monetary payments, nepotistic hiring, and other

4  illegal kickbacks. This scheme of illegal kickbacks has therefore resulted in

5  defrauding government healthcare programs, diverting these government funds to

6  Biotronik and its loyal customers.

7      26.    Biotronik sales representatives and field representatives were also

8  instructed to violate HIPAA regulations by taking over the quarterly and semi-annual

9  scheduled checks of devices for physician customers, even for patients who had

10  competitors' devices. Biotronik representatives access the medical records of this

11  broad group of pacemaker and defibrillator device patients and access the scheduling

12  boards of doctors' offices to find out which patients are scheduled for which

13  procedures, and in some cases even have computerized log-ins to physician

14  customers' patient medical record software which they use to look for potential

15  patients to implant with Biotronik devices.

16      27.    Biotronik sales representatives use this inappropriate patient access in

17  conjunction with kickbacks to convince physician customers to switch some or all of

18  their patients to Biotronik devices from those of competitors. Sales representatives

19  accessed patient data for patients with pacemaker and defibrillator devices from other

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 15

companies, such as Medtronic, Boston Scientific, St. Jude Medical, and The Sorin Group in order to pass false information to insurance payors and have the Medicaid or Medicare payment for the device implant approved.

28.   Biotronik sales representatives use this inappropriate patient access in conjunction with kickbacks to induce physician customers to switch some or all of their patients to Biotronik devices. Sales representatives accessed patient data for patients with pacemaker and defibrillator devices from other companies, such as Medtronic, Boston Scientific, St. Jude Medical, and The Sorin Group in order to pass false information to insurance payors and have the Medicaid or Medicare payment for the device implant approved.

29.   Sales representatives brought catered lunches and paid for expensive meals, parties, sporting events, paid money and gave other perks to physicians and their staffs in order to get access to all their patient data to effectuate switching those physician's patients to Biotronik devices. Ultimately, Biotronik's scheme went as far as having some sales representatives illegally change the parameters on some medical devices to run down the battery and get them changed out to a Biotronik device more quickly than if the sales representatives had not changed device parameters. Biotronik sales representatives also pushed for physician customers to allow Biotronik personnel to handle regularly-scheduled checks of all patients with competitor pacemaker

1  implants, which physicians then bill as if they had done the technical services

2  themselves.

3      30.      These acts constitute violations of the federal False Claims Act, 31

4  U.S.C. § 3729, et. seq., and numerous equivalent state and municipal statutes as set

5  forth below. The FCA provides that any person who knowingly presents and/or causes

6  to be presented to the United States a false or fraudulent claim for payment is liable

7  for a civil penalty of up to $21,916.00 for each claim, plus three times the amount of

8  the damages sustained by the Government. The FCA allows any person discovering a

9  fraud perpetrated against the Government to bring an action for himself and for the

10  Government and to share in any recovery. When Relators complained and reported

11  these practices and other illegal and fraudulent practices to Defendant Biotronik,

12  Biotronik retaliated against Relators.

13      31.      Relators seek to recover damages and civil penalties in the name of the

14  United States and the States for the violations alleged herein. On information and

15  belief, as set forth below, the damages and civil penalties that may be assessed against

16  Defendants under the facts alleged in this Complaint amount to at least hundreds of

17  millions of dollars.

18      32.      Relators also allege violations by Defendants of the California Insurance

19  Frauds Prevention Act ("CIFPA"), Cal. Ins. Code § 1871, et seq.; and the Illinois

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 17

Insurance Claims Fraud Prevention Act ("ILCFPA"), 740 Ill. Comp. Stat. § 92/1, et seq. Both California and Illinois have qui tam statutes that permit a relator to raise allegations of fraud by individuals or entities against private insurance companies. The statutes operate similarly to the federal and state FCAs and are written to prevent fraud occurring in the private health care insurance market.

33.     Upon information and belief, Biotronik receives significant revenues from private insurers in California and Illinois. Upon information and belief, Biotronik is paid by private insurers that cover California- and Illinois-based patients who have been referred for treatment as a result of Biotronik's scheme.

IV. OFF-LABEL MARKETING SCHEMES AND MISLEADING SAFETY DATA

34.     New medical products may not be marketed in the United States until the sponsor of the product has proven to the Food and Drug Administration (FDA) that the product is safe and effective for specific indications.  The indications approved by the FDA are set forth in the product's labeling, the content of which is also approved by the FDA. Although it is not unlawful for physicians to use products for indications different than those set forth in a product's labeling, the Food Drug and Cosmetic Act prohibits healthcare companies from marketing or promoting approved products for uses other than those set forth in the product's approved labeling. This regulatory

structure protects patients and consumers by ensuring that medical companies do not promote products for uses other than those found to be safe and effective by an independent, scientific governmental body.

35.     Off-label use of a medical product refers to the prescription or use of a product in a manner not approved by the FDA. Since Congress passed the Food and Drug Administration Modernization Act ("FDAMA") in November 1997, manufacturers may provide off-label studies to the medical community only if certain conditions are met.  Moreover, federal law prohibits manufacturers from promoting off-label uses through physician studies when the investigating physician is not truly independent or impartial, as well as when the physician is in fact an agent of the manufacturer based upon significant financial relationships. See 21 U.S.C. §§ 360aaa *et seq.*

36.     Whether a product is FDA-approved for a particular use will largely determine whether payment for that device will be reimbursed under the federal and state Medicaid and Medicare programs. Thus, the off-label use of such products is not eligible for reimbursement under the federal and state Medicaid and Medicare programs. Likewise, many state health care agencies intend not to reimburse for products for off-label purposes because the agencies do not authorize payment for implantation and purchase of products not recognized as medically necessary in

sources specified by federal law. Biotronik MRI-compatible pacemaker devices and loop recorders were not eligible for reimbursement from federal or state Medicaid or Medicare programs when promoted by Defendants for non-FDA indicated use.

### 1. *Improper sale of loop recorder devices.*

37.     Implantable loop recorders are electrocardiographic monitoring devices that are implanted under the skin of a patient for diagnosis in patients with recurrent unexplained episodes of palpitations or syncope, for long-term monitoring in patients at risk for or with documented atrial fibrillation, and for risk stratification in patients who have sustained a myocardial infarction and those who have certain genetic disorders. The Biotronik version of the loop recorder is called the "BioMonitor 2-AF", and is an expensive device, selling for an average of about $4,200 when implanted.

38.     In a conversation with Biotronik field clinical specialist Joe DeBoe on June 6, 2017, Relator Jeffrey Bell was told that Biotronik sales representative Michael McCormick "gets all these loops to his credit. [Dr. Alexandre] Benjo", who implants loop recorders on patients with "stroke" and "cva history [cerebrovascular accident, or stroke]". DeBoe stated that Dr. Benjo was putting loop recorders in patients who did not need them "illegally": "He's putting in loop recorders left and right on everybody. Without approval". DeBoe blames the overuse of loop recorders on McCormick: "McCormick is in his office pushing him every moment, two times a week. I need you

1   Alex I need you Alex I need you Alex. So Benjo puts in loops left and right", "[Dr.]

2   Benjo is putting those in everybody. We have 3 to 5 a week with him. Three to five a

3   week" (Exhibit 1).

4        39.     In this June 6, 2017 conversation, Joe DeBoe also stated that Biotronik

5   field clinical specialist Robin Singh pushes Dr. Alexandre Benjo to implant loop

6   recorders on his patients. "So, here's what's going on. They both are. Here's what's

7   happening…. Robin goes and cherry picks the Home Monitoring, any loop recorder

8   that has, even if it's under sensing he has no idea, he'll say, calls Benjo and says this

9   'patient needs a pacemaker', then Benjo believes him and says, 'bring him in'.

10  Happens all the time" (Exhibit 1).

11       40.     In a conversation with Biotronik field clinical specialist Joe DeBoe on

12  June 6, 2017, Relator Jeffrey Bell was told that everyone is getting a loop recorder in

13  one doctor's office, and that "everybody needs a pacemaker". Relator Jeffrey Bell

14  understood this to mean that Biotronik and that doctor are boosting their Medicare

15  claims (Exhibit 1).

16       41.     Due to its high cost and limited indications, the BioMonitor 2-AF should

17  only be implanted when it can truly be useful as a diagnostic tool. But Biotronik

18  routinely promoted and sold the device as an expensive add-on prior to the sale of one

19  of their pacemaking devices in patients who were not indicated for one. For example,

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 21

just one physician, Dr. Alexandre Benjo in Tucson, AZ, implanted 128 of the devices

in a 14-month period from 2016 to 2017 (Exhibit 2):

| Date | Biotronik Device Name | Invoice Amount |
|---|---|---|
| 08/02/2017 | BioMonitor 2-AF | $4,200 |
| 07/05/2017 | BioMonitor 2-AF | $4,200 |
| 06/30/2017 | BioMonitor 2-AF | $4,200 |
| 06/29/2017 | BioMonitor 2-AF | $4,200 |
| 06/26/2017 | BioMonitor 2-AF | $4,200 |
| 06/23/2017 | BioMonitor 2-AF | $4,250 |
| 06/20/2017 | BioMonitor 2-AF | $4,200 |
| 06/20/2017 | BioMonitor 2-AF | $4,200 |
| 06/18/2017 | BioMonitor 2-AF | $4,250 |
| 06/14/2017 | BioMonitor 2-AF | $4,200 |
| 06/07/2017 | BioMonitor 2-AF | $4,250 |
| 06/06/2017 | BioMonitor 2-AF | $4,200 |
| 06/01/2017 | BioMonitor 2-AF | $4,200 |
| 05/30/2017 | BioMonitor 2-AF | $4,200 |
| 05/26/2017 | BioMonitor 2-AF | Bulk Purchase |
| 05/24/2017 | BioMonitor 2-AF | $4,200 |
| 05/24/2017 | BioMonitor 2-AF | $4,200 |
| 05/20/2017 | BioMonitor 2-AF | $4,200 |
| 05/17/2017 | BioMonitor 2-AF | $4,200 |
| 05/03/2017 | BioMonitor 2-AF | $4,200 |
| 04/26/2017 | BioMonitor 2-AF | $4,200 |
| 04/26/2017 | BioMonitor 2-AF | $4,200 |
| 04/26/2017 | BioMonitor 2-AF | $4,200 |
| 04/26/2017 | BioMonitor 2-AF | $4,200 |
| 04/25/2017 | BioMonitor 2-AF | $4,250 |
| 04/17/2017 | BioMonitor 2-AF | $4,200 |
| 04/13/2017 | BioMonitor 2-AF | Bulk Purchase |
| 04/11/2017 | BioMonitor 2-AF | $4,200 |
| 04/07/2017 | BioMonitor 2-AF | Bulk Purchase |
| 04/05/2017 | BioMonitor 2-AF | $4,200 |
| 04/04/2017 | BioMonitor 2-AF | Bulk Purchase |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 22

| Date | Biotronik Device Name | Invoice Amount |
|---|---|---|
| 03/30/2017 | BioMonitor 2-AF | $4,200 |
| 03/29/2017 | BioMonitor 2-AF | $4,250 |
| 03/27/2017 | BioMonitor 2-AF | $4,200 |
| 03/25/2017 | BioMonitor 2-AF | $4,200 |
| 03/23/2017 | BioMonitor 2-AF | $4,200 |
| 03/17/2017 | BioMonitor 2-AF | Bulk Purchase |
| 03/15/2017 | BioMonitor 2-AF | $4,200 |
| 03/15/2017 | BioMonitor 2-AF | $4,200 |
| 03/14/2017 | BioMonitor 2-AF | $4,250 |
| 03/10/2017 | BioMonitor 2-AF | Bulk Purchase |
| 03/09/2017 | BioMonitor 2-AF | $4,250 |
| 03/09/2017 | BioMonitor 2-AF | Bulk Purchase |
| 03/08/2017 | BioMonitor 2-AF | $4,200 |
| 03/08/2017 | BioMonitor 2-AF | $4,200 |
| 03/07/2017 | BioMonitor 2-AF | $4,250 |
| 03/03/2017 | BioMonitor 2-AF | Bulk Purchase |
| 03/03/2017 | BioMonitor 2-AF | $4,200 |
| 02/28/2017 | BioMonitor 2-AF | $4,200 |
| 02/25/2017 | BioMonitor 2-AF | $4,200 |
| 02/24/2017 | BioMonitor 2-AF | $4,200 |
| 02/23/2017 | BioMonitor 2-AF | Bulk Purchase |
| 02/23/2017 | BioMonitor 2-AF | $4,200 |
| 02/22/2017 | BioMonitor 2-AF | $4,200 |
| 02/15/2017 | BioMonitor 2-AF | $4,250 |
| 02/14/2017 | BioMonitor 2-AF | $4,200 |
| 02/14/2017 | BioMonitor 2-AF | $4,200 |
| 02/08/2017 | BioMonitor 2-AF | $4,250 |
| 02/08/2017 | BioMonitor 2-AF | $4,250 |
| 02/02/2017 | BioMonitor 2-AF | $4,200 |
| 02/02/2017 | BioMonitor 2-AF | $4,200 |
| 01/30/2017 | BioMonitor 2-AF | $4,200 |
| 01/24/2017 | BioMonitor 2-AF | $4,200 |
| 01/20/2017 | BioMonitor 2-AF | $4,200 |
| 01/19/2017 | BioMonitor 2-AF | $4,200 |

| Date | Biotronik Device Name | Invoice Amount |
|---|---|---|
| 01/17/2017 | BioMonitor 2-AF | $4,250 |
| 01/15/2017 | BioMonitor 2-AF | $4,250 |
| 01/11/2017 | BioMonitor 2-AF | $4,250 |
| 01/02/2017 | BioMonitor 2-AF | $4,200 |
| 12/27/2016 | BioMonitor 2-AF | $4,200 |
| 12/24/2016 | BioMonitor 2-AF | $4,200 |
| 12/20/2016 | BioMonitor 2-AF | Bulk Purchase |
| 12/14/2016 | BioMonitor 2-AF | $4,200 |
| 12/13/2016 | BioMonitor 2-AF | $4,250 |
| 12/12/2016 | BioMonitor 2-AF | $4,200 |
| 12/11/2016 | BioMonitor 2-AF | $4,200 |
| 12/02/2016 | BioMonitor 2-AF | $4,200 |
| 11/30/2016 | BioMonitor 2-AF | $4,250 |
| 11/30/2016 | BioMonitor 2-AF | $4,250 |
| 11/29/2016 | BioMonitor 2-AF | $4,250 |
| 11/29/2016 | BioMonitor 2-AF | $4,250 |
| 11/29/2016 | BioMonitor 2-AF | $4,250 |
| 11/23/2016 | BioMonitor 2-AF | $4,200 |
| 11/23/2016 | BioMonitor 2-AF | $4,200 |
| 11/23/2016 | BioMonitor 2-AF | $4,200 |
| 11/22/2016 | BioMonitor 2-AF | Bulk Purchase |
| 11/22/2016 | BioMonitor 2-AF | $4,200 |
| 11/17/2016 | BioMonitor 2-AF | $4,200 |
| 11/17/2016 | BioMonitor 2-AF | $4,200 |
| 11/15/2016 | BioMonitor 2-AF | $4,200 |
| 11/15/2016 | BioMonitor 2-AF | $4,200 |
| 11/08/2016 | BioMonitor 2-AF | $4,250 |
| 11/08/2016 | BioMonitor 2-AF | $4,250 |
| 11/01/2016 | BioMonitor 2-AF | $4,250 |
| 10/27/2016 | BioMonitor 2-AF | $4,200 |
| 10/27/2016 | BioMonitor 2-AF | $4,250 |
| 10/26/2016 | BioMonitor 2-AF | $4,200 |
| 10/19/2016 | BioMonitor 2-AF | $4,200 |
| 10/18/2016 | BioMonitor 2-AF | $4,250 |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 24

| Date | Biotronik Device Name | Invoice Amount |
|------|-----------------------|----------------|
| 10/18/2016 | BioMonitor 2-AF | $4,250 |
| 10/07/2016 | BioMonitor 2-AF | $4,200 |
| 09/30/2016 | BioMonitor 2-AF | $4,200 |
| 09/27/2016 | BioMonitor 2-AF | $4,250 |
| 09/27/2016 | BioMonitor 2-AF | $4,250 |
| 09/27/2016 | BioMonitor 2-AF | $4,250 |
| 09/23/2016 | BioMonitor 2-AF | $4,200 |
| 09/22/2016 | BioMonitor 2-AF | $4,200 |
| 09/16/2016 | BioMonitor 2-AF | $4,250 |
| 09/13/2016 | BioMonitor 2-AF | $4,250 |
| 09/13/2016 | BioMonitor 2-AF | $4,250 |
| 09/12/2016 | BioMonitor 2-AF | $4,200 |
| 09/06/2016 | BioMonitor 2-AF | $4,250 |
| 09/06/2016 | BioMonitor 2-AF | $4,250 |
| 08/24/2016 | BioMonitor 2-AF | $4,200 |
| 08/23/2016 | BioMonitor 2-AF | $4,250 |
| 08/09/2016 | BioMonitor 2-AF | Bulk Purchase |
| 08/02/2016 | BioMonitor 2-AF | $4,250 |
| 08/02/2016 | BioMonitor 2-AF | $4,250 |
| 07/26/2016 | BioMonitor 2-AF | $4,200 |
| 07/15/2016 | BioMonitor 2-AF | $4,200 |
| 07/12/2016 | BioMonitor 2-AF | $4,250 |
| 07/12/2016 | BioMonitor 2-AF | $4,250 |
| 07/10/2016 | BioMonitor 2-AF | $4,200 |
| 07/05/2016 | BioMonitor 2-AF | $4,250 |
| 06/28/2016 | BioMonitor 2-AF | Bulk Purchase |
| 06/28/2016 | BioMonitor 2-AF | Bulk Purchase |
| 06/21/2016 | BioMonitor 2-AF | Bulk Purchase |
| 06/10/2016 | BioMonitor 2-AF | Bulk Purchase |

42.     In contrast, Relator Jeffrey Bell works with three physicians who follow

the proper indications for loop recorders and refuse to go along with the inappropriate

off-label loop recorder promotions by Biotronik. Those three physicians only implanted 6 total BioMonitor 2-AF loop recorders between them over an 11-month period from October 2016, through September 2017 (See Exhibit 3).  Biotronik is pushing physicians to purchase unnecessary and expensive loop recorders, and some physicians are going along with the scheme.

43.     Relator Andrew Schmid has also seen a huge push to sell more loop recorders in Southern California, as loop recorders can often be used to record heart rhythm data in such a way as to justify the implant of a pacemaking device. Dr. Robert Orr of San Diego County is giving a talk in March 2018, and then proctoring a "pig lab" where he teaches other doctors how to implant loop recorders.  An internal Biotronik email about this program from a San Diego sales representative said they see an 85% "conversion rate of ILRs [loop recorders] to pacemakers/ICDs", meaning that Biotronik was able to implant loop recorders in a large number of people who went on to get a much more expensive pacemaking device implant.  More Biotronik physician customers are being nominated as paid speakers about loop recorders.  One of Biotronik independent sales representative Bill Blair's doctor friends, Dr. Steve Appleby, was nominated to give Biotronik-paid speaking presentations on loop recorders (Exhibit 4).

2. *Improper sale of MRI-conditional pacemaker and defibrillator devices.*

44.    Magnetic Resonance Imaging ("MRI")-conditional pacemaker and defibrillator devices are implanted so that patients with these devices can undergo full-body MRI scans. However, in order to be actually compatible with undergoing an MRI scan, the MRI- conditional pacemaker and defibrillator devices must be used in conjunction with MRI-conditional cardiac lead wires. Otherwise, patients run the risk of their non-MRI-conditional cardiac lead wires overheating and damaging their heart while under an MRI scan, or of the pacemaker or defibrillator or lead wire becoming damaged and failing.

45.    The Biotronik versions of the MRI-conditional devices are branded with product names Edora, Eluna, Entovis, Iforia, Ilivia, Intica, Inventra, Iperia, and Itrevia, and they are very expensive devices, selling for as much as $29,600 when combined with their required accessories. Patients who had non-MRI-conditional heart lead wires already implanted, or who were undergoing a new device implant with non-MRI-conditional heart lead wires, are unable to benefit from the MRI-compatibility of their new, expensive devices, and may even be at risk of harm in the event that they may undergo full-body MRI in the future on the basis of having an MRI-conditional device implanted.

46.    Biotronik runs a website called "promricheck.com", where Biotronik

sales representatives and physicians can type in the serial numbers of the implanted device and heart lead wires to ensure they are MRI "conditional in the country/region where the MRI scan will be performed". However, despite the stated goal of the website to "give your patients safe access to MRI scans", Biotronik routinely promotes its expensive MRI-conditional pacemaking devices to be implanted in patients with MRI-incompatible heart lead wires, and even in patients with abandoned lead wires (Exhibit 5).

47.     Due to their high cost and limited indications, Biotronik MRI-conditional devices should only be implanted when they can used for the purpose for which they are intended—i.e., to be implanted in a patient who can undergo a full-body MRI. But Biotronik routinely promoted and sold MRI-conditional devices as an expensive up-charge even for patients who had non-MRI-conditional heart leads already implanted prior to the sale of the device, or who were undergoing an implant procedure with non-MRI-conditional heart lead wires. Biotronik made much more money on MRI-conditional devices, and Biotronik sales reps made much larger commissions for selling them.

48.     For example, on July 7, 2014, a Biotronik ProMRI device was implanted with an MRI-incompatible heart lead wire at a cost of $5,160 (Exhibit 6).

49.     For example, on November 25, 2014, a Biotronik ProMRI device was

implanted with an MRI-incompatible, older Biotronik Selox heart lead wire at a cost

of $5,160 (Exhibit 6).

50.     For example, on February 14, 2015, a Biotronik ProMRI device was

implanted with MRI-incompatible Guidant Corporation heart lead wires at a cost of

$5,800 (Exhibit 6).

51.     For example, on March 18, 2015, a Biotronik ProMRI device was

implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of

$23,643 (Exhibit 6).

52.     For example, on May 14, 2015, a Biotronik ProMRI device was

implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of

$5,300 (Exhibit 6).

53.     For example, on May 14, 2015, a Biotronik ProMRI device was

implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of

$5,300 (Exhibit 6).

54.     For example, on May 17, 2015, a Biotronik ProMRI device was

implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of

$5,300 (Exhibit 6).

55.     For example, on May 28, 2015, a Biotronik ProMRI device was

implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of

$5,100 (Exhibit 6).

56.     For example, on May 28, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible Medtronic heart lead wire at a cost of $5,300 (Exhibit 6).

57.     For example, on May 28, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible Boston Scientific Corporation heart lead wire at a cost of $5,300 (Exhibit 6).

58.     For example, on June 11, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $5,300 (Exhibit 6).

59.     For example, on June 12, 2015, a Biotronik ProMRI device was implanted with MRI-incompatible Guidant Corporation heart lead wires at a cost of $5,300 (Exhibit 6).

60.     For example, on June 12, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible Intermedics heart lead wire at a cost of $5,100 (Exhibit 6).

61.     For example, on June 17, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $4,717 (Exhibit 6).

62.     For example, on June 17, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $4,539 (Exhibit 6).

63.     For example, on June 29, 2015, a Biotronik ProMRI device was implanted with MRI-incompatible St. Jude Corporation and Guidant Corporation heart lead wires at a cost of $4,717 (Exhibit 6).

64.     For example, on August 11, 2015, a Biotronik ProMRI device was implanted with MRI-incompatible, older Biotronik Setrox heart lead wires at a cost of $6,000 (Exhibit 6).

65.     For example, on August 28, 2015, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with MRI-incompatible from ELA Medical heart lead wires at a cost of $3,865. The MRI device was $350 more than an appropriate non-MRI device (Exhibit 6).

66.     For example, on August 25, 2015, a Biotronik ProMRI device was implanted with MRI-incompatible, older Biotronik Setrox heart lead wires at a cost of $6,000 (Exhibit 6).

67.     For example, on October 23, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $3,587 (Exhibit 6).

68.     For example, on October 26, 2015, a Biotronik ProMRI device was implanted with an MRI-incompatible Medtronic heart lead wire at a cost of $3,880 (Exhibit 6).

69.     For example, on December 4, 2015, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik MyoPore heart lead wire at a cost of $5,095 (Exhibit 6).

70.     For example, on January 11, 2016, a Biotronik ProMRI device was implanted with MRI-incompatible Guidant Corporation heart lead wires at a cost of $3,500 (Exhibit 6).

71.     For example, on January 28, 2016 a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $11,000 (Exhibit 6).

72.     For example, on February 2, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $3,880 (Exhibit 6).

73.     For example, on February 11, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Medtronic heart lead wire at a cost of $3,000 (Exhibit 6).

74.     For example, on February 15, 2016, a Biotronik ProMRI device was

implanted with an MRI-incompatible, older Biotronik Linox heart lead wire at a cost of $10,500 (Exhibit 6).

75.    For example, on March 23, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible heart lead wire at a cost of $3,995 (Exhibit 6).

76.    For example, on March 30, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $16,843 (Exhibit 6).

77.    For example, on April 13, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $29,235 (Exhibit 6).

78.    For example, on April 25, 2016, a Biotronik ProMRI device was implanted with MRI-incompatible Guidant Corporation heart lead wires at a cost of $3,500 (Exhibit 6).

79.    For example, on April 29, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $3,000 (Exhibit 6).

80.    For example, on May 4, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Boston Scientific Corporation heart lead wire at a cost of $3,500 (Exhibit 6).

81.     For example, on May 6, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $3,000 (Exhibit 6).

82.     For example, on May 26, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wires at a cost of $4,789 (Exhibit 6).

83.     For example, on June 9, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Medtronic heart lead wire at a cost of $14,300 (Exhibit 6).

84.     For example, on June 15, 2016, a Biotronik ProMRI device was implanted with MRI-incompatible Guidant Corporation heart lead wires at a cost of $3,000 (Exhibit 6).

85.     For example, on June 16, 2016, a Biotronik Iperia 7 HF-T DF1 ProMRI device was implanted in a patient with an MRI-incompatible Boston Scientific heart lead wire at a cost of $17,500 (Exhibit 6).

86.     For example, on June 27, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wires at a cost of $3,500 (Exhibit 6).

87.     For example, on June 28, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Greatbach heart lead wires at a cost of $4,350

(Exhibit 6).

88.     For example, on July 18, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Boston Scientific Corporation heart lead wire at a cost of $3,500 (Exhibit 6).

89.     For example, on July 18, 2016, a Biotronik ProMRI device was implanted with MRI-incompatible Guidant Corporation heart lead wires at a cost of $3,500 (Exhibit 6).

90.     For example, on August 10, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient who had St. Jude Medical heart lead wires that were not MRI-compatible (Exhibit 6).

91.     For example, on August 30, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with MRI-incompatible Medtronic heart lead wires at a cost of $5,335. The MRI device was $1,635 more than an appropriate non-MRI device (Exhibit 6).

92.     For example, on September 6, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $6,200. The MRI device was $900 more than an appropriate non-MRI device (Exhibit 6).

93.    For example, on September 7, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $6,200. The MRI device was $900 more than an appropriate non-MRI device (Exhibit 6).

94.    For example, on September 9, 2016, a Biotronik ProMRI device was implanted with MRI-incompatible, older Biotronik Setrox heart lead wires at a cost of $5,400 (Exhibit 6).

95.    For example, on September 20, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $ 4,700 (Exhibit 6).

96.    For example, on October 5, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible St. Jude Medical heart lead wire at a cost of $5,335 (Exhibit 6).

97.    For example, on October 5, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with MRI-incompatible St. Jude heart lead wires at a cost of $ 7,089 (Exhibit 6).

98.    For example, on October 8, 2016, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Medtronic heart lead wire

at a cost of $5,141. The MRI device was $2,217 more than an appropriate non-MRI device (Exhibit 6).

99.     For example, on October 11, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with MRI-incompatible St. Jude Medical heart lead wires at a cost of $5,335 (Exhibit 6).

100.     For example, on October 13, 2016, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $6,000 (Exhibit 6).

101.     For example, on October 13, 2016, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $5,550. The MRI device was $1,400 more than an appropriate non-MRI device (Exhibit 6).

102.     For example, on October 18, 2016, a Biotronik Iperia 7 HF-T DF1 ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox Biotronik heart lead wire at a cost of $17,455 (Exhibit 6).

103.     For example, on October 19, 2016, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $3,900. The MRI device was $800 more than an appropriate non-MRI device (Exhibit 6).

104.    For example, on October 25, 2016, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Medtronic heart lead wire at a cost of $24,550. The MRI device was $1,500 more than an appropriate non-MRI device (Exhibit 6).

105.    For example, on November 11, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik MyoPore heart lead wire at a cost of $24,108 (Exhibit 6).

106.    For example, on November 19, 2016, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $18,277 (Exhibit 6).

107.    For example, on December 16, 2016, a Biotronik Iperia 7 DR-T DF4 ProMRI device was implanted in a patient with a non-MRI-compatible Biotronik Protego heart lead wire at a cost of $25,900. The MRI device was $1,500 more than an appropriate non-MRI device (Exhibit 6).

108.    For example, on December 16, 2016, a Biotronik Iperia 7 DR-T DF4 ProMRI device was implanted in a patient with a non-MRI-compatible Biotronik heart lead wire at a cost of $13,800 (Exhibit 6).

109.    For example, on January 3, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of

$22,881 (Exhibit 6).

110.   For example, on January 13, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $22,816 (Exhibit 6).

111.   For example, on January 17, 2017, a Biotronik Iperia 7 DR-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $23,150. The MRI device was $3,650 more than an appropriate non-MRI device (Exhibit 6).

112.   For example, on January 18, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient who had ELA Medical heart lead wires that was not MRI-compatible at a cost of $2,900 (Exhibit 6).

113.   For example, on January 31, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible heart lead wire at a cost of $4,300 by Dr. Prash Jayaraj of Los Angeles, California (Exhibit 6).

114.   For example, on February 14, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible St. Jude Medical heart lead wire at a cost of $22,701 (Exhibit 6).

115.   For example, on February 20, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of

$22,630 (Exhibit 6).

116.     For example, on February 23, 2017, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $2,700. The MRI device was $370 more than an appropriate non-MRI device (Exhibit 6).

117.     For example, on March 3, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with MRI-incompatible St. Jude Medical heart lead wires at a cost of $20,500. The MRI device was $1,500 more than an appropriate non-MRI device (Exhibit 6).

118.     For example, on March 7, 2017, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $5,550. The MRI device was $1,400 more than an appropriate non-MRI device (Exhibit 6).

119.     For example, on March 7, 2017, a Biotronik Iperia 7 DR-T DF-1 ProMRI device was implanted in a patient with MRI-incompatible Boston Scientific heart lead wires at a cost of $17,986. The MRI device was $3,800 more than an appropriate non-MRI device (Exhibit 6).

120.     For example, on March 13, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with MRI-incompatible heart lead wires from St. Jude

Medical at a cost of $18,000. The MRI device was $1,500 more than an appropriate non-MRI device (Exhibit 6).

121.    For example, on March 14, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Medtronic heart lead wire at a cost of $21,900. The MRI device was $1,500 more than an appropriate non-MRI device (Exhibit 6).

122.    For example, on March 24, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $20,500. The MRI device was $1,500 more than an appropriate non-MRI device. The MRI device was $1,500 more than an appropriate non-MRI device (Exhibit 6).

123.    For example, on March 30, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $24,484 (Exhibit 6).

124.    For example, on April 3, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $17,950 (Exhibit 6).

125.    For example, on April 5, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of

$17,950 (Exhibit 6).

126.    For example, on April 14, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $24,484 (Exhibit 6).

127.    For example, on April 17, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible heart lead wire from Oscor Medical at a cost of $3,900. The MRI device was $800 more than an appropriate non-MRI device (Exhibit 6).

128.    For example, on April 28, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Setrox heart lead wire at a cost of $5,750 (Exhibit 6).

129.    For example, on April 30, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $6,200. The MRI device was $900 more than an appropriate non-MRI device (Exhibit 6).

130.    For example, on May 2, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $21,826 (Exhibit 6).

131.     For example, on May 4, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Biotronik MyoPore heart lead wire at a cost of $24,550. The MRI device was $1,500 more than an appropriate non-MRI device (Exhibit 6).

132.     For example, on May 5, 2017, a Biotronik ProMRI device was implanted with MRI-incompatible St. Jude Corporation and Medtronic heart lead wires (Exhibit 6).

133.     For example, on May 6, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $23,478 (Exhibit 6).

134.     For example, on May 8, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $17,950 (Exhibit 6).

135.     For example, on May 9, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $17,330 (Exhibit 6).

136.     For example, on May 15, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Medtronic heart lead wire at a cost of $3,880 (Exhibit 6).

137.     For example, on May 18, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $20,787 (Exhibit 6).

138.     For example, on May 19, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Linox heart lead wire at a cost of $11,000 (Exhibit 6).

139.     For example, on May 19, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $5,262 (Exhibit 6).

140.     For example, on May 30, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible St. Jude Corporation heart lead wire at a cost of $24,061 (Exhibit 6).

141.     For example, on June 2, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $19,200 (Exhibit 6).

142.     For example, on June 7, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $10,300 (Exhibit 6).

143.     For example, on June 7, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with MRI-incompatible Boston Scientific heart lead wires at a cost of $5,335. The MRI device was $2,005 more than an appropriate non-MRI device (Exhibit 6).

144.     For example, on June 8, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $24,484 (Exhibit 6).

145.     For example, on June 10, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Biotronik MyoPore heart lead wire at a cost of $26,650 (Exhibit 6).

146.     For example, on June 16, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $18,900 (Exhibit 6).

147.     For example, on June 16, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $18,136 (Exhibit 6).

148.     For example, on June 19, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Linox heart lead wire at a cost of $15,000 (Exhibit 6).

149. For example, on June 26, 2017, a Biotronik Iperia 7 DR-T DF-1 ProMRI device was implanted in a patient with MRI-incompatible Biotronik Linox and Setrox heart lead wires at a cost of $14,500 (Exhibit 6).

150. For example, on June 29, 2017, a Biotronik Iperia 7 DR-T DF-1 ProMRI device was implanted in a patient with MRI-incompatible Medtronic heart lead wires at a cost of $14,500. The MRI device was $2,450 more than an appropriate non-MRI device (Exhibit 6).

151. For example, on June 29, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient with MRI-incompatible St. Jude Medical heart lead wires at a cost of $18,250 (Exhibit 6).

152. For example, on June 29, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $19,200 (Exhibit 6).

153. For example, on June 30, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $19,200 (Exhibit 6).

154. For example, on July 7, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $17,950 (Exhibit 6).

155.    For example, on July 14, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $24,484 (Exhibit 6).

156.    For example, on July 18, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $24,484 (Exhibit 6).

157.    For example, on July 19, 2017, a Biotronik Iperia 7 HF-T DF4 ProMRI device was implanted in a patient in Hawaii with an MRI-incompatible Boston Scientific heart lead wire at a cost of $ 26,180 (Exhibit 6).

158.    For example, on July 28, 2017, a Biotronik Iperia 7 DR-T DF1 ProMRI device was implanted in a patient with an MRI-incompatible Sorin heart lead wire at a cost of $8,900 (Exhibit 6).

159.    For example, on July 28, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protega heart lead wire at a cost of $29,600 (Exhibit 6).

160.    For example, on July 31, 2017, a Biotronik ProMRI device was implanted with MRI-incompatible, older Biotronik Setrox and Linox heart lead wires at a cost of $8,900 (Exhibit 6).

161.    For example, on July 31, 2017, a Biotronik ProMRI device was

implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $22,078 (Exhibit 6).

162.    For example, on August 2, 2017, a Biotronik ProMRI device was implanted with an MRI-incompatible Biotronik Protego heart lead wire at a cost of $20,679 (Exhibit 6).

163.    For example, on August 2, 2017, a Biotronik Iperia 7 HF-T ProMRI device was implanted in a patient with MRI-incompatible Medtronic heart lead wires at a cost of $24,650 (Exhibit 6).

164.    For example, on August 3, 2017, a Biotronik Iperia 7 HF-T ProMRI device was implanted in a patient with MRI-incompatible Boston Scientific heart lead wires at a cost of $18,250 (Exhibit 6).

165.    For example, on August 15, 2017, a Biotronik Iperia 7 DR-T ProMRI device was implanted in a patient with MRI-incompatible St. Jude Medical and Boston Scientific heart lead wires at a cost of $14,900 (Exhibit 6).

166.    For example, on August 17, 2017, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $5,014. The MRI device was $414 more than an appropriate non-MRI device (Exhibit 6).

167.    For example, on August 17, 2017, a Biotronik Ilivia 7 HF-T ProMRI device was implanted in a patient with an MRI-incompatible St. Jude Medical heart lead wire at a cost of $ 24,425 (Exhibit 6).

168.    For example, on August 17, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Medtronic heart lead wire at a cost of $3,724. The MRI device was $392 more than an appropriate non-MRI device (Exhibit 6).

169.    For example, on August 21, 2017, a Biotronik Eluna 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $5,462 (Exhibit 6).

170.    For example, on August 23, 2017, a Biotronik Iperia 7 DR-T ProMRI device was implanted in a patient with MRI-incompatible Medtronic heart lead wires at a cost of $ 13,800 (Exhibit 6).

171.    For example, on August 24, 2017, a Biotronik Edora 8 DR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $4,598. The MRI device was $466 more than an appropriate non-MRI device (Exhibit 6).

172.    For example, on August 28, 2017, a Biotronik Ilivia 7 DR-T ProMRI device was implanted in a patient with MRI-incompatible St. Jude heart lead wires at a cost of $ 13,800 (Exhibit 6).

173.    For example, on August 30, 2017, a Biotronik Eluna 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $5,550. The MRI device was $1,400 more than an appropriate non-MRI device (Exhibit 6).

174.    For example, on August 30, 2017, a Biotronik Edora 8 SR-T ProMRI device was implanted in a patient with an MRI-incompatible Biotronik heart lead wire at a cost of $4,150 (Exhibit 6).

175.    For example, on September 7, 2017, a Biotronik Ilivia 7 DR-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Setrox heart lead wire at a cost of $19,312 (Exhibit 6).

176.    For example, on September 7, 2017, a Biotronik Eluna 8 DR-T DF4 ProMRI device was implanted in a patient with an MRI-incompatible Biotronik Selox heart lead wire at a cost of $6,200. The MRI device was $900 more than an appropriate non-MRI device (Exhibit 6).

177.    For example, on September 11, 2017, a Biotronik Iperia 7 DR-T ProMRI device was implanted in a patient with MRI-incompatible Medtronic heart lead wires at a cost of $14,750 (Exhibit 6).

178.    For example, on September 12, 2017, a Biotronik Iperia 7 DR-T DF01 ProMRI device was implanted in a patient with an MRI-incompatible St. Jude heart lead wire at a cost of $25,175 (Exhibit 6).

179.    For example, on December 6, 2017, a Biotronik Eldora 8 DR-T MRI device was implanted in a Medicare patient with MRI-incompatible Biotronik Selox heart lead wires (Exhibit 6).

180.    For example, on March 17, 2018, a Biotronik Iperia ProMRI system was implanted along with incompatible heart lead wires by Dr. Eduardo Tovar. The Iperia cost $21,500, whereas the appropriate device, the Itrevia 7 HF-T system could have been implanted for only $19,000 (Exhibit 6).

181.    For example, on April 28, 2018, a Biotronik Edora ProMRI system was implanted along with incompatible heart lead wires by Dr. Alireza Jafari. The Edora cost $5,750, whereas the appropriate device, the Etrinsa 8 DR-T system could have been implanted for only $4,550 (Exhibit 6).

182.    For example, on April 29, 2018, a Biotronik Edora ProMRI system was implanted along with incompatible heart lead wires by Dr. Alireza Jafari. The Edora

1   cost $5,750, whereas the appropriate device, the Etrinsa 8 DR-T system could have been

2   implanted for only $5,014 (Exhibit 6).

3       183.    For example, on June 28, 2018, a Biotronik Edora ProMRI system was

4   implanted along with incompatible heart lead wires by Dr. Alicia Montanez. The Edora

5   cost $5,900, whereas the appropriate device, the Etrinsa 8-DR-T system could have

6   been implanted for only $3,690 (Exhibit 6).

7       184.    Biotronik also paid sales representatives an extra "spiff" payment of $100

8   to $200 each if they could sell Biotronik ProMRI devices that were near the end of

9   their "shelf life". Biotronik even paid this extra commission payment to sales

10  representatives if the ProMRI devices were implanted without compatible heart lead

11  wires. For example, a June 27, 2016 implant of an Entovis ProMRI device without the

12  proper MRI-compatible heart lead wires resulted in a $100 "spiff" payment to the

13  sales representative (Exhibit 7).

14      185.    For example, a June 15, 2016 implant of an Entovis ProMRI device in a

15  patient with non-MRI-compatible heart lead wires who could never safely undergo an

16  MRI scan resulted in a $200 "spiff" payment to the sales representative (Exhibit 7).

17      186.    For example, a July 18, 2016 implant of an Entovis ProMRI device in a

18  patient with non-MRI-compatible heart lead wires who could never safely undergo an

19  MRI scan resulted in a $200 "spiff" payment to the sales representative (Exhibit 8).

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 52

187.    For example, another July 18, 2016 implant of an Entovis ProMRI device in a patient with non-MRI-compatible heart lead wires who could never safely undergo an MRI scan resulted in a $200 "spiff" payment to the sales representative (Exhibit 8).

188.    For example, a May 6, 2016 implant of an Entovis ProMRI device in a patient with non-MRI-compatible heart lead wires who could never safely undergo an MRI scan resulted in a $100 "spiff" payment to the sales representative (Exhibit 9).

### 3. *Improper early replacement of pacemaker and defibrillator devices*.

189.    Biotronik pacemaker and defibrillator devices are implanted with a battery that works for a period of up to 7-10 years, and physicians are not supposed to change out the devices until they have 3 months or less battery left. At this point, physicians receive an "elective replacement indicator" ("ERI") from the device. However, Biotronik sales representatives have routinely pushed for devices to be changed out and billed to Medicaid and Medicare and other payors much earlier, and in some cases, have even increased the voltage on the units so that the battery ran down faster.

190.    The Biotronik pacemaker and defibrillator devices are very expensive, selling for as much as $29,600 when combined with their required accessories. Devices changed out earlier than necessary add a significant cost to Medicaid,

1  Medicare and other payors. Some documents indicate that devices were being changed

2  out up to 1.5 years early, and a Biotronik sales rep discussed devices being changed

3  out up to 4 years early. By inappropriately changing devices out early, Biotronik could

4  have been adding up to 21% to 57% to the cost to payors.

5      191.    For example, in a June 6, 2017 conversation with Biotronik field clinical

6  specialist Joe DeBoe, Relator Jeffrey Bell was told how Biotronik field clinical

7  specialist Robin Singh got a Boston Scientific pacemaker changed out to a Biotronik

8  device by falsely claiming that the Boston Scientific device had less than 30 days of

9  battery life left on it: "he [Robin Singh] he went to Jose Fernandez [Cardiologist] in

10  Jose's clinic. You know the girl in S603, you know the Altrua [Boston Scientific

11  pacemaker]. Those things are workhorses, right? It said the patient had 6 months left

12  on the battery. For six months. It still says six months. He writes on there,

13  'ERI...needs to see Peress for Gen change.' Writes it on the schedule. I do all of

14  Peress's clinics. I do all of these patients. I check the guy and it's 6 months. He writes

15  on the thing that he called Boston and Boston said there is less than 30 days on the

16  battery. I called Boston you know what they told me? There is no record of a phone

17  call on this patient, ever. Number one. Number two, they can't calculate it in days, it's

18  calculated in months. He [Robin Singh] lied in medical records." (Exhibit 1).

19      192.    In the same conversation, Joe DeBoe discussed a patient who was

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 54

changed out with 2 years left on his pacemaker battery: "You know what he [Biotronik sales representative Robin Singh] probably did? He probably said he needed an upgrade to a BI-V [higher-powered pacemaker device]. That's what he does too". DeBoe went on to say that Robin Singh pushes early pacemaker changes for a number of cardiology patients in Arizona, including for patients of Dr. Jose Fernandez and of Dr. Kioumars Mostafizi of Tucson: "they'll say pacer rep checked and he says 'this patient's pacing and at 100% V-Paced Paced Left Bundle Branch Block, blocking upper respir… needs to see [Dr. Darren] Peress for upgrade to BI-V'. They come and see me, and I look at the H&P [History and Physical medical record]. I'm looking at the patient and he has a pulmonary disorder. Oh! he has pulmonary disorder. He has pulmonary hypertension. That's why he can't breathe. Not because he has Heart Failure. Dude. He [Robin Singh] does it all the time" (Exhibit 1).

193.    Biotronik sales reps targeted devices from other manufacturers to be replaced earlier than necessary with Biotronik implants. Documents indicate that devices from manufacturers Boston Scientific, Medtronic, and St. Jude Medical were frequently targeted for unnecessary early replacement. Biotronik sales representatives violated HIPAA privacy rules to track patients with other devices on a daily basis in order to try to get those devices changed out as quickly and early as possible to Biotronik devices (Exhibit 10):

| Date | Device Name | Notes on Biotronik Calendar Regarding End-of-Battery-Life |
|------|-------------|------------------------------------------------------------|
| 9/15/2014 | Boston Scientific device | |
| 9/19/2014 | Guidant device | |
| 10/16/2014 | Medtronic device | |
| 10/17/2014 | | |
| 10/20/2014 | Medtronic device | |
| 10/22/2014 | Medtronic device | |
| 10/22/2014 | St. Jude device | |
| 10/23/2014 | Medtronic device | |
| 11/20/2014 | Boston Scientific device | |
| 11/24/2014 | Boston Scientific device | close to ERI |
| 12/12/2014 | Boston Scientific device | |
| 12/15/2014 | Boston Scientific device | |
| 12/16/2014 | Boston Scientific device | |
| 12/29/2014 | Boston Scientific device | |
| 1/13/2015 | Biotronik device | not due |
| 1/13/2015 | Biotronik device | not due |
| 2/5/2015 | Medtronic device | |
| 2/5/2015 | | ERI BIV |
| 2/9/2015 | Biotronik device | |
| 2/12/2015 | St. Jude device | |
| 2/12/2015 | Boston Scientific device | |
| 2/12/2015 | Boston Scientific device | BIV ERI |
| 2/12/2015 | Boston Scientific device | |
| 2/13/2015 | Boston Scientific device | |
| 2/18/2015 | Boston Scientific device | ERI switch to our clinic |
| 2/24/2015 | Boston Scientific device | |
| 2/25/2015 | St. Jude device | close ERI |
| 2/26/2015 | Boston Scientific device | |
| 2/26/2015 | Medtronic device | shoud be eri and our gen change |
| 2/26/2015 | Medtronic device | |
| 3/2/2015 | St. Jude device | |
| 3/2/2015 | Medtronic device | not due |
| 3/2/2015 | Biotronik device | not due |
| 3/2/2015 | St. Jude device | Close ERI |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 56

| Date | Device Name | Notes on Biotronik Calendar Regarding End-of-Battery-Life |
|------|-------------|-----------------------------------------------------------|
| 3/10/2015 | Medtronic device | |
| 3/11/2015 | Medtronic device | 1 year ERI |
| 3/12/2015 | Boston Scientific device | |
| 3/13/2015 | Boston Scientific device | |
| 3/16/2015 | Boston Scientific device | |
| 3/16/2015 | Boston Scientific device | |
| 3/17/2015 | Boston Scientific device | |
| 4/1/2015 | Medtronic device | |
| 4/9/2015 | Boston Scientific device | |
| 4/13/2015 | Boston Scientific device | |
| 4/16/2015 | Medtronic device | |
| 4/16/2015 | Medtronic device | |
| 4/16/2015 | Boston Scientific device | |
| 4/16/2015 | Boston Scientific device | close ERI |
| 4/17/2015 | St. Jude device | |
| 4/20/2015 | Boston Scientific device | |
| 4/24/2015 | Medtronic device | 1yr ERI |
| 4/27/2015 | Biotronik device | |
| 5/11/2015 | Boston Scientific device | |
| 5/12/2015 | St. Jude device | 1year ERI |
| 5/14/2015 | Medtronic device | Close ERI |
| 5/14/2015 | Boston Scientific device | |
| 5/15/2015 | St. Jude device | not due |
| 5/18/2015 | Biotronik device | not due |
| 5/28/2015 | Boston Scientific device | |
| 5/28/2015 | Medtronic device | not due |
| 6/1/2015 | Boston Scientific device | 1 year ERI |
| 6/4/2015 | Boston Scientific device | |
| 6/8/2015 | St. Jude device | Close ERI |
| 6/9/2015 | Biotronik device | |
| 6/9/2015 | Boston Scientific device | |
| 6/9/2015 | St. Jude device | |
| 6/14/2015 | Boston Scientific device | |
| 6/15/2015 | Biotronik device | |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 57

| Date | Device Name | Notes on Biotronik Calendar Regarding End-of-Battery-Life |
|------|-------------|-----------------------------------------------------------|
| 6/23/2015 | Boston Scientific device | |
| 6/25/2015 | Biotronik device | |
| 7/14/2015 | St. Jude device | |
| 7/15/2015 | Biotronik device | |
| 7/16/2015 | Boston Scientific device | close ERI |
| 7/16/2015 | Biotronik device | not due |
| 7/21/2015 | Boston Scientific device | |
| 7/27/2015 | Boston Scientific device | 1.5years |
| 7/29/2015 | St. Jude device | |
| 8/14/2015 | Medtronic device | not due |
| 8/18/2015 | Biotronik device | |
| 8/19/2015 | Biotronik device | not due |
| 8/19/2015 | Medtronic device | |
| 8/20/2015 | Boston Scientific device | |
| 8/21/2015 | Biotronik device | |
| 9/11/2015 | Boston Scientific device | |
| 10/8/2015 | Boston Scientific device | 1year-eri |
| 10/8/2015 | Medtronic device | |
| 10/8/2015 | Boston Scientific device | |
| 10/9/2015 | Medtronic device | |
| 10/13/2015 | Boston Scientific device | 1year ERI |
| 10/14/2015 | Boston Scientific device | 1year ERI |
| 10/15/2015 | Medtronic device | |
| 10/23/2015 | Medtronic device | Close ERI |
| 10/23/2015 | Biotronik device | |
| 11/13/2015 | | should be ERI |
| 11/18/2015 | Boston Scientific device | 1year ERI |
| 11/20/2015 | Boston Scientific device | Close ERI |
| 11/20/2015 | Boston Scientific device | |
| 12/9/2015 | Medtronic device | 1 year left |
| 12/9/2015 | Medtronic device | 1 year left |
| 12/10/2015 | Medtronic device | |
| 12/10/2015 | Boston Scientific device | |
| 12/11/2015 | Medtronic device | |

| Date | Device Name | Notes on Biotronik Calendar Regarding End-of-Battery-Life |
|---|---|---|
| 12/23/2015 | Medtronic device | |
| 1/12/2016 | Boston Scientific device | |
| 1/12/2016 | Boston Scientific device | |
| 1/14/2016 | Boston Scientific device | |
| 1/15/2016 | Medtronic device | 1YR ERI |
| 1/15/2016 | Biotronik device | |
| 1/15/2016 | Medtronic device | |
| 1/15/2016 | St. Jude device | |
| 1/18/2016 | Medtronic device | |
| 1/19/2016 | Medtronic device | |
| 1/19/2016 | Boston Scientific device | 1year |
| 1/20/2016 | Boston Scientific device | |
| 1/20/2016 | St. Jude device | |
| 1/20/2016 | Boston Scientific device | |
| 1/26/2016 | Medtronic device | |
| 1/26/2016 | Medtronic device | |
| 2/12/2016 | Medtronic device | |
| 2/15/2016 | St. Jude device | |
| 2/18/2016 | Boston Scientific device | |
| 2/19/2016 | Boston Scientific device | |
| 3/9/2016 | Medtronic device | |
| 3/9/2016 | Boston Scientific device | |
| 4/15/2016 | Medtronic device | |
| 4/15/2016 | Boston Scientific device | |
| 4/25/2016 | Boston Scientific device | ICD beeping, ERI? |
| 5/4/2016 | St. Jude device | |
| 5/5/2016 | Medtronic device | |
| 5/6/2016 | St. Jude device | Close ERI |
| 5/10/2016 | St. Jude device | Close ERI |
| 5/17/2016 | Boston Scientific device | 1 year ERI |
| 6/1/2016 | St. Jude device | |
| 6/7/2016 | Boston Scientific device | close ERI |
| 6/13/2016 | Boston Scientific device | |
| 6/14/2016 | Boston Scientific device | |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 59

| Date | Device Name | Notes on Biotronik Calendar Regarding End-of-Battery-Life |
|------|-------------|-----------------------------------------------------------|
| 6/30/2016 | Boston Scientific device | |
| 7/6/2016 | Boston Scientific device | 1 year ERI |
| 7/16/2016 | Boston Scientific | close ERI |
| 7/22/2016 | St. Jude device | 9 months ERI |
| 8/18/2016 | Boston Scientific device | |
| 8/23/2016 | Boston Scientific device | |
| 8/24/2016 | Boston Scientific device | 1 year |
| 9/7/2016 | Boston Scientific device | 1 year ERI |
| 9/9/2016 | Boston Scientific device | |
| 9/13/2016 | | Text message - changeouts with 4 years left on battery |
| 9/16/2016 | Biotronik device | close to ERI |
| 10/6/2016 | Boston Scientific device | |
| 10/10/2016 | Medtronic device | |
| 10/11/2016 | Boston Scientific device | |
| 10/18/2016 | Boston Scientific device | |
| 10/26/2016 | Medtronic device | |
| 10/28/2016 | Boston Scientific device | |
| 10/28/2016 | Medtronic device | |
| 11/7/2016 | Medtronic device | |
| 11/23/2016 | Biotronik device | |
| 12/20/2016 | Boston Scientific device | 1.5 years |
| 12/20/2016 | St. Jude device | 1.5 years ICD |
| 12/20/2016 | | Battery voltage [V] 2.91, Remaining battery capacity [%] 9 |
| 12/28/2016 | Medtronic device | |
| 1/11/2017 | Biotronik device | |
| 1/11/2017 | Boston Scientific device | close ERI |
| 1/20/2017 | Boston Scientific device | |
| 2/1/2017 | Medtronic device | |
| 3/9/2017 | Biotronik device | 6 months ERI |
| 3/13/2017 | Boston Scientific device | |
| 4/18/2017 | Biotronik device | not due |
| 4/21/2017 | Boston Scientific device | |

| Date | Device Name | Notes on Biotronik Calendar Regarding End-of-Battery-Life |
|---|---|---|
| 4/21/2017 | Medtronic device | |
| 4/24/2017 | Boston Scientific device | 7 months |
| 5/25/2017 | Biotronik device | |
| 6/2/2017 | St. Jude device | not due |
| 6/2/2017 | Biotronik device | close to ERI Cylos |
| 6/5/2017 | Biotronik device | close to ERI Cylos |
| 6/16/2017 | Medtronic device | |
| 6/27/2017 | Boston Scientific device | |
| 7/21/2017 | Medtronic device | |
| 7/26/2017 | Medtronic device | Follow-Up with [Dr. David] Lapan on MDT ERI |
| 7/27/2017 | Boston Scientific device | |
| 8/9/2017 | Biotronik device | close to ERI |
| 8/15/2017 | Medtronic device | |
| 8/16/2017 | Boston Scientific device | |
| 9/6/2017 | Boston Scientific device | |
| 10/24/2017 | St. Jude device | |
| 10/25/2017 | Boston Scientific device | |
| 11/14/2017 | Boston Scientific device | |
| 11/15/2017 | St. Jude device | |
| 11/29/2017 | Boston Scientific device | |
| 12/6/2017 | Boston Scientific device | |
| 12/7/2017 | Medtronic device | |
| 12/18/2017 | Boston Scientific device | |
| 12/20/2017 | St. Jude device | |
| 1/10/2018 | St. Jude device | |
| 1/22/2018 | Boston Scientific device | |
| 1/30/2018 | Biotronik device | |
| 2/2/2018 | Boston Scientific device | |
| 2/14/2018 | St. Jude device | |

194.    For example, a December 20, 2016 print-out of a Biotronik Lumax 540

HF-T device noted that the voltage was running at 2.9 volts, much higher than the

normal range for an end of life of a pacemaker battery, and certain to run the battery

for another one-to-two additional years. Biotronik sales representative Robin Singh

had checked the patient in the doctor's office and told the patient that they needed to

come in the office soon for a generator change, even though there were 1-2 years

remaining on the battery. The patient came into the doctor's office and saw Relator

Jeffrey Bell and was confused as to why he was supposed to be there. The device was

checked by Relator Jeffrey Bell and he found that it was not near the end-of-life for

the battery, probably a year or two or more away. However, five weeks later on

January 27, 2017, Robin Singh convinced the doctor to give the patient a new

Biotronik device (Exhibit 11).

195.    For example, a February 20, 2018, print-out of a Biotronik Etrinsa 8 DR-

T noted that the voltage was running at 4 volts in the ventricular lead, which was eight

times higher than the threshold electricity level of 0.5 volts for that patient. So, once

implanted, this device's output was turned up in order to run the battery down more

quickly (Exhibit 12).

196.    For example, a text conversation from another Biotronik sales

representative to Relator Jeffrey Bell stated that devices were being changed out with

"4 years left" in some cases (Exhibit 13).

197.    For example, an April 24, 2017 Biotronik calendar entry stated that a

Boston Scientific device with 7 months battery left was being changed out for a Biotronik device (Exhibit 14).

198.    For example, an August 24, 2016 Biotronik calendar entry stated that a Boston Scientific device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

199.    For example, a December 9, 2015 Biotronik calendar entry stated that a Medtronic device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

200.    For example, another December 9, 2015 Biotronik calendar entry stated that another Medtronic device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

201.    For example, a December 20, 2016 Biotronik calendar entry stated that a Boston Scientific device with 1.5 years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

202.    For example, a December 20, 2016 Biotronik calendar entry stated that a St. Jude defibrillator device with 1.5 years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

203.    For example, an April 24, 2015 Biotronik calendar entry stated that a Medtronic device with 1-years' worth of battery left was being changed out for a

Biotronik device (Exhibit 14).

204.     For example, a May 12, 2015 Biotronik calendar entry stated that a St. Jude device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

205.     For example, a July 27, 2015 Biotronik calendar entry stated that a Boston Scientific device with 1.5 years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

206.     For example, an October 8, 2015 Biotronik calendar entry stated that a Boston Scientific device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

207.     For example, a November 18, 2015 Biotronik calendar entry stated that a Boston Scientific device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

208.     For example, a January 15, 2016 Biotronik calendar entry stated that a Medtronic device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

209.     For example, a January 19, 2016 Biotronik calendar entry stated that a Boston Scientific device with 1-years' worth of battery left was being changed out for a Biotronik device (Exhibit 14).

210.    For example, an April 18, 2017 Biotronik calendar entry stated that a Biotronik device which was "not due" was being changed out for another Biotronik device (Exhibit 14).

211.    For example, a January 13, 2015 Biotronik calendar entry stated that a Biotronik device which was "not due" was being changed out for another Biotronik device (Exhibit 14).

212.    For example, another January 13, 2015 Biotronik calendar entry stated that a Biotronik device which was "not due" was being changed out for another Biotronik device (Exhibit 14).

213.    For example, a March 2, 2015 Biotronik calendar entry stated that a Medtronic device which was "not due" was being changed out for a Biotronik device (Exhibit 14).

214.    For example, another March 2, 2015 Biotronik calendar entry stated that a Biotronik device which was "not due" was being changed out for another Biotronik device (Exhibit 14).

215.    For example, a May 15, 2015 Biotronik calendar entry stated that a St. Jude device which was "not due" was being changed out for a Biotronik device (Exhibit 14).

216.    For example, another May 18, 2015 Biotronik calendar entry stated that a

Biotronik device which was "not due" was being changed out for another Biotronik device (Exhibit 14).

217.    For example, a May 28, 2015 Biotronik calendar entry stated that a Medtronic device which was "not due" was being changed out for a Biotronik device (Exhibit 14).

218.    For example, a July 16, 2015 Biotronik calendar entry stated that a Biotronik device which was "not due" was being changed out for another Biotronik device (Exhibit 14).

219.    For example, an August 14, 2015 Biotronik calendar entry stated that a Medtronic device which was "not due" was being changed out for a Biotronik device (Exhibit 14).

220.    For example, an August 19, 2015 Biotronik calendar entry stated that a Biotronik device which was "not due" was being changed out for another Biotronik device (Exhibit 14).

221.    For example, a June 2, 2017 Biotronik calendar entry stated that a St. Jude device which was "not due" was being changed out for a Biotronik device (Exhibit 14).

222.    For example, a June 8, 2018, the Tucson Biotronik sales calendar noted that Biotronik FCS Jon Augat was going to top customer Dr. James Myer's office to

check a patient's device which had 12% batter left (Exhibit 15). On December 18, 2018, the Tucson Biotronik sales calendar noted that Biotronik FCS Robin Singh was going back to top customer Dr. James Myer's office to check the same patient's device which had 12% batter left in June, calling it "ERI" or "elective replacement indicator" claiming that the battery was too low, even though it should still be good for more than the required 3 months before changing out (Exhibit 15). On December 20, 2018, the Tucson Biotronik sales calendar noted that Biotronik staff was going back to top customer Dr. James Myer's office to change out the same patient's device which had 12% batter left in June, even though it should still be good for more than the required 3 months before changing out (Exhibit 15).

223.    For example, on September 19, 2018, the Tucson Biotronik sales calendar noted that Biotronik field staff were going to Banner University Medical Center's South location to do a device check on a device that was "near ERI", meaning that the Biotronik staff were hoping for an early change-out to a new, expensive pacemaking device (Exhibit 16).

224.    Biotronik sales representative Bill Blair also required Biotronik field clinical staff in Orange County, California, to track patients who were at or near battery replacement time. Field clinical staff were required to enter patient information on end-of-life devices onto the sales calendar for Blair to follow-up with the physician

1  customer to try to ensure the physician implanted a new Biotronik device, instead of a

2  device from a competitor (Exhibit 17).

3            *4. <u>Improper addition of remote monitoring to most Biotronik devices.</u>*

4        225.    Biotronik pacemaker and defibrillator devices are almost always

5  implanted with a "remote monitoring" function added on, for which the company

6  charges an extra $500-$1,000 with nearly every implant. This increases the cost for

7  Medicaid, Medicare, other payors, and for patients when they are charged for co-

8  payment. However, most physicians do not use the remote monitoring function to

9  follow their patients' pacemaker and defibrillator devices, so the additional charge is

10  an unnecessary cost that benefits Biotronik and benefits the Biotronik sales

11  representatives in their sales commission payments, but is an inappropriate false claim

12  to Medicaid, Medicare, and other payors.

13        226.    For example, Relator Jeffrey Bell is a sales representative for three

14  physicians who do not use remote monitoring to follow their patients. However, since

15  July 2015, Relator Jeffrey Bell's commission statements show that the following 182

16  Biotronik pacemaker and defibrillator implants were implanted on these three

17  physicians' patients, and that insurers including Medicaid and Medicare were charged

18  an extra $500 to $1,000 each for Biotronik remote monitoring devices. However,

19  Biotronik representatives and Defendant Beyond Reps LLC employees tell patients

20

that they can receive home monitoring devices for free any time they choose, meaning

that the total cost is allocated to payors at the time of implant. Again, these three

physicians do not use remote monitoring, but Biotronik charged $500 to $1,000 extra

for each pacemaker device they implanted for remote monitoring (Exhibit 18):

| Date | Remote Monitoring Device Invoice Charge | Type of Biotronik Implantable Cardiovascular Device |
|---|---|---|
| 7/29/2015 | $1,000 | Defibrillator |
| 7/31/2015 | $500 | Pacemaker |
| 8/5/2015 | $1,000 | Defibrillator |
| 8/5/2015 | $1,000 | Defibrillator |
| 8/10/2015 | $1,000 | Defibrillator |
| 8/12/2015 | $500 | Pacemaker |
| 8/21/2015 | $1,000 | Defibrillator |
| 8/26/2015 | $500 | Pacemaker |
| 9/2/2015 | $1,000 | Defibrillator |
| 9/8/2015 | $500 | Pacemaker |
| 9/8/2015 | $1,000 | Defibrillator |
| 9/11/2015 | $500 | Pacemaker |
| 9/14/2015 | $1,000 | Defibrillator |
| 9/15/2015 | $1,000 | Defibrillator |
| 9/15/2015 | $1,000 | Defibrillator |
| 9/18/2015 | $1,000 | Defibrillator |
| 9/21/2015 | $1,000 | Defibrillator |
| 9/25/2015 | $500 | Pacemaker |
| 9/30/2015 | $1,000 | Defibrillator |
| 10/1/2015 | $1,000 | Defibrillator |
| 10/2/2015 | $500 | Pacemaker |
| 10/5/2015 | $1,000 | Defibrillator |
| 10/9/2015 | $500 | Pacemaker |
| 10/23/2015 | $500 | Pacemaker |
| 10/23/2015 | $1,000 | Defibrillator |

| Date | Remote Monitoring Device Invoice Charge | Type of Biotronik Implantable Cardiovascular Device |
|---|---|---|
| 10/26/2015 | $500 | Pacemaker |
| 10/27/2015 | $1,000 | Defibrillator |
| 10/28/2015 | $500 | Pacemaker |
| 10/28/2015 | $1,000 | Defibrillator |
| 11/24/2015 | $500 | Pacemaker |
| 11/24/2015 | $500 | Pacemaker |
| 12/3/2015 | $500 | Pacemaker |
| 12/4/2015 | $500 | Pacemaker |
| 12/7/2015 | $500 | Pacemaker |
| 12/7/2015 | $1,000 | Defibrillator |
| 12/7/2015 | $1,000 | Defibrillator |
| 12/14/2015 | $1,000 | Defibrillator |
| 12/16/2015 | $500 | Pacemaker |
| 12/18/2015 | $500 | Pacemaker |
| 12/28/2015 | $500 | Pacemaker |
| 1/4/2016 | $1,000 | Defibrillator |
| 1/5/2016 | $500 | Pacemaker |
| 1/8/2016 | $500 | Pacemaker |
| 1/11/2016 | $500 | Pacemaker |
| 1/12/2016 | $500 | Pacemaker |
| 1/13/2016 | $500 | Pacemaker |
| 1/20/2016 | $500 | Pacemaker |
| 1/20/2016 | $500 | Pacemaker |
| 1/22/2016 | $1,000 | Defibrillator |
| 1/27/2016 | $500 | Pacemaker |
| 1/29/2016 | $1,000 | Defibrillator |
| 2/1/2016 | $500 | Pacemaker |
| 2/3/2016 | $1,000 | Defibrillator |
| 2/8/2016 | $500 | Pacemaker |
| 2/8/2016 | $500 | Pacemaker |
| 2/11/2016 | $500 | Pacemaker |
| 2/11/2016 | $500 | Pacemaker |
| 2/12/2016 | $500 | Pacemaker |

| Date | Remote Monitoring Device Invoice Charge | Type of Biotronik Implantable Cardiovascular Device |
|------|------|------|
| 2/19/2016 | $1,000 | Defibrillator |
| 2/22/2016 | $500 | Pacemaker |
| 2/23/2016 | $500 | Pacemaker |
| 2/29/2016 | $1,000 | Defibrillator |
| 3/4/2016 | $500 | Pacemaker |
| 3/7/2016 | $500 | Pacemaker |
| 3/9/2016 | $1,000 | Defibrillator |
| 3/10/2016 | $1,000 | Defibrillator |
| 3/11/2016 | $1,000 | Defibrillator |
| 3/14/2016 | $500 | Pacemaker |
| 3/22/2016 | $1,000 | Defibrillator |
| 3/23/2016 | $1,000 | Defibrillator |
| 3/25/2016 | $500 | Pacemaker |
| 3/28/2016 | $500 | Pacemaker |
| 3/28/2016 | $1,000 | Defibrillator |
| 3/30/2016 | $500 | Pacemaker |
| 3/31/2016 | $500 | Pacemaker |
| 4/2/2016 | $500 | Pacemaker |
| 4/4/2016 | $500 | Pacemaker |
| 4/9/2016 | $500 | Pacemaker |
| 4/13/2016 | $500 | Pacemaker |
| 4/13/2016 | $500 | Pacemaker |
| 4/13/2016 | $1,000 | Defibrillator |
| 4/19/2016 | $500 | Pacemaker |
| 4/25/2016 | $500 | Pacemaker |
| 4/29/2016 | $500 | Pacemaker |
| 5/3/2016 | $500 | Pacemaker |
| 5/4/2016 | $500 | Pacemaker |
| 5/4/2016 | $1,000 | Defibrillator |
| 5/6/2016 | $500 | Pacemaker |
| 5/18/2016 | $500 | Pacemaker |
| 5/25/2016 | $500 | Pacemaker |
| 5/26/2016 | $500 | Pacemaker |

| Date | Remote Monitoring Device Invoice Charge | Type of Biotronik Implantable Cardiovascular Device |
|---|---|---|
| 5/26/2016 | $1,000 | Defibrillator |
| 6/1/2016 | $500 | Pacemaker |
| 6/15/2016 | $500 | Pacemaker |
| 6/15/2016 | $500 | Pacemaker |
| 6/17/2016 | $500 | Pacemaker |
| 6/27/2016 | $500 | Pacemaker |
| 6/27/2016 | $500 | Pacemaker |
| 7/10/2016 | $500 | Pacemaker |
| 7/18/2016 | $500 | Pacemaker |
| 7/18/2016 | $500 | Pacemaker |
| 7/25/2016 | $1,000 | Defibrillator |
| 7/29/2016 | $1,000 | Defibrillator |
| 8/5/2016 | $500 | Pacemaker |
| 8/10/2016 | $1,000 | Defibrillator |
| 8/18/2016 | $500 | Pacemaker |
| 8/29/2016 | $500 | Pacemaker |
| 9/2/2016 | $500 | Pacemaker |
| 9/6/2016 | $500 | Pacemaker |
| 9/9/2016 | $500 | Pacemaker |
| 9/9/2016 | $1,000 | Defibrillator |
| 9/14/2016 | $500 | Pacemaker |
| 9/21/2016 | $1,000 | Defibrillator |
| 9/29/2016 | $500 | Pacemaker |
| 10/6/2016 | $500 | Pacemaker |
| 10/7/2016 | $500 | Pacemaker |
| 10/7/2016 | $500 | Pacemaker |
| 10/14/2016 | $500 | Pacemaker |
| 10/14/2016 | $1,000 | Defibrillator |
| 10/17/2016 | $500 | Pacemaker |
| 10/24/2016 | $500 | Pacemaker |
| 10/27/2016 | $500 | Pacemaker |
| 10/28/2016 | $1,000 | Defibrillator |
| 11/1/2016 | $500 | Pacemaker |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 72

| Date | Remote Monitoring Device Invoice Charge | Type of Biotronik Implantable Cardiovascular Device |
|---|---|---|
| 11/4/2016 | $1,000 | Defibrillator |
| 11/10/2016 | $500 | Pacemaker |
| 11/11/2016 | $500 | Pacemaker |
| 11/11/2016 | $500 | Pacemaker |
| 11/11/2016 | $500 | Pacemaker |
| 11/14/2016 | $1,000 | Defibrillator |
| 11/15/2016 | $1,000 | Defibrillator |
| 11/18/2016 | $500 | Pacemaker |
| 12/9/2016 | $500 | Pacemaker |
| 12/12/2016 | $1,000 | Defibrillator |
| 12/14/2016 | $1,000 | Defibrillator |
| 12/16/2016 | $1,000 | Defibrillator |
| 1/3/2017 | $500 | Pacemaker |
| 1/6/2017 | $500 | Pacemaker |
| 1/16/2017 | $500 | Pacemaker |
| 1/20/2017 | $500 | Pacemaker |
| 1/23/2017 | $1,000 | Defibrillator |
| 1/24/2017 | $1,000 | Defibrillator |
| 1/27/2017 | $1,000 | Defibrillator |
| 1/30/2017 | $500 | Pacemaker |
| 1/31/2017 | $1,000 | Defibrillator |
| 2/2/2017 | $1,000 | Defibrillator |
| 2/2/2017 | $1,000 | Defibrillator |
| 2/3/2017 | $500 | Pacemaker |
| 2/7/2017 | $500 | Pacemaker |
| 2/11/2017 | $500 | Pacemaker |
| 2/17/2017 | $1,000 | Defibrillator |
| 3/15/2017 | $1,000 | Defibrillator |
| 3/27/2017 | $500 | Pacemaker |
| 4/5/2017 | $500 | Pacemaker |
| 4/5/2017 | $500 | Pacemaker |
| 4/7/2017 | $500 | Pacemaker |
| 4/20/2017 | $1,000 | Defibrillator |

| Date | Remote Monitoring Device Invoice Charge | Type of Biotronik Implantable Cardiovascular Device |
|---|---|---|
| 4/21/2017 | $1,000 | Defibrillator |
| 4/24/2017 | $500 | Pacemaker |
| 5/15/2017 | $500 | Pacemaker |
| 5/31/2017 | $1,000 | Defibrillator |
| 6/2/2017 | $1,000 | Defibrillator |
| 6/9/2017 | $500 | Pacemaker |
| 6/11/2017 | $500 | Pacemaker |
| 6/15/2017 | $1,000 | Defibrillator |
| 6/19/2017 | $500 | Pacemaker |
| 6/23/2017 | $500 | Pacemaker |
| 7/7/2017 | $500 | Pacemaker |
| 7/11/2017 | $500 | Pacemaker |
| 7/17/2017 | $500 | Pacemaker |
| 8/1/2017 | $500 | Pacemaker |
| 8/3/2017 | $500 | Pacemaker |
| 8/4/2017 | $500 | Pacemaker |
| 8/10/2017 | $500 | Pacemaker |
| 8/17/2017 | $500 | Pacemaker |
| 8/22/2017 | $500 | Pacemaker |
| 8/24/2017 | $1,000 | Defibrillator |
| 8/28/2017 | $1,000 | Defibrillator |
| 9/1/2017 | $500 | Pacemaker |
| 9/6/2017 | $500 | Pacemaker |
| 9/12/2017 | $500 | Pacemaker |
| 9/15/2017 | $1,000 | Defibrillator |

5. *Improper and untrue safety claims*

227.    Relators have also found a Biotronik heart lead wire that is failing at a

much faster rate than what Biotronik has been telling the public and their physician

1    customers.

2        228.    Biotronik is selling a heart lead wire (a wire that attaches to the

3    implanted defibrillator device and to the heart to deliver a high energy shock when it

4    detects signals that could indicate a potentially dangerous and often lethal heart

5    rhythm) called the "Linox" (later sold as the "Protego", and also sold under the trade

6    names "Volta" and "Vigila" for the Sorin company) which is failing at a very

7    noticeably high rate (collectively, "Linox"). Biotronik publishes false claims to the

8    public and to their physician customers that these wires have a failure rate between

9    0.08% and 1.49%, however, real-world experience as well as published reports of

10   Linox failures indicate that the true failure rate is at least 5% and may be as high as

11   25%.

12       229.    Biotronik is under-reporting failure rates on their Linox leads. According

13   to Biotronik's annually published "Product Performance Reports", which the

14   company makes available to physician customers and the general public, only a few

15   hundred of the Linox lead wires have been returned or have failed. However, medical

16   research, reports to the FDA, and personal experience indicates to the Relators that the

17   failure rate is much higher.

18       230.    Biotronik does not appear to report two types of incidents as lead wire

19   failures:

20

    a.  Biotronik does not report incidents in which the Linox lead wire

        fails and is not removed from the patient's body and returned to

        Biotronik. This represents the majority of heart lead wire failures –

        failed lead wires are normally left in the patient's body.

    b.  Biotronik also does not appear to report any of the cases when

        patients have requested that functions on their implanted

        defibrillator device be turned off, because they were receiving

        inappropriate shocks due to the lead wire failing.

231.    Most failed lead wires are left in the body – but Biotronik does not report these as failures. Removing an implanted heart lead wire is highly risky, and the procedure is reported to be fatal in 0.6% to 1.4% of patients, with 2.5% suffering a major complication during the removal of an implanted heart lead wire (Exhibit 19). Therefore, only a small percentage of all failed heart lead wires, including Linox lead wires, are ever extracted from the patient – most are left in the patient's body once they fail. The lead wires that are left in the body are "capped off" when the lead wires fail, and a replacement wire is placed alongside the failed one, and some percentage of those removed lead wires are returned to Biotronik by cardiologists for review of their failure. Biotronik appears to be limiting their reporting of the number of Linox failures to those few that are removed and returned to the company, and not accurately

1    reporting the much larger number that fail and are "capped off" and left in the

2    patient's body.

3        232.    By failing to report the much larger number of Linox lead wires that fail

4    and are left in the patient's body, Biotronik falsely reports a very low rate of failure

5    for the Linox. By failing to report the appropriate number of lead wire failures, the

6    company deceives physicians into using the Linox wires, believing that they are high-

7    performing and are as good, or better than the competition. In this way, Biotronik also

8    puts additional patients at risk of the harms of a failed lead wire, up to and including

9    death.

10       233.    Biotronik has not provided the Relators with any type of corporate

11   training to report to the company when they've found a failed lead wire, or a physician

12   has reported a failed lead wire to them. The only time that sales representatives and

13   field clinical representatives report Linox lead wire failures is when the physician

14   removes a failed one and replaces it. Biotronik has no set protocol on reporting the

15   majority of failed Linox lead wires that are left in the body and capped off.

16       234.    Failed Linox lead wires on the market are causing heart complications

17   and are contributing to deaths. Biotronik is still selling the Linox today, though it

18   already has a newer, "safer" model on the market to replace the Linox for the past

19   year. The Linox failures cause an increased rate of inappropriate shocks from the

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 77

1   implanted defibrillator device. Defibrillator device shocks are extremely painful and

2   the equivalent of several hundred to a thousand volts being shocked across the chest,

3   and patients liken the experience to being "kicked in the chest by a horse". When a

4   patient receives an inappropriate shock, the risk of heart injury or even death rises

5   substantially, not to mention the anxiety the patient feels as they sometimes receive

6   one inappropriate shock after another from their device.

7       235.    For example, Relator Andrew Schmid had a case on November 27, 2018

8   in which the shock function of the patient's device had been turned off several days

9   previously, after delivering 42 high energy shocks within about an hour. These were

10  inappropriate implantable defibrillator shocks, probably due to a Protego heart lead

11  wire failure. The patient had to be brought to the emergency room where a special

12  magnet device was placed on top of her Biotronik pacemaking device to stop the

13  shocks from continuing to occur (Exhibit 20, page 45). The attached record shows that

14  the pacing "impedance" and shock "impedance" parameters had a major decrease,

15  which can signal a loss of integrity of the wire conductor or insulation on the cable of

16  the heart lead wire (Exhibit 20, page 23).

17      236.    For example, Relator Schmid had a case on March 26, 2016, in which the

18  patient was continuously receiving inappropriate shocks from his Biotronik device due

19  to a failure of the Linox heart lead wire, and Mr. Schmid had to turn off the

20

1   defibrillation function of the pacemaker to stop the patient from continuously being

2   shocked. During the testing, Andrew noted that the failed Linox heart lead wire had

3   caused six episodes of shocking the patient, all were "non-physiologic noise" due to

4   the failed Linox heart lead wire (Exhibit 21). Two weeks later, on April 12, 2016, Mr.

5   Schmid received a text message from the patient's physician, Dr. Mazda Motallebi,

6   indicating that the patient had died suddenly (Exhibit 22). The patient was pacemaker

7   dependent and probably died because the Linox failed and the pacemaker function

8   wouldn't thereafter work correctly.

9       237.    For example, Relator Jeffrey Bell assisted with a 67-year-old female

10   patient on April 15, 2015 who had received fifty (50) inappropriate shocks from her

11   implanted defibrillator due to a failed two-year-old Linox heart lead wire. In this case,

12   the wire had been re-packaged and sold to The Sorin company, who re-sells the Linox

13   lead wires using the trade names "Volta" and the "Vigila" – but they are manufactured

14   by Biotronik as a Linox lead wire. The implanted defibrillator's battery was

15   completely depleted, and the implanted defibrillator and the heart lead wire had to be

16   removed and replaced by Dr. Lionel Faitelson (Exhibit 23).

17       238.    For example, Relator Schmid had a case on December 14, 2017 with a

18   patient where the defibrillator shock therapy had been turned off the day before. The

19   patient had had a Biotronik implantable cardiac defibrillator ("ICD") and a Linox

20

1   Smart heart lead wire implanted on the same day in February 2014. On page 12 of his

2   record, notes indicate that his ICD wrongly detected what it thought was a dangerous

3   rhythm dozens of times, approximately 36, and began charging to deliver an

4   inappropriate high energy shock, however the noise wasn't sustained, so the  high

5   energy charge was terminated, and the patient wasn't shocked that day. However, the

6   patient did receive two inappropriate shocks on December 13, 2017 (pages 53-60 of

7   the record). The doctor turned the device off, or otherwise he probably would have

8   continued to be shocked. This patient had received life-saving therapy from the ICD

9   on July 31, 2017 (pages 30-31), and only a few months later had the lead wire failure

10  (Exhibit 24).

11      239.    For example, in a case from November 22, 2018, an 83-year-old patient

12  with a Linox Smart SD 65/18 heart lead wire was inappropriately shocked twice, and

13  nearly inappropriately six other times (Exhibit 25, pages 18-20).

14      240.    For example, in a case from January 23, 2018, a 40-year-old patient with

15  a Biotronik ICD and a Linox S 65 heart lead wire was nearly shocked inappropriately

16  twice due to the ICD interpreting noise from the Linox as a heart arrythmia (Exhibit

17  26, pages 61, 63-67).

18      241.    For example, in a case from January 24, 2018, a 58-year-old male patient

19  with a Biotronik ICD and a Linox Smart S 65 heart lead wire was nearly shocked

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 80

twice due to lead wire noise and was inappropriately shocked once due to lead wire noise (Exhibit 27, pages 25, 35-39).

242.    Biotronik falsely claims a very low percentage rate of Linox lead wire failure. Biotronik has falsely claimed a very low failure rate for these devices for years.

243.    For example, in their 2018 Product Performance Report, Biotronik claims the following "confirmed malfunction" rates for a variety of Linox heart lead wires (Exhibit 28):

- 1.49% for the Linox S (p. 82)
- 0.83% for the Linox SD (p. 83)
- 0.58% for the Linox(smart) S (p. 84)
- 0.28% for the Linox(smart) S DX (p. 85)
- 0.36% for the Linox(smart) SD (p. 86)
- 0.08% for the Linox(smart) TD (p. 87)
- 0.93% for the Linox T (p. 88)
- 1.21% for the Linox TD (p. 89)

244.    According to the medical literature, the Linox failure rate is much higher than Biotronik claims. However, a number of medical research articles have pointed out the higher failure rate of the Linox heart lead wires than Biotronik's low claimed failure rate, or than competitor heart lead wires.

245.    For example, in November 2014, Padfield, et al wrote in the Journal of

Cardiovascular Electrophysiology that a review of Linox heart lead wires used in British Columbia from 2008-2012 showed a 3.4% failure rate. The researchers found that Linox's failure rate was much higher than the 0.4% failure rate of the "Durata" heart lead wire by Biotronik's competitor St. Jude Medical. The Linox lead wire also had a very poor failure rate at 5 years – 8.4% vs 0.6% for the Durata lead wire (Exhibit 29).

246.    For example, in May 2016, Noti, et al, published their findings from Bern University Hospital in Switzerland in the *Heart Rhythm* medical journal. They found that 8 out of 93 Biotronik Linox heart lead wires had failed, and that the failure rate over a 3-year period was 5.1%, far higher than the 0.8% and 0% failure rates suffered by competitor wires (Exhibit 30).

247.    For example, a December 2016, review by van Malderen, et al, noted that the Biotronik Linox heart lead wires had the worst survival rate at 5 years compared to competing lead wires by St. Jude Medical company and by Boston Scientific. The Linox had a 5.9% failure rate, compared to only 1.5% for the Boston Scientific and St. Jude wires (Exhibit 31).

248.    For example, a July 2018, review by Weberndörfer, et al, found that Biotronik Linox Smart heart lead wires had a 5-year failure rate of 14.0%, compared to a rate of only 1.3% among a group of competitor's lead wires (Exhibit 32).

249.    Despite Biotronik's claims of low incidence rates of failure the FDA has received many thousands of failure reports, and a number of death reports. The "MAUDE" FDA database for reporting device adverse events has thousands of reports for the Biotronik Linox heart lead wire.

250.    For example, just since December 28, 2017, the FDA has received over 500 reports of Linox heart lead wire failures, many causing patient harm, or causing additional patient risk and cost as the wires had to be removed and replaced (Exhibit 33).

251.    Since January 2011, the FDA has received 3,839 reports of malfunctions of the Linox leads (Exhibit 34), 479 reports of malfunctions of the Linox leads sold as the "Protego" (Exhibit 35), and 243 reports of malfunctions of the Linox leads sold as the "Vigila" and "Volta" by the Sorin company (Exhibit 36).

252.    For example, a September 12, 2012 MAUDE adverse event report to the FDA stated that a Linox lead wire failed due to a possible insulation break, causing electrical arcing between the lead wire and the implanted defibrillator, and making it impossible to communicate with the device in order to program its parameters. The physician explanted [surgically removed] the lead wire and sent it to Biotronik for review. Biotronik noted that the lead wire "demonstrated multiple signs of abrasion and a rubbed through insulation" (Exhibit 37).

253.   The FDA has also received 76 reports of death related to the Linox, "Protego", and "Volta" lead wires, some of which were related to device malfunction by the patients' physicians (Exhibit 38).

254.   The surgical removal, or "explanting" or extraction of a heart lead wire is inherently dangerous, as human tissue grows around the lead wire, making it difficult to extract without causing damage to the surrounding tissue, up to and including death of the patient. For example, a December 13, 2016 MAUDE adverse event report to the FDA on a Linox lead wire noted that the wire was extracted due to the development of a lead fracture, resulting in the patient's death during the extraction process (Exhibit 39).

255.   For example, a report of death to the FDA stated that on April 21, 2011, a device continued to shock the patient inappropriately, causing the patient to run his car into a bus while still shocking him (Exhibit 40).

256.   For example, a report of death to the FDA stated that on December 10, 2014, a device delivered an inappropriate shock due to a short-circuit of the Linox lead wire, 59 months after implantation (Exhibit 41).

257.   Abrasion of the lead wire insulation, exposing the metal wire itself and causing shorts with other wires or with the implanted defibrillator appear to be relatively common with the Linox lead wires. Numerous reports in the medical

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 84

1  literature and on the FDA MAUDE adverse event reports over the years point to this

2  problem.

3      258.    For example, Relator Jeffrey Bell recently spoke to a Sorin rep in South

4  Carolina, said he's been seeing so many problems with the Linox that "you wouldn't

5  believe it". The rep stated that he has been working there for the past eight years and

6  seen these Linox problems all along. Relator Jeffrey Bell has seen Linox leads fail

7  within six months of implanting them. At least a couple of patients had noise all the

8  time after a couple months with the Linox, and Relator Jeffrey Bell had to turn off the

9  defibrillator shocking function to ensure the Linox wires did not cause the implanted

10  defibrillators to start shocking the patients repeatedly.

11     259.    Biotronik continues to sell these dangerous, potentially deadly lead wires.

12  Despite the high number of malfunctions due to friction and abrasion and fracture of

13  the insulation of the Linox lead wires, the company has never stopped selling them to

14  date nor corrected its false promotion of a low percentage of failures. Biotronik has

15  been selling a replacement lead wire for the Linox leads for over a year but is still

16  carrying an extensive inventory of the Linox lead wires for sale nationwide. The new

17  lead wire, the "Plexa", uses a silicon coating material that "absorbs force and protects

18  the cables", apparently a design acknowledgment of the significant problems with the

19  abrasion problems and broken insulation that plagued the Linox lead wires (Exhibit

20

42). Yet the company continues to promote and sell the failing Linox lead wires in a substantial volume.

260.    For example, records of Biotronik inventories currently carried by sales representatives and field clinical representatives are as follows:

a.  Linox Smart S65 and DX65-15 lead wires - there are 123 of them in the field just waiting to be implanted located all over the country, not including the stocks the company can sell from headquarters (Exhibit 43).

b.  Linox Smart SDX65-17 and SD60-16 lead wires - there are 80 of them in the field with sales and clinical representatives just waiting to be implanted located all over the country (Exhibit 44).

c.  Linox Smart SD65-18 lead wires - there are 19 of them in the field with sales and clinical representatives just waiting to be implanted located all over the country (Exhibit 45).

d.  Protego T65 and 65-16 lead wires - there are 63 of them in the field with sales and clinical representatives just waiting to be implanted located all over the country (Exhibit 46).

e.  Protego S60 and S65 lead wires - there are 74 of them in the field with sales and clinical representatives just waiting to be implanted

1   located all over the country (Exhibit 47).

2

3   ## V. BIOTRONIK'S VIOLATIONS OF THE ANTI-KICKBACK STATUTE

4   261.   The Anti-Kickback Statute (AKS) prohibits any person or entity from

5   knowingly and willfully offering, paying, soliciting, or receiving any remuneration,

6   directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering,

7   arranging for, or recommending the purchase or ordering of any goods or services for

8   which payment may be made, in whole or in part, under a federal health program,

9   including Medicare (see 42 U.S.C. § 1320a-7b). Furthermore, violations of the AKS

10  are also subject to civil monetary penalties (see 42 U.S.C. § 1320a-7a)

11  262.   For the purposes of the AKS, remuneration includes the transfer of

12  anything of value, "directly or indirectly, overtly or covertly, in cash or in kind" (see

13  42 U.S.C. § 1320a-7b(b)(l). The AKS covers any arrangement where one purpose of

14  the remuneration was to obtain money for the referral, item, or service, or to induce

15  further referrals, or further purchase of items or services.

16  263.   As codified in the Patient Protection and Affordable Care Act of 2010, a

17  claim for payment to a Federal Health Care Program that includes items or services

18  resulting from a violation of The Anti-Kickback Statute (42 USC § 1320a-7b)

19  constitutes a false or fraudulent claim for purposes of the False Claims Act. (See

20

paragraph (g) of 42 U.S.C. § 1320a-7b).  Furthermore, in accordance with paragraph (f) of 42 U.S.C. § 1320a-7b, the term Federal Health Care Program means: (1) any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government (other than the health insurance program under chapter 89 of title 5); or (2) any State health care program, as defined in [42 U.S.C. §] 1320a–7(h)].  This amendment to the AKS clarifies "that all claims resulting from illegal kickbacks are considered false claims for purposes of civil action under the False Claims Act" (see 155 Cong. Rec. S10854, statement of Senator Leahy).

264.     In addition to manufacturing, marketing, selling, and licensing to sell illegally marketed devices, as more fully alleged herein, Biotronik also engaged in a widespread and pervasive scheme of illegal kickbacks via nepotistic hiring and illegal cash and entertainment schemes to boost sales of their illegally marketed devices resulting in unjust enrichment. Among other improper inducements, Biotronik provided inappropriate jobs for family members of physicians to implant devices or to refer patients for implant; and provided cash and entertainment for physicians who had the potential to create higher returns on investment for the company.

265.     Biotronik uses illegal kickbacks and quid pro quo arrangements to induce physicians to cause the purchasing, leasing, ordering and use, or arranging for or

recommending purchasing, leasing, or ordering and use, of Biotronik's devices for which payment may be made in whole or in part under Government Health Care Programs.

266.    Biotronik funnels illegal payments to physicians to encourage them to implant Biotronik devices through direct payments or by payments to their family members.

267.    Such conduct was specifically a violation of Biotronik corporate policy and was a violation of the Anti-Kickback statute.

268.    The Code of Business Conduct also states that Biotronik personnel should not pay for recreation or entertainment: "BIOTRONIK-sponsored meals and refreshments provided in conjunction with a consultant meeting should be modest in value and be subordinate in time and focus to the primary purpose of the meeting. BIOTRONIK shall not provide recreation or entertainment in conjunction with these meetings" (Exhibit 48).

269.    Starting in at least 2011, and continuing up until present time, Biotronik has defrauded Medicaid, Medicare, TriCare, and other public and private insurance payors by paying illegal inducements to cardiologists and electrophysiologists. Biotronik also funnel illegal payments to physicians to encourage them to implant Biotronik devices through direct cash payments or by inviting them to expensive

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 89

dinners and other meals. Under this guise, Biotronik recruits physicians to dinners or conferences or entertainment and pays the expenses for them and their local physician referral sources to be entertained at expensive dinners or on paid excursions to induce them to give up to one hundred percent (100%) of their pacemaker and cardiac implant patients to the implanting physicians that use Biotronik devices.

*1. Expensive meals, golf, Major League Baseball, Strip Clubs, and entertaining spouses as kickbacks*

270.     Biotronik also funnels illegal inducements to physicians to encourage them to implant Biotronik devices by inviting them to expensive dinners and other meals, and pays for them to golf, go to major league baseball games, strip clubs, and other entertainment. Biotronik recruits physicians to dinners or conferences or entertainment and pays the expenses for them and their local physician referral sources to be entertained at expensive dinners or on paid excursions to induce them to give up to one hundred percent (100%) of their pacemaker and cardiac implant patients to the implanting physicians that use Biotronik devices.

271.     For example, for the date of May 31, 2018 the online calendar for Biotronik Tucson noted that dinner at the Curves strip club had been scheduled for Dr. David Lapan (Exhibit 49).

272.     The Biotronik Code of Business Conduct defines appropriate meals for

1    healthcare professionals, saying in part, "The meal should be incidental to the bona

2    fide presentation of scientific, educational, or business information and be provided in

3    a manner conducive to the presentation of such information. The meal should not be

4    part of an entertainment or recreational event…. • Meals should be in a setting that is

5    conducive to bona fide scientific, educational, or business discussions" (Exhibit 50).

6        273.    However, Biotronik sales representatives routinely schedule

7    entertainment activities and dinners and meals at high-priced restaurants to impress

8    physicians and try to buy their business. Orange County, California-based

9    independent sales representative Bill Blair has claimed that, per upper management,

10   he is entitled and authorized to use the corporate expense accounts and credit cards of

11   all Biotronik employees in the area. Bill Blair regularly insists that he be loaned a

12   corporate credit card to expense meals and entertainment with physician customers

13   and their wives and families.

14       274.    Bill Blair has taken Relator Andrew Schmid's corporate credit card

15   repeatedly and continuously and given Relator Schmid receipts and names of business

16   meal attendees. Many times, the name lists appeared to be incomplete or false.

17       275.    Bill Blair routinely used the corporate credit card of Relator Andrew

18   Schmid and other local Biotronik employees in Orange County, Long Beach, and the

19   Los Angeles County, CA area to pay for these dinners and entertainment activities for

20

the physicians and their wives and families. This is also true for Arizona. Biotronik

field clinical staff are also required to give their Biotronik corporate credit cards to

independent sales representative Michael McCormick to pay for his entertainment of

Arizona physician customers.

276.     For example, a series of pictures from a Los Angeles Dodgers baseball

playoff game on October 6, 2017, shows Biotronik sales representative Bill Blair,

Biotronik clinical representatives Jason Pagano and Mike Candeleria, entertaining the

catheter lab manager from Lakewood Regional Medical Center. The pictures show

them in the luxury suites of the Dodgers game. This was a Dodgers' playoff game

where they won the Division Series against the Arizona Diamondbacks, with their

best pitcher, Clayton Kershaw, pitching. The price for these tickets could be from

hundreds of dollars to thousands of dollars. For example, according to one Fox sports

news report, Dodgers' World Series tickets this year will average $3,332 each (Exhibit

51).

277.     Lakewood Regional Medical Center's Biotronik sales for the past 12

months were about $2.6 million dollars, about 50% market share at that hospital. Only

one other Tenet hospital had higher Biotronik sales over that period than Lakewood

(Exhibit 52).

278.     For example, a series of pictures from an Anaheim Angels professional

baseball game on August 31st, 2016, show Biotronik sales representative Bill Blair,

Karey Seitz Bresnahan (Lakewood Regional Medical Center Cardiac Catheter Lab

Manager), Lionel Magdalena (Lakewood Regional Medical Center Catheter Lab

Technologist), and Roger Gonzalez (Lakewood Regional Medical Center Cardiac

Catheter Lab Technologist) enjoying the game together. On information and belief,

Bill Blair paid for these Biotronik clients to attend the game with him (Exhibit 53).

279.     For example, a series of pictures and receipts from a May 15, 2014

Anaheim Angels professional baseball game shows stadium pictures and

entertainment that Biotronik paid for its customers after the game at The Catch

Restaurant, adjacent to the Angels Stadium. The pictures show Biotronik sales

representative Bill Blair entertaining clients from Lakewood Regional Medical Center

including catheter lab manager Karey Seitz Bresnahan, and catheter lab technologists

Lionel Magdaleno and Roger Gonzalez. Bill Blair used Relator Andrew Schmid's

credit card to pay $142.92 for the meal at The Catch Restaurant for that evening,

including seven alcoholic drinks from the bar (Exhibit 54).

280.     For example, a series of pictures and receipts from a June 19, 2013

Anaheim Angels professional baseball game showed Biotronik sales representative

Bill Blair entertaining Biotronik customers from Lakewood Regional Medical Center.

Attendees included catheter lab manager Karey Seitz Bresnahan and catheter lab

technologists Roger Gonzalez and Lionel Magdelano. Bill Blair used Relator Andrew Schmid's corporate credit card and paid $184.37 for a meal at The Catch Restaurant at Angel's Stadium for the group, including eight alcoholic drinks from the bar. Bill Blair falsely reported Relator Andrew Schmid as an "attendee" at the event (Exhibit 55).

281.    For example, Softball game pictures from March 5, 2015 with Biotronik sales rep Bill Blair and the staff at the Lakewood Regional Medical Center cardiac catheter lab. Relator Andrew Schmid understands that Bill Blair is using his money or Biotronik money to pay for the softball equipment and/or league fees and/or post-game bar tabs (Exhibit 56).

282.    For example, on the date of 6-25-14 the Biotronik online sales calendar noted that Bill Blair added a meeting reminder to book a special dinner for Dr. Joseph Song at the Aria Casino in Las Vegas, and to also check if there were Eagles rock concert tickets available or not for their October performance (Exhibit 57).

283.    For example, a series of pictures from April 15, 2012 show Biotronik sales representative Bill Blair entertaining customers at the Long Beach, California, Grand Prix car racing event. Attendees included Biotronik client Dr. Joseph Song, Lakewood Regional Medical Center catheter lab manager Karey Seitz Bresnahan (Exhibit 58).

284.    For example, on or around April 29, 2013, Biotronik sponsored a wine tasting "referral dinner" event with "referring and implanting doctors" at The Strand House, a beachfront restaurant in Manhattan Beach, CA.  A picture from the event shows attendees included Dr. Milan Rawal (a Lakewood Regional Medical Center referring cardiologist), Dr. Isaac Eisenstein (a Lakewood Regional Medical Center cardiologist who implants pacemaker devices), Dr. Prash Jayaraj (an implanting clinical cardiac electrophysiologist and a paid Biotronik consultant), Biotronik Regional Sales Director Bob Marsella, Biotronik sales representative Bill Blair, Dr. Milan Rawal's wife, Lakewood Regional Medical Center catheter lab manager Karey Seitz Bresnahan, and other Biotronik customers (Exhibit 59).

285.    For example, a July 27, 2016, picture shows a birthday party for Karey Seitz Bresnahan, the catheter lab manager for Lakewood Regional Medical Center. The party was paid for by Biotronik sales representative Bill Blair and was held at East Side Mario's restaurant in Lakewood, California. Attendees included other Lakewood catheter lab staff members, including cardiac nurse Carla Hatcher, cardiac nurse Noel Marie, another cardiac nurse named Carlos, catheter lab staff member Charrise Powell, trauma nurse Jerred Gomez and his wife Daniella and their child. Biotronik attendees included Bill Blair, field clinical specialist Jason Pagano, and field clinical specialist Mike Candelaria (Exhibit 60).

286.     For example, Biotronik paid for an office Christmas party for staff and spouses of their client Dr. Alicia Montanez on December 8, 2016. Biotronik reported spending $392 on Dr. Alicia Montanez, which Relator Andrew Schmid states was the average amount per person who attended (Exhibit 61).

287.     For example, pictures and receipts show that Biotronik paid for December 11, 2015, Annual Holiday Party for the offices of Dr. Alicia Montanez and Dr. Octaviano Roges at Hannah's Restaurant in Rancho Santa Margarita, CA. Attendees included Ryan Romero (spouse to office employee Mayra Romero), Babak Khorram (spouse of office employee Liza Khorram),Liza Khorram (scheduler for Dr. Alicia Montanez), the spouse of office employee Cindy Alcantar, Cindy Alcantar (medical assistant for Dr. Alicia Montanez office), Mayra Romero (front office staff for Dr. Octaviano Roges), some out of town guests of Dr. Alicia Montanez and Dr. Octaviano Roges, Vivian Roges (office staff of Dr. Alicia Montanez and Dr. Octaviano Roges), Dr. Alicia Montanez (implanting physician and important Biotronik customer), Dr. Octaviano Roges (husband and office partner of Dr. Alicia Montanez), and the two children of Dr. Alicia Montanez and her husband Dr. Octaviano Roges. Biotronik sales representative Bill Blair submitted a falsified expense report to the company for this party with falsified sign-in sheets. Attendees not listed on the expense report were two friends of Dr. Alicia Montanez who were

visiting from out of town, the two children of Dr. Alicia Montanez, Ryan Romero (spouse of office employee Mayra Romero), and the spouse of medical assistant Cindy Alcantar.  Bill Blair added the names of Biotronik employees as attendees on the expense report who did not attend, including Andres Williams, Clea Fuenzalida, Jason Pagano, and Andrew Menker, and PIH-Downey Hospital cardiac catheter lab employees BJ Jacinto, Miles Messina, and Mike Cerom. Biotronik reported $134.25 each for this restaurant Holiday party to CMS for Sunshine Act reporting, and falsely reported the activity as an office "in-service" (Exhibit 62).

288.    For example, pictures and receipts show that Biotronik paid for a December 16, 2014, Annual Holiday Party for the offices of Dr. Alicia Montanez and Dr. Octaviano Roges at Anqi Restaurant in Costa Mesa, CA. Attendees included Ryan Romero (spouse to office employee Mayra Romero), Babak Khorram (spouse of office employee Liza Khorram),Liza Khorram (scheduler for Dr. Alicia Montanez), Mayra Romero (front office staff for Dr. Octaviano Roges), Vivian Roges (office staff of Dr. Alicia Montanez and Dr. Octaviano Roges), Dr. Alicia Montanez (implanting physician and important Biotronik customer), Dr. Octaviano Roges (husband and office partner of Dr. Alicia Montanez), and the two children of Dr. Alicia Montanez and her husband Dr. Octaviano Roges. Biotronik reported $156.06 each for this restaurant Holiday party to CMS for Sunshine Act reporting (Exhibit 63).

289.     For example, pictures and receipts show that Biotronik paid for December 18, 2013, Annual Holiday Party for the offices of Dr. Alicia Montanez and Dr. Octaviano Roges at Mastro's Steakhouse in Costa Mesa, CA. Attendees included Vivian Roges (clinic staff), Dora Rodriguez (office medical assistant), Mayra Romero (office medical assistant), Liza Khorram (office scheduler) Dr. Alicia Montanez (implanting EP and Biotronik consultant), Dr. Octaviano Roges (spouse and office partner of Dr. Alicia Montanez). Biotronik reported $145.65 each for this restaurant Holiday party to CMS for Sunshine Act reporting (Exhibit 64).

290.     For example, pictures and receipts from a Biotronik-sponsored December 13, 2013, Annual Christmas Party for Lakewood Regional Medical Center show Biotronik personnel partying with Lakewood Regional customers at Phil Trani's Restaurant. A $1,489.46-dollar receipt from the event shows that Biotronik paid $750.50 for 51 alcoholic drinks. Attendees included Biotronik sales representative Bill Blair, Biotronik field clinical specialists Frances Calzadillas and Clea Fuenzalisda, the Relator Andrew Schmid, and customer Dr. Milan Rawaj, staff from the Lakewood Regional Medical Center catheter lab, and their spouses and significant others. Bill Blair used Relator Andrew Schmid's corporate credit card to pay for the event and falsified the expense report and did not list the spouses and significant others (Exhibit 65).

291.    For example, Biotronik paid for a happy hour for Dr. Alicia Montanez's office staff on October 12, 2017. The happy hour was held at a TGI Friday's restaurant, and the total bill was for $278.55, including $139.99 worth of liquor (Exhibit 66).

292.    For example, on September 8, 2015, Biotronik paid $110.04 for a catered breakfast from Einstein Bros. Restaurant for a group of cardiologists and cardiology fellows at Long Beach VA Medical Center (Exhibit 67).

293.    For example, on June 23, 2017, Biotronik independent sales representative Bill Blair demanded from local Biotronik employees the amount of money available to spend on their Biotronik corporate credit cards and asked for their card balances. He picked one of their cards to use that weekend for a dinner (Exhibit 68).

294.    For example, on May 23, 2017, Bill Blair demanded from local Biotronik employees the amount of money available to spend on their Biotronik corporate credit cards and asked for their card balances. He picked Relator Andrew Schmid's card to use the next night for a dinner (Exhibit 69).

295.    For example, on April 20, 2017, Bill Blair demanded from local Biotronik employees the amount of money available to spend on their Biotronik corporate credit cards and asked for their card balances to use that day for a lunch

1  (Exhibit 70).

2     296.    For example, on April 19, 2017, Bill Blair demanded from local

3  Biotronik employees the amount of money available to spend on their Biotronik

4  corporate credit cards and asked for their card balances to use that day for a "doc

5  dinner" (Exhibit 71).

6     297.    For example, Bill Blair ordered Relator Andrew Schmid to attend an

7  office staff holiday party on December 9, 2016 with Dr.'s Alicia Montanez and

8  Octaviano Roges and their children and wives. Biotronik sales manager Bob Marsella

9  expensed the party (Exhibit 72).

10     298.    For example, Bill Blair ordered Relator Andrew Schmid to attend and

11  help pay for a doctor's office nurse retirement party on May 19, 2016 (Exhibit 73).

12     299.    For example, on December 11, 2015, Relator Andrew Schmid was

13  instructed to pay for a $1,579 Christmas party for Dr. Alicia Montanez' and Dr.

14  Octaviano Roges' staff at Hanna's Restaurant in Rancho Santa Margarita, California

15  (Exhibit 74).

16     300.    For example, on June 26, 2014, Relator Andrew Schmid was instructed

17  to attend and pay part of the cost of a $419 "going away party" at Joseph's Bar and

18  Grill for Michael Soromaya, a technician from Caremore Medical Group (Exhibit 75).

19     301.    For example, on December 22, 2014, Relator Andrew Schmid was

20

instructed to pay for a $621 Christmas party for Dr. Howard Elkin, his significant other, office staff and spouses at Phlight Restaurant and Wine Bar in Rancho Santa Margarita, California (Exhibit 76).

302.    For example, on December 13, 2013, Relator Andrew Schmid was instructed to pay for a $1,489 Christmas party for the Lakewood Regional Medical Center Cath Lab doctors and staff at Phil Tranis Restaurant in Long Beach, California (Exhibit 77).

303.    For example, on July 26, 2016, Relator Andrew Schmid was instructed to pay for a $275 catered lunch order from Super Mex Catering in Lakewood, California for the birthday party of Lakewood Regional Medical Center catheter lab manager Karey Seitz-Bresnahan (Exhibit 78).

304.    For example, on November 30, 2016, Relator Andrew Schmid was instructed to attend and pay for a $736 dinner at Maestro's Steakhouse in Costa Mesa, California with Bill Blair, Jason Pagano, his wife Erin, Dr. Mark Lee and his fiancée (Exhibit 79).

305.    For example, on June 26, 2013, Relator Andrew Schmid was instructed to pay for a $403 meal from Juan Great Fiesta in Santa Fe Springs, California for the baby shower party for Dr. Gary Marsh of Caremore Medical Group (Exhibit 80).

306.    For example, Biotronik paid Dr. Leon Feldman as a Biotronik consultant

a total of $245,939 in "General" payments according to the government Centers for Medicare and Medicaid Services ("CMS") from 2013-2017. Feldman was within the top-ten highest paid physicians by Biotronik for each year from 2013-2017. Mike Whitaker was the Biotronik sales rep supporting Dr. Feldman and Christian Marin is a Biotronik Field Clinical Staff ("FCS") supporting Dr. Feldman in the Palm Springs, Rancho Mirage, and Inland Empire area of California. Former Biotronik FCS Jason Pagano told Andrew Schmid that Pagano was friends with Biotronik FCS Christian Marin, and that during conversations between Pagano and Marin, Marin detailed the fact that Biotronik sales rep Mike Whitaker would use Marin's Biotronik corporate credit card to take Dr. Feldman "bar hopping" several nights per week. Marin said he was always nervous submitting his expense reports because Whitaker would use the credit card throughout the night at multiple bars and night clubs, and he would have no way to justify those expenses if questioned by the compliance department. Biotronik FCS Andrew Menker also had a conversation with Andrew Schmid about Whitaker and Feldman. Andrew Menker knew Whitaker and Feldman; he was previously a trainee and watched Dr. Feldman implant devices. Menker told Schmid that he saw Whitaker and Feldman out at a bar one night, and an intoxicated Whitaker told him that he and Dr. Feldman take drugs together, such as MDMA (ecstasy) and marijuana. During a conversation with another former Biotronik employee, Barry

Hawkins, Barry told Andrew that to be a successful sales rep with Dr. Feldman, one must be willing to party with Feldman every night, and basically "sell your soul" (Exhibit 81).

307. The online business calendar for the Biotronik Tucson sales team showed schedules for sales representative Mike McCormick to take physician customers to golf outings on several occasions. For example, a June 12, 2018 Golf outing between Biotronik sales representative Mike McCormick and Dr.'s Michael Alloway and Douglas Peterson at Tucson Country Club (Exhibit 82).

308. For example, for the date of June 16, 2018 Mike McCormick made an online Biotronik calendar entry for a Golf outing for himself and Dr. Monty Morales' family at La Paloma Country Club (Exhibit 82).

309. For example, for the date of July 7, 2018 Mike McCormick made an online Biotronik calendar entry for a Golf outing between himself and Biotronik's Anthony Kumar with Dr.'s Mukesh Gopalakrishnan and Ajay Tuli at Tucson Country Club (Exhibit 82).

310. The Biotronik Tucson calendar showed schedules for numerous happy hours, dinners, and lunch events for customers at expensive bars and restaurants in the Tucson, Arizona area from 2013-2018. For example, a May 17, 2018 Dinner meeting with Biotronik sales representative Mike McCormick and Dr. Santiago Ramirez at

Flemings Steakhouse (Exhibit 83).

311.    For example, for the date of May 23, 2018 an online Biotronik calendar entry was made for bringing Whole Foods Smoothies for all of Dr. Thomas Waggoner's staff (Exhibit 83).

312.    For example, for the date of June 5, 2018 an online Biotronik calendar entry was made for a Dinner Meeting between Mike McCormick and Dr. Jitender Munjal (Exhibit 83).

313.    For example, for the date of June 16, 2018 an online Biotronik calendar entry was made for a Party for Dr. Sanjaya Hebbar at Skyline Country Club (Exhibit 83).

314.    For example, for the date of June 18, 2018 an online Biotronik calendar entry was made for a Dinner for Dr. Monty Morales at Persian Room Fine Dining by Robin Singh (Exhibit 83).

315.    For example, for the date of June 19, 2018 an online Biotronik calendar entry was made for Lunch at the Ambulatory Surgery Center (Exhibit 83).

316.    For example, for the date of June 22, 2018 an online Biotronik calendar entry was made for a lunch for Dr. Thomas Waggoner of Pima Heart clinic (Exhibit 83).

317.    For example, for the date of June 27, 2018 an online Biotronik calendar

entry was made for a Lunch for Doctors at Pima Heart cardiology clinic in Tucson (Exhibit 83).

318. For example, for the date of July 5, 2018 an online Biotronik calendar entry was made for a Dinner meeting between Mike McCormick and Dr. Basel Skeif at Vivace restaurant (Exhibit 83).

319. For example, for the date of July 6, 2018 an online Biotronik calendar entry was made for a Lunch at Dr. Richard Reilly's office for 15 people (Exhibit 53).

320. For example, for the date of June 26, 2018 an online Biotronik calendar entry was made for a Referral lunch for Dr. Rajen Desai from a Biotronik rep to help build his business (Exhibit 83).

321. For example, for the date of July 2, 2018 an online Biotronik calendar entry was made for a marketing lunch to increase Dr. Peter Spooner's referral business (Exhibit 83).

322. For example, for the date of August 16, 2018 an online Biotronik calendar entry was made for a referral lunch for Mike McCormick with Dr. Rajen Desai and 22 people (Exhibit 83).

323. For example, for the date of September 14, 2018 an online Biotronik calendar entry was made for a Referral lunch with Biotronik sales representative Mike McCormick and Biotronik physician customer Dr. Rajen Desai with his referral

partner physicians and 10 others (Exhibit 86).

324.    For example, for the date of October 2, 2018 an online Biotronik calendar entry was made for a referral "sales" lunch for Dr. Jitender Munjal with internist Dr. Rashmi Chhabra in Green Valley, Arizona (Exhibit 86).

325.    For example, for the date of October 8, 2018 an online Biotronik calendar entry was made for a Referral lunch for Dr. Robert Smith and 9 staff at the office of Saguaro Physicians (Exhibit 83).

326.    For example, for the date of October 19, 2018 an online Biotronik calendar entry was made for a referral lunch for Dr. Jitender Munjal with internist Dr. Rashmi Chhabra at his office at 120 W. Calle de La Tiendas, Green Valley, AZ (Exhibit 83).

327.    For example, for the date of November 8, 2018 an online Biotronik calendar entry was made for a Referral lunch for physician customers and 24 staff (Exhibit 83).

328.    For example, for the date of December 6, 2018 an online Biotronik calendar entry was made for a Referral lunch for Eldorado Internal Medicine clinic for 25 people (Exhibit 83).

329.    For example, for the date of January 17, 2019 an online Biotronik calendar entry was made for a referral dinner for Dr. Jitender Munjal with internist Dr.

William Howe at Fleming's Steakhouse (Exhibit 83).

330.    For example, for the date of February 6, 2019 an online Biotronik calendar entry was made for a Referral lunch for Dr. Sal Tirrito's office in Rincon, Arizona (Exhibit 83).

331.    These included dinners with VA Hospital personnel, birthday dinners for doctors, and "referral" dinners and lunches in which Biotronik paid for expensive meals and drinks for a physician and their community referral partner physicians as a form of inducement. For example, for the date of June 14, 2018 an online Biotronik calendar entry was made for a Referral lunch for Dr.'s Rajen Desai, Peter Spooner and Pima Heart physicians, at El Dorado restaurant, 30 people (Exhibit 83).

332.    A large number of additional examples of dinners, lunches, birthday lunches and dinners, referral lunches and dinners were held according to Biotronik calendar entries and text messages, as follows (Exhibit 84):

| Date | Customers and Location |
|------|------------------------|
| 3/26/13 | Dr. Santiago Ramirez – confirm for Thursday |
| 4/9/13 | Dr. Kioumars Mostafizi - Flemings |
| 4/16/13 | Dr. Kioumars Mostafizi dinner |
| 4/17/13 | Dr. Charles Katzenberg lunch - Fresh |
| 4/17/13 | Dr. Monty Morales dinner |
| 4/25/13 | Dr. Kioumars Mostafizi dinner - Five Palms |
| 5/21/13 | Dr. Ralph Morales - dinner 6pm |

| Date | Customers and Location |
|---|---|
| 6/11/13 | Dr. Kioumars Mostafizi's dinner |
| 6/25/13 | Dr. Mark Goldberg lunch – Choice Greens |
| 7/10/13 | Dr. Sal Tirrito Schedule lunch or dinner |
| 7/24/13 | Dr. Tirrito lunch or dinner<br>Dr. Sanjaya Hebbar dinner Sullivan's |
| 8/21/13 | Dr. Kioumars Mostafizi dinner at Sullivans Table for 12 |
| 9/11/13 | Tucson Medical Center lunch, 35 people |
| 10/9/13 | Dr. Charles Katzenberg lunch |
| 10/23/13 | Dinner Dr. Sal Tirrito and Dr. Monty Morales Five palms |
| 10/25/13 | Dr. Sal Tirrito and Dr. Rodriguez lunch - Panera |
| 10/30/13 | Dr. Sal Tirrito and Dr. Monty Morales - Five palms dinner |
| 11/5/13 | Dr. Sal Tirrito lunch |
| 11/13/13 | Dr. Brenda Wells lunch |
| 12/18/13 | Dr. Mark Goldberg lunch |
| 1/28/14 | Lunch with Desert cardiology 40 people |
| 1/29/14 | Dr. Armando Gonzales |
| 1/31/14 | Dr. Mark Ellis dinner Tucson Medical Center Emergency room doctor – Bob's Steak House |
| 3/6/14 | Dr. Mark Goldberg lunch |
| 3/11/14 | Dr. Monty Morales dinner - Flemings or Nox |
| 3/11/14 | Dr. Sal Tirrito, Dr. Veronica Pimienta lunch, 7 people |
| 5/14/14 | Dr. Monty Morales lunch – Ragazzi restaurant |
| 6/12/14 | Dr. Sal Tirrito, Dr. Brenda Wells lunch |
| 6/17/14 | Dr. Benigno Decena lunch - Zinburger |
| 6/25/14 | Dr. Gregory Pennock lunch |
| 7/1/14 | Dr. Benigno Decena lunch - Zinburger |
| 7/28/14 | Dr. Kioumars Mostafizi dinner - Tavolino 12 people |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 108

| Date | Customers and Location |
|------|------------------------|
| 8/6/14 | Tucson Medical Center lunch, 30 people |
| 8/22/14 | Dr. Lee Goldberg lunch |
| 9/2/14 | Mike Iverson and Dr. Sal Tirrito and Dr. Monty Morales dinner - Vivace |
| 9/3/14 | Dr. Mark Goldberg lunch |
| 9/5/14 | Dr. Sal Tirrito dinner - Phx |
| 9/17/14 | Dr. Kioumars Mostafizi dinner - Sullivan's |
| 10/8/14 | Dr. Mark Goldberg lunch |
| 10/14/14 | Dr. Morales lunch and speaker nomination form – Pho across from Northwest Medical Center |
| 10/15/14 | Desert Cardiology lunch 45 people |
| 10/27/14 | Nurse Practitioner dinner |
| 11/5/14 | Dr. Kioumars Mostafizi dinner - Armitage 7 people |
| 11/12/14 | Dr. Sal Tirrito dinner - Nox |
| 12/22/14 | Dr. Sal Tirrito, Tucson Medical Center lunch |
| 1/26/15 | Tucson Medical Center catheter lab lunch |
| 2/20/15 | Dr. Syyeda Siddiqui, Dr. Sal Tirrito lunch |
| 3/3/15 | Dr. Mason Garcia dinner |
| 3/11/15 | Dr. Ralph Morales dinner - Primo |
| 3/11/15 | Dr. Sal Tirrito lunch United Clinic 5 people |
| 3/18/15 | Dr. Mark Goldberg lunch |
| 3/19/15 | Dr. Lee Goldberg lunch |
| 4/1/15 | Dr. Monty Morales lunch – RA Sushi bar |
| 4/9/15 | Dr. Monty Morales dinner - Flemings '12 people |
| 4/16/15 | Dr. Sal Tirrito - Five palms dinner Sal/ sassan Momtazbakhsh AIM |
| 4/23/15 | Dr. Santiago Ramirez staff dinner - Sullivans |
| 5/8/15 | Tucson Medical Center catheter lab lunch |

| Date | Customers and Location |
|---|---|
| 5/19/15 | Dr. Timothy Marshall clinic lunch |
| 6/8/15 | Dr. Lee Goldberg clinic lunch |
| 6/17/15 | Dr. Gregory Pennock - Flemings |
| 7/8/15 | Dr. David Stout, Dr. Sal Tirrito dinner - Yardhouse/ Robin |
| 7/20/15 | Dr. Craig Hoover Dinner Meeting - Flemings |
| 7/23/15 | Dr. Kioumars Mostafizi referral dinner - Flemings |
| 8/5/15 | Dr. Sal Tirrito dinner - Nox |
| 8/12/15 | Dr. Peter Spooner, Dr. Rajen Desai referral dinner with primary care physicians - Flemings |
| 8/21/15 | Dr. Monty Morales lunch |
| 8/27/15 | David Strout FNP lunch, 20-25 people – Old Pueblo |
| 9/17/15 | Dr. Alexandre Benjo referral lunch – AZ Kidney Disease & Hypertension |
| 9/24/15 | Dr. Alexandre Benjo meet & greet lunch – Comprehensive Care Tucson |
| 9/25/15 | Dr. Hoang Minh Thai lunch – VA Hospital |
| 9/29/15 | Dr. Ralph Morales dinner – Robin |
| 10/7/15 | Dr. David Lapan, Dr. Alexandre Benjo dinner – Kingfisher |
| 10/7/15 | Dr. Peter Spooner, Dr. Brian Martin lunch – El Dorado Medical Building |
| 10/13/15 | Dr. Santiago Ramirez office lunch |
| 10/14/15 | Dr. Mark Goldberg, Dr. Jessica Hoffman dinner |
| 10/29/15 | Dr. Alexandre Benjo referral lunch – AZ Kidney Disease & Hypertension |
| 11/4/15 | David Strout FNP referral lunch |
| 11/19/15 | Dr. William Howe dinner – Vivaci |
| 11/25/15 | Dr. Mark Goldberg BBQ lunch |
| 12/3/15 | Dr. Craig Hoover dinner |

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 110

| Date | Customers and Location |
|---|---|
| 12/9/15 | Dr. Ajay Tuli, Dr. Paul Bejarano and primary care physicians – Flemings |
| 12/9/15 | Dr. Peter Spooner, Dr. Martin lunch – El Dorado Internal Medicine |
| 12/10/15 | Dr. Darren Peress dinner – Living Room |
| 12/15/15 | Dr. David Lapan dinner |
| 12/17/15 | Dr. Peter Ott lunch - AZ Inn |
| 1/9/16 | Dr. Santiago Ramirez dinner – Hacienda Del Sol |
| 1/13/16 | Dr. Darren Peress dinner – Living Room |
| 1/21/16 | Dr. Alexandre Benjo, Dr. Francisco Valdivia dinner – Flemings |
| 2/3/16 | Dr. David Lapan dinner – Flemings |
| 2/4/16 | Tucson Medical Center lunch 40 people |
| 2/11/16 | Green Valley catheter lab lunch |
| 2/16/16 | Dr. Ryan Tsuda/ VA Hospital – Hacienda Del Sol |
| 2/18/16 | Dr. Ralph Morales dinner – Parish |
| 2/19/16 | Dr. David Lapan dinner – Café Poca Cosa |
| 2/19/16 | Dr. Morales lunch – Mossic Café |
| 3/1/16 | Dr. Hoang Minh Thai dinner – Sullivans |
| 3/3/16 | Dr. Peter Spooner dinner – Flemings |
| 3/3/16 | Dr. Sal Tirrito dinner – North |
| 3/10/16 | Dr. Ralph Morales dinner – Casa Vicente |
| 3/14/16 | Dr. Francisco Valdivia, Dr. Alexandre Benjo referral dinner – St. Mary's office |
| 3/23/16 | Dr. Jessica Hoffman, Dr. Mark Goldberg dinner – Firebirds |
| 3/24/16 | Dr. Alexandre Benjo dinner – Kingfisher |
| 4/5/16 | Dr. Alexandre Benjo, Dr. Ralph Morales dinner – Flemings |
| 4/12/16 | Dr. Charles Katzenberg dinner – Mr. An's |
| 4/13/16 | Tucson Medical Center catheter lab lunch |

| Date | Customers and Location |
|------|------------------------|
| 4/18/16 | Dr. Hoang Minh Thai birthday dinner - Contigo |
| 4/21/16 | Dr. Frank Molls dinner |
| 4/21/16 | Tucson Medical Center lunch – Goodness restaurant |
| 4/25/16 | Dr. Ralph Morales dinner – Agustin Kitchen |
| 4/26/16 | Dr. Gregory Pennock lunch |
| 5/3/16 | Dr. David Lapan dinner – Union |
| 5/3/16 | Dr. Ralph Morales dinner – Agustin Kitchen |
| 5/5/16 | Dr. Sal Tirrito dinner – Pasco |
| 5/5/16 | Dr. Hoang Minh Thai dinner – Sullivan's |
| 5/10/16 | Dr. Ryan Tsuda/ VA Hospital dinner – Hacienda Del Sol |
| 5/10/16 | St. Mary's Hospital nurses lunch – Goodness restaurant catering |
| 5/12/16 | Tucson Medical Center nurses lunch |
| 5/16/16 | Dr. Morales dinner – Flemings |
| 5/17/16 | Dr. William Howe lunch – Scordato's restaurant |
| 5/17/16 | Dr. Ajay Tuli dinner – Flemings |
| 5/18/16 | Dr. Gregory Pennock dinner – Flemings |
| 5/23/16 | Dr. Hoang Minh Thai dinner – Sullivans |
| 5/24/16 | Dr. Alexandre Benjo lunch |
| 6/10/16 | Tucson Medical Center lunch |
| 6/23/16 | Dr. Santiago Ramirez office lunch |
| 6/23/16 | Dr. Ralph Morales dinner |
| 6/23/16 | Dr. Kioumars Mostafizi lunch |
| 6/30/16 | Dr. Peter Spooner dinner |
| 6/30/16 | Dr. Monty Morales dinner – Sullivans |
| 7/19/16 | Dr. Peter Spooner, Dr. David Gallo dinner – 5 Palms |
| 7/26/16 | Pima Heart Northwest Office lunch – 30 people – 1238 West Orange Grove, Tucson |

| Date | Customers and Location |
|---|---|
| 7/29/16 | Dr. Santiago Ramirez & 6 primary care physicians referral dinner – Flemings |
| 7/29/16 | Pima Heart Westside Office lunch |
| 7/30/16 | Dr. Peter Spooner referral dinner |
| 8/3/16 | St. Mary's hospital dinner – Augustin Kitchen |
| 8/4/16 | Dr. Santiago Ramirez lunch |
| 8/5/16 | Tucson Medical Center lunch |
| 8/11/16 | Dr. Brenda Peart dinner – 44th Biestro |
| 8/19/16 | Dr. William Elliott dinner – Flemings |
| 8/23/16 | Dr. Hymie Faitelson lunch |
| 8/24/16 | Dr. Frank Molls dinner – RA Sushi Bar |
| 8/26/16 | Dr. Santiago Ramirez office lunch |
| 9/15/16 | Dr. Morales lunch – PF Chang's |
| 9/16/16 | Pima Heart Orang Grove lunch |
| 9/22/16 | Dr. Rajen Desai, Dr. Ajay Tuli, Dr. Paul Bejarano dinner – Flemings |
| 9/28/16 | Dr. Gregory Pennock lunch |
| 9/28/16 | Dr. Jessica Hoffman office lunch, 17 people |
| 9/30/16 | Dr. Santiago Ramirez office lunch |
| 10/6/16 | Dr. Peter Spooner dinner – Downtown |
| 11/1/16 | Dr. Ajay Tuli dinner |
| 11/3/16 | Dr. Alexandre Benjo dinner – Agustin Kitchen |
| 11/9/16 | Dr. Scott Berman office lunch |
| 11/21/16 | Dr. William Howe dinner – Zin Burger |
| 12/1/16 | Dr. Ralph Morales dinner – Maynard's |
| 12/6/16 | Tucson Medical Center cardiac lunch – NYPD Pizza |
| 12/8/16 | Dr. Rajen Desai dinner – Flemings |

| Date | Customers and Location |
|------|------------------------|
| 12/15/16 | Tucson Medical Center catheter lab lunch |
| 1/4/17 | Dr. Morales, Dr. Gundeep Singh dinner – Vivace |
| 1/9/17 | St. Mary's Hospital catheter lab lunch |
| 1/11/17 | Dr. Frank Molls dinner – Wildflower |
| 1/20/17 | Dr. Santiago Ramirez office lunch |
| 1/21/17 | Dr. Peter Spooner dinner – McCormick's |
| 1/24/17 | Dr. David Lapan dinner – Flemings |
| 2/2/17 | Dr. Craig Hoover dinner – Wildflower |
| 2/7/17 | Dr. Alexandre Benjo dinner – Tavolino's |
| 2/10/17 | Dr. Hymie Faitelson lunch |
| 2/15/17 | Dr. Mark Goldberg, Dr. Jessica Hoffman dinner – Kingfisher |
| 2/22/17 | Dr. Paul Bejarano, Dr. Ajay Tuli lunch |
| 3/9/17 | Dr. Mohammad Reza Habizadeh dinner – Flemings |
| 3/9/17 | Dr. Ralph Morales dinner – Feast |
| 3/30/17 | Dr. Kirk Gavlick, Dr. William Howe office lunch |
| 4/5/17 | Dr. Hoang Minh Thai dinner – RA Sushi Bar |
| 4/11/17 | Dr. Hymie Faitelson lunch |
| 4/18/17 | Dr. Ralph Morales dinner – Vivace |
| 4/22/17 | Dr. Vinay Sanghi, Dr. William Elliott dinner – SV Home Korea Restaurant |
| 4/26/17 | Dr. Mark Goldberg lunch, 15 people |
| 5/8/17 | Tucson Medical Center catheter lab nurses lunch |
| 5/11/17 | St. Mary's Hospital nurses lunch |
| 5/18/17 | Dr. Sal Tirrito lunch |
| 5/22/17 | Dr. William Elliott dinner |
| 6/12/17 | Dr. Ralph Morales dinner – Yardhouse |
| 6/15/17 | Dr. Gregory Pennock dinner |

| Date | Customers and Location |
|------|------------------------|
| 6/15/17 | Dr. Kathryn Bates, Dr. Gregory Pennock lunch, 15 people |
| 6/16/17 | Dr. Kirk Gavlick lunch |
| 6/23/17 | Pima Heart Surgery Center lunch |
| 6/29/17 | St. Joseph's Hospital catheter lab lunch |
| 7/12/17 | Dr. Hoang Minh Thai dinner – RA Sushi bar |
| 7/14/17 | Dr. Arthur Menezes dinner – Flemings |
| 7/20/17 | Dr. Ajay Tuli and new cardiologist dinner – Flemings |
| 7/20/17 | Dr. Alexandre Benjo lunch - Teresa's Mosaic Cafe |
| 8/1/17 | Dr. Monty Morales birthday dinner - MiAn Sushi and Modern Asian Cuisine |
| 8/3/17 | Dr. Raj Bose dinner |
| 8/4/17 | Dr. Hymie Faitelson office lunch |
| 8/9/17 | Dr. Hoang Minh Thai dinner – Saffron |
| 8/11/17 | Pima Heart office lunch |
| 8/31/17 | Dr. Arthur Menezes lunch |
| 9/6/17 | Dr. Arthur Menezes dinner |
| 10/26/17 | Dr. Morales lunch |
| 10/27/17 | Dr. Neil Gheewala dinner |
| 10/27/17 | Dr. Hoang Minh Thai lunch – Trident Grill |
| 10/30/17 | Dr. Mathew Hutchinson dinner – Tavolino |
| 11/2/17 | Dr. Santiago Ramirez office lunch |
| 11/6/17 | Tucson Medical Center catheter lab lunch |
| 11/21/17 | Dr. Sal Tirrito, David Strout FNP dinner |
| 12/13/17 | Dr. Ajay Tuli, Dr. Paul Bejarano, Dr. Thomas Waggoner dinner |
| 12/20/17 | Dr. Monty Morales dinner – Vivace |
| 12/22/17 | Dr. Santiago Ramirez office lunch |
| 1/8/18 | Dr. Hymie Faitelson, Dr. Rostam Khoubyari dinner – Flemings |

| Date | Customers and Location |
| --- | --- |
| 1/11/18 | Dr. Hoang Minh Thai dinner |
| 1/24/18 | Dr. Arthur Menezes, Dr. Mukesh Gopalakrishnan lunch |
| 1/31/18 | Dr. Sal Tirrito referral breakfast - Starbucks |
| 2/6/18 | Dr. Rajen Desai lunch |
| 11/12/18 | Dinner between Biotronik sales representative Mike McCormick and Northwest Medical Center CEO Kevin Stockton |
| 12/18/18 | Dinner for Dr. Jitender Munjal |
| 1/28/19 | Dinner for Biotronik sales representative Mike McCormick and vascular surgeon Dr. Janice Thai |
| 2/13/19 | Dinner at Culinary Dropout restaurant for staff from Carondelet Heart & Vascular Institute at St. Mary's Hospital |
| 4/1/19 | Dinner with Biotronik sales representative Mike McCormick for Dr. William Elliott |
| 4/12/19 | April 12, 2019 a scheduled team Dinner for Dr. Thomas Waggoner's office at Flemings Steakhouse |

333.     For example, Dr. Isaac Eisenstein is an implanting cardiologist.  He mostly implants pacemakers but has credentials to implant cardiac defibrillators ICDs as well.  Biotronik arranged dinners with Dr. Eisenstein and Dr. Stuart Finkelstein, who is an internal medicine/addiction specialist doctor.  Dr. Eisenstein is an implanting cardiologist and Dr. Finkelstein is a referring internal medicine physician. Dr. Finkelstein requests which pacemaker vendor is utilized. At one dinner Jamal Hussain attended, and he is an implanting cardiologist as well.  At another dinner, Dr. Finkelstein's office partner, Dr. Kyaw Moe, a nephrologist, also attended the dinner (Exhibit 85).

334.     For example, Biotronik arranged and paid $267.81 for a dinner with Dr. Eisenstein and Dr. Finkelstein on September 25, 2013 at Cafe Arte restaurant, in Cerritos, CA (Exhibit 85).

335.     For example, Biotronik arranged and paid $1,001.71 for a dinner with Dr. Eisenstein and Dr. Finkelstein on April 3, 2014 at Café Arte in Cerritos, CA (Exhibit 85).

336.     For example, Biotronik arranged and paid $872.81 for a dinner with Dr. Eisenstein and Dr. Finkelstein on March 24, 2015 at Café Arte in Cerritos, CA (Exhibit 85).

337.     For example, Biotronik arranged and paid $735.58 for a dinner with Dr. Eisenstein and Dr. Finkelstein on October 4, 2016 at Café Arte in Cerritos, CA (Exhibit 85).

338.     For example, Biotronik arranged and paid $535.74 for a dinner with Dr. Eisenstein and Dr. Finkelstein on February 15, 2017 at Café Arte in Cerritos, CA (Exhibit 85).

339.     For example, at the instruction of Biotronik sales rep Bill Blair, Relator Andrew Schmid tentatively scheduled a dinner with Dr. Finkelstein and Dr. Isaac Eisenstein on June 28, 2017.  Both Bill Blair and Relator Andrew Schmid were unable to attend the dinner and pay for it, and Relator Schmid attempted to reschedule. Dr.

Finkelstein told Relator Schmid that he and Dr. Eisenstein were fine without him. When Bill Blair learned that the doctors would attend dinner together without a Biotronik employee present to pay, he forced one of the field clinical specialists to attend and to pay for the dinner (Exhibit 85).

*2. Entertaining Dr. Jerry Floro and his Wife with Golf, Dinners, and Parties as Kickbacks*

340.     Biotronik's Code of Business conduct also stated that "BIOTRONIK shall not provide or pay for any entertainment or recreational event or activity for any healthcare professional. Such activities include, but are not limited to: theater, sporting events, cruises or tours, golf, skiing, fishing or hunting, leisure or vacation trips." (See Exhibit 50).

341.     However, Biotronik sales representative Bill Blair' instructed and demanded Relator Andrew Schmid to attend, pay for, and expense multiple dinners with Dr. Jerry Floro, his wife Judy Floro (who has no vested interest in cardiac devices), Bill Blair and his wife Kelly Blair. On several occasions Relator Andrew Schmid has been required to play golf with Bill Blair, Dr. Jerry Floro and his wife Judy Floro. On all occasions, Bill Blair has paid for the golf for Dr. Floro and his wife, and Relator Andrew Schmid was required to pay for the lunch with his Biotronik corporate credit card. When Bill Blair reported the expenses to the Sunshine Act

website for payments to physicians, he often falsified the reports by claiming that medical staff members had attended instead of Dr. Floro's wife, Judy.

342.    On August 24, 2013 Relator Andrew Schmid was instructed to pay for a $577.74 dinner at Fleming's Steakhouse with Bill Blair, his wife Kelly Blair,  Dr. Jerry Floro and his wife Judy Floro. Bill Blair reported to the Sunshine Act website that the attendees at lunch that day included Biotronik field personnel, but they did not attend and Dr. Floro's wife did attend (Exhibit 86).

343.    For example, on December 16, 2016, Relator Andrew Schmid was instructed to attend and pay for a $606 dinner at Maestro's Steakhouse in Costa Mesa, California with Bill Blair, his wife Kelly Blair, Dr. Jerry Floro and his wife Judy Floro (Exhibit 87).

344.    For example, on March 4, 2014, Relator Andrew Schmid was instructed to attend and pay for a $486.61 dinner at Captain Jack's restaurant with Dr. Jerry Floro, his wife Judy Floro, Bill Blair, and Kelly Blair his wife. Bill Blair reported to the Sunshine Act website that the attendees at lunch that day included Biotronik field personnel and a nurse from Dr. Floro's medical group, but they did not attend and Dr. Floro's wife did attend (Exhibit 88).

345.    For example, on June 13, 2014, Relator Andrew Schmid was instructed to attend and pay for a $448.02 dinner at Captain Jack's restaurant with Dr. Jerry

Floro, his wife Judy Floro, Bill Blair, and Kelly Blair his wife. Bill Blair reported to the Sunshine Act website that the attendees at lunch that day included Biotronik field personnel, and a medical assistant and nurse from Dr. Floro's medical group, but they did not attend and Dr. Floro's wife did attend (Exhibit 89).

346.    For example, on October 3, 2014, Relator Andrew Schmid was instructed to attend and pay for a $411.66 dinner at Captain Jack's restaurant with Bill Blair, his wife Kelly Blair, Dr. Jerry Floro and his wife Judy Floro. Bill Blair reported to the Sunshine Act website that the attendees at lunch that day included Biotronik field personnel and a nurse from Dr. Floro's medical group, but they did not attend and Dr. Floro's wife did attend (Exhibit 90).

347.    For example, on December 12, 2014, Relator Andrew Schmid was instructed to attend and pay for a $518.92 dinner at Fleming's Steakhouse with Bill Blair, his wife Kelly Blair, Dr. Jerry Floro and his wife Judy Floro. Bill Blair reported to the Sunshine Act website that the attendees at lunch that day included Biotronik field personnel and staff members from Dr. Floro's medical group, but they did not attend and Dr. Floro's wife did attend (Exhibit 91).

348.    For example, on April 18, 2015, Relator Andrew Schmid was instructed to attend and pay for a $747.31 dinner at Fleming's Steakhouse in Newport Beach, California with Bill Blair, his wife Kelly Blair, Dr. Jerry Floro and his wife Judy

1   Floro. Bill Blair falsely reported to the Sunshine Act website that the meal was

2   attended by several staff at Lakewood Regional Medical Center and at Pioneer

3   Medical Group, while Dr. Floro's wife was not reported (Exhibit 92).

4        349.    For example, on May 1, 2015, Relator Andrew Schmid was instructed by

5   Bill Blair to pay $101.58 for lunch at Strawberry Farms Golf Club in Irvine,

6   California for Dr. Jerry Floro and his wife Judy Floro on a day when Blair paid for

7   their golf. Bill Blair reported to the Sunshine Act website that the attendees at lunch

8   that day included staff members from Dr. Floro's medical group, but they did not

9   attend and Dr. Floro's wife did attend (Exhibit 93).

10       350.    For example, on November 13, 2015, Relator Andrew Schmid was

11  instructed to attend and pay for a $794.20 dinner at Maestro's Steakhouse in Costa

12  Mesa, California with Bill Blair, his wife Kelly Blair, Dr. Jerry Floro and his wife

13  Judy Floro. Bill Blair falsely reported to the Sunshine Act website that the meal was

14  attended by several staff at Lakewood Regional Medical Center and at Pioneer

15  Medical Group, while Dr. Floro's wife was not reported (Exhibit 94).

16       351.    For example, on December 16, 2015, Biotronik paid 708.48 for a dinner

17  for Dr. Jerry Flor and his wife Judy at The Winery, Newport Beach, CA, a harborside

18  restaurant with a window seat, to watch the "Newport Beach Christmas Boat Parade"

19  (Exhibit 95).

20

352.     For example, on April 1, 2016, Relator Andrew Schmid was instructed by Bill Blair to pay $250 for lunch at St. Regis Monarch Beach resort in Dana Point, California for Dr. Jerry Floro and his wife Judy Floro on a day when Blair paid for their golf. A series of text messages between Bill Blair and Dr. Jerry Floro on March 7th noted that Dr. Jerry Floro's wife, Judy, preferred the Monarch club for golf for a golf outing with Bill Blair on March 10, 2016, and the Monarch was also used for the outing on April 1, 2016. Bill Blair reported to the Sunshine Act website that the attendees at lunch that day included a medical assistant and nurse from Dr. Floro's medical group, but they did not attend and Dr. Floro's wife did attend (Exhibit 96).

353.     For example, on December 16, 2016, Biotronik paid $726.96 for a holiday celebration dinner at Mastro's Steakhouse Costa Mesa, CA for Bill Blair, Kelly Blair, Dr. Jerry Floro and Judy Floro. Bill Blair falsely reported to the Sunshine Act website that the meal was attended by several staff at Dr. Floro's office, while Dr. Floro's wife was not reported (Exhibit 97).

354.     For example, Bill Blair ordered Relator Andrew Schmid to move a golf outing with Dr. Jerry Floro and his wife from March 24, 2017, to another weekday, but not during the week of April 10-14 (Exhibit 98).

*3. Christmas Parties, Birthday Parties, Retirement Parties, and Happy Hours as Kickbacks*

355.    Biotronik sales representatives routinely schedule happy hour drink events at bars, and dinners and meals for special events such as Christmas, birthdays and retirement parties at high-priced restaurants to impress physicians and try to buy their business, with no scientific, educational, or business informational purpose.

356.    For example, the Biotronik Tucson calendar showed schedules for 22 happy hour drink events for customers at bars and restaurants in the Tucson, Arizona area from 2014-2018 (Exhibit 99):

| Date | Time | Customers and Location |
|------|------|------------------------|
| 7/9/14 | 5:15-6:15pm | Goldberg happy hour Taco tote 5:15pm |
| 7/16/14 | 5-6pm | Ralph morales happy hour Feast |
| 9/23/14 | 4-5pm | Happy hour Leah Caremore 4pm |
| 10/23/14 | 5:30-6:30pm | Smh cath lab happy hour TBA |
| 3/16/15 | 5:30-6:30pm | Mr. An's happy hour 530 Margie lancer |
| 3/20/15 | 5-6pm | Mr. An's happy hour 5pm |
| 8/12/15 | 5:30-6:30pm | David Happy Hour Scordatos NPs from Pima |
| 11/23/15 | 5-6pm | Happy hour-nwmc cath lab Fox and the Hound |
| 1/21/16 | 5:30pm | Mr. An's happy hour Margie/ robin |
| 1/26/16 | 5-6pm | TMC One Happy Hour TBA Robin |
| 2/18/16 | 5:30pm | Mr. An's happy hour Margie 5:30pm Mccormick |
| 3/1/16 | 6-8pm | TMC EP Lab happy hour The Living Room – Wine Café & Lounge 2905 E Skyline Dr, Unit 168, Tucson, Az 85718, United States |

| Date | Time | Customers and Location |
|---|---|---|
| 4/21/16 | 4:30pm | JB/ Clarizza happy hour Pasco |
| 4/22/16 | 5:30-6:30pm | Happy Hour Pima Heart ESO Trident Grill 2 |
| 5/19/16 | 6:30-9:30pm | Oban Happy Hour-Peress staff OBON Sushi Bar Ramen 350 E Congress St, Tucson, AZ 85701, United States |
| 6/10/16 | 5:30-7:30pm | Pima Heart Happy Hour @ Union |
| 10/7/16 | 5:30pm | KM happy hour Mr Ans |
| 4/6/17 | 5:30-7:30pm | Biomonitor 2 Tech Night and AF algorithm Happy Hour Union |
| 4/20/17 | 6-7pm | Happy Hour for Columba SMH Cath Lab Salud JW Marriott Justin |
| 5/4/17 | 4:30-5:30pm | Twigs Happy Hour Benjo Squad Twigs Bistro |
| 12/21/17 | 5-7pm | TMC Cath lab Happy hour TD Grille Swan |
| 1/26/18 | 5-6pm | Happy Hour Ramirez Office Culinary Dropout |

357.    For example, a Biotronik sales calendar entry from November 16, 2017, scheduled a Happy Hour for catheter lab staff at St. Mary's Hospital, the facility where top Biotronik customer Dr. Alexandre Benjo does his pacemaker implants. Dr. Benjo is also a top user of expensive Biotronik "loop recorder" diagnostic devices (Exhibit 100).

358.    For example, a Biotronik sales calendar entry from December 9, 2015 scheduled a dinner meeting for Dr. Ajay Tuli and Dr. Paul Bejarano at Flemings restaurant (Exhibit 101).

359.    For example, a Biotronik sales calendar entry from January 9, 2017

scheduled a dinner meeting for Dr. Santiago Ramirez and Biotronik representative Nicole Bajka at Hacienda Del Sol restaurant (Exhibit 102).

360.    Biotronik sales representatives also use each other's corporate credit cards to pay for expensive entertainment that is more than their budget will allow. For example, in a conversation with Biotronik sales representative Jeff Germano on July 18, 2017, Relator Jeffrey Bell was told that Biotronik sales representative Michael McCormick and field clinical specialist Robin Singh shared an expense budget to pay for entertaining doctors. Germano stated that McCormick used to call him or text him all the time for his credit card to take his doctors out, but McCormick doesn't anymore because Germano will tell him to go to hell. Germano stated that McCormick uses the Biotronik corporate credit cards of other local Biotronik sales representatives and field staff, including Robin Singh, Justin DiLeone, and Jon Augat all the time. Germano stated that Robin Singh got his monthly allowance bumped up from $500.00 to $2000.00 for McCormick. Germano stated that Robin is a dumbsh** and brags to everyone how he has more money to spend, and that although McCormick was an independent sales representative and was supposed to spend his own money entertaining doctors, he instead uses the company's credit cards for everything (Exhibit 103).

361.    Bill Blair has ordered Relator Andrew Schmid and other Biotronik field

1    clinical staff members to expense a baby shower for Dr. Gary Marsh, multiple annual

2    holiday parties for Dr. Howard Elkin's staff and spouses, a holiday party for Dr.

3    Alicia Montanez and Dr. Octaviano Roges' staff and spouses and children, a birthday

4    party for Lionel Magdalena, a birthday party for Karey Bresnahan-Seitz, Carl Smith's

5    retirement party, Dr. Kaushal Tamboli's holiday party, Anna (Dr. Stanley Kawanishi's

6    medical assistant) birthday party, Dr. Anajanit Singh's nurse retirement party, and

7    many other similar parties. Relator Andrew Schmid has also observed Biotronik sales

8    manager Bob Marsella expensing holiday parties for Dr. Alicia Montanez, Dr.

9    Octaviano Roges and their children, office staff and spouses.

10   362.    For example, the Biotronik field sales calendar had a November 22,

11   2013, entry for "Todd's Bday" at Joe Jost's Tavern in Long Beach, CA. The company

12   paid for a birthday celebration for Todd, a catheter lab staff member at customer Long

13   Beach Memorial Medical Center (Exhibit 104).

14   363.    For example, the Biotronik field sales calendar had a December 4, 2013,

15   entry for "Michelle LBMC Bday Party" at Roman Cucina restaurant. The company

16   paid for a birthday celebration for Michelle, a catheter lab staff member at customer

17   Long Beach Memorial Medical Center (Exhibit 104).

18   364.    For example, the Biotronik field sales calendar had a January 15, 2014,

19   entry for "Virg Bday Dinner" at Arte Café in Cerritos, CA, and noted "need everyone

20

to attend". The company paid for a birthday celebration for Virg Narbutas, the CEO at customers West Anaheim Medical Center and La Palma Intercommunity Hospital (Exhibit 104).

365.    For example, the Biotronik field sales calendar had a May 9, 2014, entry for "Lbmmc happy hour – Patrick bday" at Tilted Kilt Pub & Eatery in Long Beach, CA. The company paid for a birthday celebration for Patrick, a staff member at customer Long Beach Memorial Medical Center (Exhibit 104).

366.    For example, the Biotronik field sales calendar had a March 10, 2015, entry for "Dr. Kawanishi Breakfast", and noted "Ana's birthday today!!! They want Panera breakfast and coffee". The company paid for catered breakfast from Panera coffee for Dr. Kawanishi's office for the birthday of his medical assistant Ana (Exhibit 104).

367.    For example, the Biotronik field sales calendar had an April 3, 2015, entry for "Happy Hour Lakewood catheter lab" at Black Angus Steakhouse. The company paid for the happy hour gathering for customers at the Lakewood Regional Medical Center catheter lab (Exhibit 104).

368.    For example, the Biotronik field sales calendar had a July 28, 2015, entry for "Dr. Kawanishi dinner/happy hour" at El Torito restaurant in Long Beach, CA. The company paid for the dinner and happy hour the office of customer Dr. Stanley

1    Kawanishi (Exhibit 104).

2    369.    For example, the Biotronik field sales calendar had an August 11, 2015,

3    entry for "Lbmmc Happy Hour" at James Republic restaurant in Long Beach, CA.

4    The company paid for a happy hour for the catheter lab staff at customer Long Beach

5    Memorial Medical Center (Exhibit 104).

6    370.    For example, the Biotronik field sales calendar had a September 14,

7    2015, entry for "LRMC Lunch – Lionel's Birthday". The company paid for catered

8    lunch from Domenico's Belmont Shore restaurant for the birthday of Lionel

9    Magdalena, the catheter lab technologist at customer Lakewood Regional Medical

10   Center (Exhibit 104).

11   371.    For example, the Biotronik field sales calendar had a September 23,

12   2015, entry for "PIH Cath Lab Happy Hour In-Service" at Dal Rae Restaurant in Pico

13   Rivera, CA. The company paid for the happy hour and dinner for the catheter lab staff

14   members at customer Presbyterian Intercommunity Hospital (Exhibit 104).

15   372.    For example, the Biotronik field sales calendar had a September 30,

16   2015, entry for "LRMC In-Service Happy Hour" at EJ Malloy's Restaurant & Sports

17   Bar in Long Beach, CA. The company paid for the happy hour for the catheter lab

18   staff members at customer Lakewood Regional Medical Center (Exhibit 104).

19   373.    For example, the Biotronik field sales calendar had a November 20,

20

2015, entry for "Todd's 50th Bday from LBMMC" at Joe Jost's Tavern in Long Beach, CA. The company paid for a birthday celebration for Todd, a catheter lab staff member at customer Long Beach Memorial Medical Center (Exhibit 104).

374.    For example, the Biotronik field sales calendar had a November 24, 2015, entry for "Dr. Kawanishi Bday/CLS & ICD MRI In-Service".  The company paid for catered lunch for the office from Domenico's Belmont Shore restaurant for the birthday of customer Dr. Stanley Kawanishi (Exhibit 104).

375.    For example, the Biotronik field sales calendar had a November 1, 2016, entry for "Sol Going Away Party". The company paid for lunch for the going away party for Sol, the nurse practitioner at customer Dr. Stanley Kawanishi's clinic (Exhibit 104).

376.    For example, the Biotronik field sales calendar had a December 15, 2016, entry for "Tamboli/Yoshino office party". The company paid for the annual holiday party for customer Dr. Kaushal Tamboli at the request of a nurse practitioner in his office (Exhibit 104).

377.    For example, the Biotronik field sales calendar had a February 24, 2017, entry for "PIH Cardiac retirement party". The company paid for the retirement party for a staff member at customer Presbyterian Intercommunity Hospital (Exhibit 104).

378.    For example, the Biotronik field sales calendar had an April 27, 2017,

entry for "Caremore Happy Hour". The company paid for the happy hour for the office and customer Dr. Mazda Motallebi at Caremore Medical Group, a Medicare-only provider (Exhibit 104).

379.    For example, the Biotronik field sales calendar had a July 27, 2017, entry for "Karey Bday Lunch". The company paid for lunch for the catheter lab at customer Lakewood Regional Medical Center for Karey Seitz Bresnahan, the catheter lab manager (Exhibit 104).

380.    For example, the Biotronik field sales calendar had a July 27, 2017, entry for "Segal HH", a happy hour gathering. The company paid for the happy hour for the office staff of customer Dr. Douglas Segal (Exhibit 104).

381.    For example, the Biotronik field sales calendar had a September 1, 2017, entry for "Tamboli HH", a happy hour gathering. The company paid for the happy hour for the office staff of customer Dr. Kushal Tamboli (Exhibit 104).

382.    For example, the Biotronik field sales calendar had a November 16, 2017, entry for "Los Al CV HH", a happy hour gathering. The company paid for the happy hour for the office staff of customer Los Alamitos Cardiovascular Group (Exhibit 104).

383.    For example, the Biotronik field sales calendar has a December 11, 2017, entry for "Elkin Xmas party". The company is planning to pay for the office holiday

party for customer Dr. Howard Elkin (Exhibit 104).

384.     For example, the Biotronik field sales calendar has a December 12, 2017, entry for "PIH Christmas party". The company is planning to pay for the Christmas party for customer Presbyterian Intercommunity Hospital catheter lab (Exhibit 104).

385.     For example, on December 14, 2017, Biotronik sales representative Bill Blair and a Medtronic sales representative split the bill for a dinner and drinks for the Christmas party for Dr. Mazda Motallebi's Care More Group office staff at the Lazy Dog Restaurant & Bar in Downey, CA. The Biotronik portions of the bill were $568.20 for dinner, and $79.42 for drinks. Blair used Relator Andrew Schmid's Biotronik credit card to pay for the meal. The Care More Group only sees Medicare patients (Exhibit 105).

386.     For example, the Biotronik field sales calendar has a December 15, 2017, entry for "Montanez/roges Xmas party" at the Water Grill restaurant in Costa Mesa, CA. The company paid for the annual Christmas office party for customers Dr. Alicia Montanez and Dr. Octaviano Roges (Exhibit 106).

### 4. Training Payments

387.     One method Biotronik uses to pay cash to physicians as quid pro quo for their loyal business is to pay them to ostensibly "train" Biotronik employees. To carry this scheme out, Biotronik engages physician customers as contracted "consultants",

and pays them $400 or more per pacemaker or defibrillator implant to simply allow a Biotronik employee to stand quietly behind them and watch their implants.

388.   Biotronik currently contracts with 44 different physician customers to provide this paid "training" service for hundreds of dollars per implant (Exhibit 107).

389.   Some physicians demand payment, and in fact demand a "trainee" be present at nearly every Biotronik pacemaker or defibrillator implant as payment for choosing a Biotronik device instead of on of Biotronik's competitors' devices. Biotronik routinely agrees to these physician demands and promotes these agreements to physicians as a way to profit off of their implant procedures. Biotronik sales representative consistently required that the company "provide" a trainee for the pacemaker devices that his physician customers were implanting – so that they could get paid a training fee by the company.

390.   For example, on May 26, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Alicia Montanez had a Biotronik pacemaker implant scheduled the next morning, and asked "Trainee available?" (Exhibit 108).

391.   For example, on May 27, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Alicia Montanez had a Biotronik pacemaker implant scheduled the next

morning, and asked "Trainee available?" (Exhibit 108).

392.    For example, on May 29, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Steven Appleby had a Biotronik pacemaker implant scheduled the next morning, and asked "Trainee available?" (Exhibit 108).

393.    For example, on August 18, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer at Lakewood Regional Medical Center had a Biotronik pacemaker implant scheduled that afternoon, and asked "Trainee?" (Exhibit 108).

394.    For example, on August 25, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer at West Anaheim Medical Center had a Biotronik pacemaker implant scheduled that afternoon, and asked "Trainee available?" (Exhibit 108).

395.    For example, on September 26, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Prash Jayaraj at Lakewood Regional Medical Center had a Biotronik pacemaker implant scheduled the following morning, and asked "Trainee available?" (Exhibit 108).

396.    For example, on January 15, 2015, Biotronik sales representative Bill

Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Mazda Motallebi had a Biotronik pacemaker implant scheduled the following morning, and asked "Trainee available?" (Exhibit 108).

397.   For example, on March 2, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch asking her "Trainee available tomorrow?" for one of his customers (Exhibit 108).

398.   For example, on March 5, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch asking her "Anyone coming to case?" for one of his customers (Exhibit 108).

399.   For example, on March 9, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch asking her "Trainee available?" for one of his customer's implants the next morning (Exhibit 108).

400.   For example, on March 16, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch asking her "Trainee available?" for one of his customer's implants at Lakewood Regional Medical Center the next morning (Exhibit 108).

401.   For example, on March 19, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch asking her

1  "Trainee available?" for one of his customer's implants that afternoon, and for another

2  one the next morning (Exhibit 108).

3      402.    For example, on April 9, 2015, Biotronik sales representative Bill Blair

4  sent a text message to Biotronik Training coordinator Tami Hirsch asking her

5  "Trainee available?" for his customer Dr. Prash Jayaraj at Lakewood Regional

6  Medical Center for an implant the next morning (Exhibit 108).

7      403.    For example, on June 2, 2015, Biotronik sales representative Bill Blair

8  sent a text message to Biotronik Training coordinator Tami Hirsch asking her

9  "Trainee available?" for his customer Dr. Alicia Montanez at Presbyterian

10 Intercommunity Hospital for an implant the next morning (Exhibit 108).

11     404.    For example, on July 6, 2015, Biotronik sales representative Bill Blair

12 sent a text message to Biotronik Training coordinator Tami Hirsch asking her

13 "Trainee available?" for one of his customer's implants at Lakewood Regional

14 Medical Center the next morning (Exhibit 108).

15     405.    For example, on July 26, 2015, Biotronik sales representative Bill Blair

16 sent a text message to Biotronik Training coordinator Tami Hirsch asking her

17 "Trainee available?" for one of his customer's implants the next day (Exhibit 108).

18     406.    For example, on July 27, 2015, Biotronik sales representative Bill Blair

19 sent a text message to Biotronik Training coordinator Tami Hirsch asking her

20

"Trainee available?" for his customer Dr. Prash Jayaraj at Lakewood Regional Medical Center for an implant the next morning (Exhibit 108).

407.    For example, on July 29, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Mazda Motallebi had a Biotronik pacemaker implant scheduled the following morning, and asked "Trainee available?" (Exhibit 108).

408.    For example, on September 21, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Mazda Motallebi had a Biotronik pacemaker implant scheduled the following morning, and asked "Trainee available?" (Exhibit 108).

409.    For example, on September 23, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Alicia Montanez at Anaheim Regional Medical Center had a Biotronik pacemaker implant scheduled the next morning, and asked "Trainee available?" (Exhibit 108).

410.    For example, on September 28, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Mazda Motallebi had a Biotronik pacemaker implant scheduled the following Friday morning, and asked "Trainee available?" (Exhibit 108).

411.     For example, on October 18, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Alicia Montanez at Long Beach Memorial Medical Center had a Biotronik pacemaker implant scheduled that afternoon, and asked "Trainee available?" (Exhibit 108).

412.     For example, on October 20, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch asking her "Trainee available?" for his customer Dr. Alicia Montanez at Presbyterian Intercommunity Hospital for an implant the next Friday morning (Exhibit 108).

413.     For example, on October 21, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer at Long Beach Memorial Medical Center had a Biotronik pacemaker implant scheduled the next afternoon, and asked "Trainee available?" (Exhibit 108).

414.     For example, on October 23, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer at Anaheim Regional Medical Center had a Biotronik pacemaker implant scheduled the next morning, and asked "Trainee available?" (Exhibit 108).

415.     For example, on November 23, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her

that his customer Dr. Alicia Montanez at Anaheim Regional Medical Center had a Biotronik pacemaker implant scheduled the next morning, and asked "Trainee available?" (Exhibit 108).

416.    For example, on December 14, 2015, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Alicia Montanez at Lakewood Regional Medical Center had a Biotronik pacemaker implant scheduled the next day, and asked "Trainee available?" (Exhibit 108).

417.    For example, on March 17, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Alicia Montanez had a Biotronik pacemaker implant scheduled the next day and asked, "Trainee available?". He sent more text messages to Ms. Hirsch asking, "Trainee available?" for additional implants for his customers the next day, and each of the 3 remaining days of the week (Exhibit 108).

418.    For example, on April 2, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer at Anaheim Regional Medical Center had a Biotronik pacemaker implant scheduled that afternoon, and asked "Trainee available?" (Exhibit 108).

419.    For example, on April 14, 2014, Biotronik sales representative Bill Blair

sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Appleby had a Biotronik pacemaker implant scheduled the next day, and asked "Trainee available?" (Exhibit 108).

420.     For example, on May 7, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer at Long Beach Memorial Medical Center had a Biotronik pacemaker implant scheduled that afternoon, and asked "Trainee available?" (Exhibit 108).

421.     For example, on March 17, 2014, Biotronik sales representative Bill Blair sent a text message to Biotronik Training coordinator Tami Hirsch telling her that his customer Dr. Alicia Montanez had a Biotronik pacemaker implant scheduled the next day, and asked "Trainee available?" (Exhibit 108).

422.     For example, on May 18, 2012, Biotronik sales rep Bill Blair was "trained" by his physician customer Dr. Alicia Montanez, despite working in the industry for years, and having passed his certification in December 2010. This appears to have been done in order to justify paying Dr. Montanez despite Bill Blair not having a real "trainee" for her that day (Exhibit 109).

423.     For example, on November 6, 2015, Dr. Mazda Motallebi was paid by Biotronik for training a Biotronik employee on pacemaker device implants. However, he did not provide any training that day. Instead, he hooked a new epicardial wire to

1   the pacemaker. Relator Andrew Schmid was present at the training and witnessed it

2   (Exhibit 110).

3       424.    For example, in a March 9, 2016 email from Biotronik Area Field

4   Training Clinical Specialist Tami Hirsch, who is in charge of much of Biotronik's

5   training program, she said not to grade a "trainee" with all 3 & 4 grades on a scale

6   from 1-4, because that would result in the trainee passing their certification. If the

7   trainee passed their certification, that would then the end of that person's availability

8   to be "trained", and for physician customers to be paid to "train" that employee.

9   Biotronik paid physician customers about $400 per case to allow Biotronik employees

10  to stand behind them during an implant and "train" on the procedure. If the "trainees"

11  were certified too quickly, Biotronik might not have enough people to send to all the

12  "training" cases and make it more difficult to justify paying their physician customers

13  (Exhibit 111).

14      425.    Biotronik even hires people to do nothing but "training", sending them to

15  up to 70 "trainings" or more to stand quietly behind a physician and justify the

16  payment of hundreds of dollars per implant procedure. Some of these employees are

17  hired solely to show up as "trainees" at implants for Biotronik's customers, justifying

18  the payments made to their physician customers, and then are even fired after they

19  have been "trained" for a few months.

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 140

426.     For example, Biotronik independent sales representative Bill Blair pushed for Dr. Appleby to receive his signed training contract at a dinner with sales manager Mike Iverson on August 22, 2011, instead of waiting until the training department was done considering his nomination and contacted Dr. Appleby themselves (Exhibit 112).

427.     For example, on September 22, 2016, Dr. Mazda Motallebi, one of the highest volume device implanters for Biotronik in Orange County, was rejected from further work as a trainer because he had been getting paid as a trainer on too high a percent of his cases and was making Biotronik look like they were paying for his business (Exhibit 113). But Dr. Mazda Motallebi had an expectation that Biotronik would provide trainee payments during his implants.  If Biotronik did not have a trainee available, they always must apologetically explain that there was no one available to attend. So, just a few months after being rejected by the training department for getting paid to train too frequently, on January 13, 2017 Biotronik was re-nominating Dr. Mazda Motallebi as a trainer because the sales managers and sales representatives were not willing to have him be angry about not getting paid (Exhibit 113). Also, Dr. Mazda Motallebi is contracted with Biotronik to teach the cardiology follows "Pig Heart Lab program" at which a pig heart is dissected. He is paid very well, approximately $2500, and most recently Biotronik paid him to go to Hawaii and

1  teach a program to the Hawaii University Cardiology fellows.

2  428.   For example, on January 13, 2015, Dr. Alicia Montanez, a high-volume

3  customer of Biotronik's in Anaheim, California, was paid to train a Biotronik

4  employee while implanting a device for a patient with Medi-Cal government

5  insurance (Exhibit 114).

6  429.   For example, on October 28, 2015, Dr. Alicia Montanez, a high-volume

7  customer of Biotronik's in Anaheim, California, was paid to train a Biotronik

8  employee on a Medicare patient (Exhibit 114).

9  430.   For example, on October 29, 2015, Dr. Alicia Montanez, a high-volume

10  customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee

11  Johnathon Beal on a Medi-Cal patient (Exhibit 114).

12  431.   For example, on December 10, 2015, Dr. Alicia Montanez, a high-

13  volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik

14  employee on a Medi-Cal patient (Exhibit 114).

15  432.   For example, on December 17, 2015, Dr. Alicia Montanez, a high-

16  volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik

17  employee Salem Smith (Exhibit 114).

18  433.   For example, on January 11, 2016, Dr. Alicia Montanez, a high-volume

19  customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee

20

1  Salem Smith (Exhibit 114).

2      434.    For example, on January 20, 2016, Dr. Alicia Montanez, a high-volume

3  customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee

4  Michael Candeleria (Exhibit 114).

5      435.    For example, on January 21, 2016, Dr. Alicia Montanez, a high-volume

6  customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee

7  Michael Candeleria (Exhibit 114).

8      436.    For example, again on January 21, 2016, Dr. Alicia Montanez, a high-

9  volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik

10 employee Michael Candeleria on a Medicare patient (Exhibit 114).

11     437.    For example, on February 9, 2016, Dr. Alicia Montanez, a high-volume

12 customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee

13 Michael Candeleria on a Medicare patient (Exhibit 114).

14     438.    For example, again on February 9, 2016, Dr. Alicia Montanez, a high-

15 volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik

16 employee Michael Candeleria on a Medicare patient (Exhibit 114).

17     439.    For example, on February 11, 2016, Dr. Alicia Montanez, a high-volume

18 customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee

19 Michael Candeleria on a Medicare patient (Exhibit 114).

20

440.     For example, on February 23, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medi-Cal patient (Exhibit 114).

441.     For example, on February 27, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medicare patient (Exhibit 114).

442.     For example, on February 28, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medicare patient (Exhibit 114).

443.     For example, on March 16, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medicare patient (Exhibit 114).

444.     For example, on April 26, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medi-Cal patient (Exhibit 114).

445.     For example, on May 19, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Evan Stieber (Exhibit 114).

446.     For example, on May 24, 2016, Dr. Alicia Montanez, a high-volume

customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Evan Stieber (Exhibit 114).

447.    For example, on June 1, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Evan Stieber on a Medicare patient (Exhibit 114).

448.    For example, on July 21, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Caroline Carney on a Medi-Cal patient (Exhibit 114).

449.    For example, on July 22, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Caroline Carney on a Medi-Cal patient (Exhibit 114).

450.    For example, on July 26, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik on a Medicare patient (Exhibit 114).

451.    For example, on August 9, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Caroline Carney (Exhibit 114).

452.    For example, on August 11, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee

Caroline Carney (Exhibit 114).

453.     For example, on August 18, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Caroline Carney (Exhibit 114).

454.     For example, on August 25, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medicare patient (Exhibit 114).

455.     For example, on August 26, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Caroline Carney on a Medicare patient (Exhibit 114).

456.     For example, on August 31, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medicare patient (Exhibit 114).

457.     For example, on September 7, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Taylor Clarkin on a Medicare patient (Exhibit 114).

458.     For example, on September 24, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee James Crawford on a Medicare patient (Exhibit 114).

459.    For example, on September 25, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Salem Smith on a Medicare patient (Exhibit 114).

460.    For example, on October 11, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Nicole Kent on a Medicare patient (Exhibit 114).

461.    For example, on October 18, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee (Exhibit 114).

462.    For example, on October 18, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Nicole Kent on a Medicare patient (Exhibit 114).

463.    For example, on October 28, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Nicole Kent (Exhibit 114).

464.    For example, again on October 28, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Nicole Kent (Exhibit 114).

465.    For example, on November 5, 2016, Dr. Alicia Montanez, a high-volume

customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medi-Cal patient (Exhibit 114).

466.    For example, on November 9, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train Biotronik employee Taylor Clarkin (Exhibit 114).

467.    For example, on November 17, 2016, Dr. Alicia Montanez, a high-volume customer of Biotronik's in Anaheim, California, was paid to train a Biotronik employee on a Medi-Cal patient (Exhibit 114). The Biotronik device was replacing a St. Jude Medical corporation device which was still under warranty, and for which the hospital (and thus Medi-Cal) could have received a free replacement.

468.    For example, from approximately June 2016 to October 2016, Biotronik sales representative Bill Blair hired Nicole Kent as an "independent associate" of his company, Precision Medical.  Kent's role was to attend "training cases" for Biotronik, and she attended many. These were cases in which Blair's physician customers were paid approximately $400 each to have a "trainee" stand behind them during a pacemaker implant. Ultimately, she was terminated after she complained that she had to sit around to wait to attend a training case late at night. Relator Andrew Schmid attended cases with Kent and believes she was paid approximately $1500/month by Blair.  Blair said to Relator Andrew Schmid, "she is my employee and I can tell her to

stand on a street corner and hold a sign that says, 'will work for pacemakers' if I want to." Blair provided her with no training plan, no expectations or responsibilities other than that she needed to attend training cases and clinics.

469.    For example, in a June 6, 2017 conversation with Biotronik field clinical specialist Joe DeBoe, Relator Jeffrey Bell was told "When [Dr. Darren] Peress doesn't have a trainee and get $400.00 a case, he has not used us at all except when Sal [Dr. Salvatore Tirrito] sends him something. That's how we were getting business because [Dr.] Peress was flipping all the [Dr. James] Myer and [Dr. Peter] Spooner stuff to BIO because he had a trainee every case. Every case the trainee was in the room he got 400 bucks" (Exhibit 115).

470.    For example, Biotronik sales representative Robin Singh stated that Biotronik brought trainees to Dr. Darren Peress's office routinely "every Tuesday and Wednesday so he tries to stack our cases for those days." (Exhibit 116).

471.    In fact, records show that Dr. Peress was paid by Biotronik to "train" the same Biotronik personnel over and over again on the same devices, including training Biotronik field clinical specialists Nicole Bajka, Justin DiLeone, and Joe DeBoe on at least 32 occasions between October 2015, and April 2017 (Exhibit 117):

| Date | Notes About Paid Training on Biotronik Sales Calendar |
|---|---|
| 10/28/2015 | Justin training with Dr. Peress |

| Date | Notes About Paid Training on Biotronik Sales Calendar |
|---|---|
| 12/22/2015 | Justin training with Dr. Peress |
| 5/17/2016 | Justin training with Dr. Peress |
| 8/5/2016 | Justin and Nicole training with Dr. Peress |
| 8/29/2016 | Nicole training with Dr. Peress |
| 9/9/2016 | Nicole training with Dr. Peress |
| 9/20/2016 | Justin training with Dr. Peress |
| 10/14/2016 | Nicole training with Dr. Peress |
| 10/28/2016 | Nicole training with Dr. Peress |
| 11/1/2016 | Joe training with Dr. Peress |
| 11/4/2016 | Nicole training with Dr. Peress |
| 11/15/2016 | Joe training with Dr. Peress |
| 11/29/2016 | Justin training with Dr. Peress |
| 12/13/2016 | Nicole training with Dr. Peress |
| 1/20/2017 | Nicole training with Dr. Peress |
| 1/24/2017 | Joe training with Dr. Peress |
| 1/31/2017 | Nicole training with Dr. Peress |
| 2/13/2017 | Joe training with Dr. Peress |
| 3/1/2017 | Justin training with Dr. Peress |
| 3/7/2017 | Justin training with Dr. Peress |
| 3/8/2017 | Justin training with Dr. Peress |
| 3/27/2017 | Joe training with Dr. Peress |
| 3/27/2017 | Joe training with Dr. Peress |
| 4/12/2017 | Justin training with Dr. Peress |
| 4/21/2017 | Justin training with Dr. Peress |

472.     For example, in a text exchange on August 4, 2016, the Relator Jeffrey Bell was informed by another Biotronik sales representative that Biotronik had hired a person to do training with doctors for 4-5 months and then fired him, and turned around and hired a lady to take his place and get "trained" as a way to pay off the

1  doctors (Exhibit 118).

2  473.    For example, in July 2018 – Cameron Rimmer, son of Biotronik manager

3  Rich Rimmer, was doing Biotronik training cases from Biotronik sales representative

4  Andrew Nash's pacemaker implant training school. Biotronik sometimes sends

5  students from Nash's school to paid trainings with customer physicians as a way of

6  keeping the physicians busy and getting paid (Exhibit 119).

7  474.    Dr. Asim Yunus is a cardiologist working in Saginaw, Michigan, and his

8  daughter is a Biotronik Field Clinical Specialist in New York City. Dr. Yunus has

9  received over $114,000 in general payments and over $97,000 in associated research

10  payments from Biotronik since 2013. One Biotronik employee named Jadlyn

11  Harmony, apparently based in North Carolina, has stated that she was "mentored" by

12  Dr. Yunus on 16 cases in 2 days at the beginning of September 2018, despite being

13  certified as "trained" on implants in May 2018. On information and belief, Biotronik

14  paid Dr. Yunus for having Jadlyn attend some or all of these 16 "mentored" cases

15  (Exhibit 120).

16  475.    For example, a Biotronik employee named Nicole Bajka appeared to be

17  primarily working on getting "trained" repeatedly by Dr. Darren Peress and others as a

18  way of Biotronik paying off doctors. Nicole was so busy getting "trained" that

19  Biotronik scheduled her for at least 55 "training" sessions (in which doctors were

20

paid) between August 2016, and February 2017, according to Biotronik calendar

entries (Exhibit 121):

| Date | Notes About Paid Training on Biotronik Sales Calendar |
|---|---|
| 8/29/2016 | Nicole training with Dr. Peress |
| 9/9/2016 | Nicole training with Dr. Peress |
| 9/19/2016 | Nicole Brady Training |
| 9/20/2016 | Nicole Brady Training |
| 9/21/2016 | Nicole Brady Training |
| 9/22/2016 | Nicole Brady Training |
| 9/23/2016 | Nicole Brady Training |
| 9/24/2016 | Nicole Brady Training |
| 9/25/2016 | Nicole Brady Training |
| 9/26/2016 | Nicole Brady Training |
| 9/27/2016 | Nicole Brady Training |
| 9/28/2016 | Nicole Brady Training |
| 9/29/2016 | Nicole Brady Training |
| 9/30/2016 | Nicole Brady Training |
| 10/1/2016 | Nicole Brady Training |
| 10/14/2016 | Nicole training with Dr. Peress |
| 10/24/2016 | Nicole PreBrady |
| 10/25/2016 | Nicole PreBrady |
| 10/26/2016 | Nicole PreBrady |
| 10/28/2016 | Nicole training with Dr. Peress |
| 11/4/2016 | Nicole training with Dr. Peress |
| 11/6/2016 | Nicole Brady |
| 11/7/2016 | Nicole Brady |
| 11/8/2016 | Nicole Brady |
| 11/9/2016 | Nicole Brady |
| 11/10/2016 | Nicole Brady |

| Date | Notes About Paid Training on Biotronik Sales Calendar |
|---|---|
| 11/11/2016 | Nicole Brady |
| 11/12/2016 | Nicole Brady |
| 11/13/2016 | Nicole Brady |
| 11/14/2016 | Nicole Brady |
| 11/15/2016 | Nicole Brady |
| 11/16/2016 | Nicole Brady |
| 11/17/2016 | Nicole Brady |
| 11/18/2016 | Nicole Brady |
| 11/19/2016 | Nicole Brady |
| 12/13/2016 | Nicole training with Dr. Peress |
| 1/5/2017 | Nicole Home monitoring |
| 1/20/2017 | Nicole training with Dr. Peress |
| 1/23/2017 | Nicole Pre Tachy |
| 1/24/2017 | Nicole Pre Tachy |
| 1/25/2017 | Nicole Pre Tachy |
| 1/31/2017 | Nicole training with Dr. Peress |
| 2/6/2017 | Nicole Tachy |
| 2/7/2017 | Nicole Tachy |
| 2/7/2017 | Nicole Tachy |
| 2/8/2017 | Nicole Tachy |
| 2/9/2017 | Nicole Tachy |
| 2/11/2017 | Nicole Tachy |
| 2/12/2017 | Nicole Tachy |
| 2/13/2017 | Nicole Tachy |
| 2/14/2017 | Nicole Tachy |
| 2/15/2017 | Nicole Tachy |
| 2/16/2017 | Nicole Tachy |
| 2/17/2017 | Nicole Tachy |
| 2/18/2017 | Nicole Tachy |

476.     In a conversation with Relator Jeffrey Bell on December 4, 2015,

1  Biotronik sales manager Mike Iverson claimed that a Biotronik employee named

2  Justin [DiLeone] had been used as a "trainee" to pay off doctors 76 times, even though

3  Relator Bell had evidence that Justin had been sent to these "trainings" over 100

4  times. Iverson went on to say "I'm not saying that he has been actually trained, I'm

5  telling you how many cases he has done. So, that's a separate issue. That's my issue,

6  that's not your issue. The fact that he has done 76 cases and he failed his Brady

7  Training and we had to cut him out of cases and send him back to do some remedial

8  sh**. So that he could get on it because Germano [Biotronik Sales Representative Jeff

9  Germano] is just sticking him on the wall so he can pay his doctors. That's my

10  problem, that's not your problem" (Exhibit 122).

11      477.    In a November 20, 2015 conversation, Biotronik sales representative

12  Robin Singh told Relator Jeffrey Bell about the same employee Justin DiLeone, "He

13  has probably done 100 cases…. He was on the verge of getting fired" (Exhibit 123).

14      478.    For example, during a Biotronik Tucson sales team dinner meeting on

15  February 20, 2019, Relator Jeffrey Bell spoke with a Biotronik FCS-in-training named

16  Bakir Mousa. Mr. Mousa said he had been training with Robin Singh (Biotronik FCS)

17  and Justin DiLeone (Biotronik FCS) since the prior July (about 7 months). Mr. Mousa

18  had already been to company headquarters in Lake Oswego, Oregon for training with

19  implanting defibrillators, and had been driving to Phoenix and back to Tucson

20

constantly to do training cases in both cities, sometimes doing multiple training cases in one day. Mr. Mousa said that a lot of the recent cases were with Dr. Jitender Munjal, an important Biotronik physician customer with Pima Heart cardiology clinic in Tucson. Based on the Tucson Biotronik calendar, it appears Mr. Mousa has been doing up to 8 cases a week, and normally someone would be able to train for the position in much shorter time and with far fewer cases than that. It appears that Mr. Mousa is continuing to "train" long after the training is necessary in order to justify paying the Biotronik physician customers their $400 "training" fees at a time, just for letting Mr. Mousa stand behind them and observe.

479. Biotronik put numerous training cases with Bakir Mousa on the sales calendar for the Tucson area. For example, on September 11, 2018 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

480. For example, on December 6, 2018 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

481. For example, on January 3, 2019 Biotronik scheduled a paid training case with Dr. Darren Peress and Biotronik "trainee" Bakir Mousa (Exhibit 124).

482. For example, on January 4, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

483.    For example, on January 7, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

484.    For example, on January 8, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

485.    For example, on January 15, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

486.    For example, on January 15, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

487.    For example, on January 28, 2019 Biotronik scheduled two paid training cases with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

488.    For example, on January 29, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

489.    For example, on February 26, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

490.    For example, on February 27, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

491.    For example, on February 28, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

492.    For example, on April 10, 2019 Biotronik scheduled a paid training case

with Dr. Darren Peress and Biotronik "trainee" Bakir Mousa (Exhibit 124).

493.     For example, on April 10, 2019 Biotronik scheduled a paid training case with Dr. Jitender Munjal and Biotronik "trainee" Bakir Mousa (Exhibit 124).

494.     In a conversation with Relator Jeff Bell on September 6, 2018, former Biotronik FCS Joe DeBoe stated that top Biotronik physician customer Darren Peress received thousands of dollars in inappropriate "training" payments through the work of Biotronik sales representative Mike  McCormick (Exhibit 124).

495.     Biotronik was putting so much money into paying physicians for "training," that Biotronik sales representative Andrew Nash started a side company in 2015 called "Heart Rhythm Academy" in Scottsdale, Arizona, to recruit and provide "trainees" to go to the Biotronik pacemaker implants as a means for Biotronik to pay its doctors bogus training fees for each implant.

496.     Biotronik required Relator Jeffrey Bell himself to participate in excessive and unnecessary paid "training" with some of Biotronik's favored physician customers in both Arizona and Nevada. On July 29, 2015, Relator Jeffrey Bell was first sent to Phoenix to start training on implanting Biotronik pacemakers with Biotronik physician customers. In Phoenix, Relator Jeffrey Bell was sent to do training cases with Dr. Amarnauth Singh and Dr. Andy Tran, with Biotronik sales representative Jeff Germano at the facility. Relator was also sent to Las Vegas for

1  training, where Relator Jeffrey Bell did training cases with Biotronik customer Dr.

2  William Resh and another physician.

3      497.    On August 1, 2015, Relator Jeffrey Bell went to Las Vegas for a day and

4  a half to do 12 training cases on Biotronik pacemakers. Biotronik corporate training

5  manager Tammy Hirsch was his trainer. Relator Jeffrey Bell had to get certified on

6  three each of pacemakers and defibrillators, but they made him do a lot more cases,

7  about 20, until Relator Bell told Hirsch that the company was doing an excessive

8  number of training cases.

9      498.    Biotronik training manager Tammy Hirsch had a room at the Vegas

10  hotel, and brought a training simulator, and was going have Relator Jeffrey Bell do

11  training cases on the training simulator to sign him off on doing enough training cases.

12  Hirsch then contacted him again and told him that the training simulator cases would

13  not count, and that he needed to do more live training cases with doctors in Phoenix

14  and Las Vegas, at which point Relator Jeffrey Bell told her that it seemed excessive

15  and inappropriate to continue paying doctors to do "training" cases with him. Relator

16  Jeffrey Bell had already been selling and servicing pacemakers and high-powered

17  heart devices since 2001 and did not require extensive training on Biotronik products.

18  The continued "training" was simply physicians were being paid by Biotronik to have

19  Relator Jeffrey Bell stand behind them and watch them in surgery, which required no

20

1    extra work by the physician in exchange for the payment.

2    499.    Biotronik employees also fraudulently signed training forms. Biotronik

3    Area Field Training Clinical Specialist Tami Hirsch instructed that only sales rep Bill

4    Blair or Relator Andrew Schmid accompany "trainees" to training cases in which

5    Blair's Biotronik physician customers were paid for allowing the trainee to stand

6    behind them during a pacemaker implant. Hirsch did not want newer employees

7    bringing people for this "training". Instead of following that instruction, Blair would

8    fraudulently sign the training documents as if he was present for the case.

9    500.    For example, on August 27, 2016, Bill Blair signed a trainee form for

10   "trainee" Caroline Carney on an implant with Dr. Alicia Montanez. On the same date,

11   Biotronik field clinical specialist Jason Pagano sent an email asking Relator Andrew

12   Schmid or Blair to sign Carney's training form (Exhibit 125).

13   501.    For example, Relator Jeffrey Bell had a conversation with former

14   Biotronik field clinical staff member Joe DeBoe on February 5, 2019, regarding the

15   fraudulent signing of training forms by Biotronik personnel in Tucson. Mr. DeBoe

16   stated that Biotronik Tucson sales representative Mike McCormick has been

17   instructing other FCSs to fraudulently fill out "training forms", claiming these FCSs

18   had attended "training" at physician customer offices, even though they had not

19   actually attended the sessions. Mr. DeBoe said that Biotronik had been routinely

20

paying its physician customers approximately $400 per session to "train" Biotronik employees by allowing the employees to stand behind them during a surgical implant, as described in detail in Relator's complaint. McCormick was instructing Biotronik employees to sign that they were "trained" by BIO's physician customers, even though these employees were not present at the supposed "training" session with the paid physician. Accordingly, these Biotronik physician customers would receive approximately $400 per procedure even though they performed no training at all.

### 5. Nepotistic hiring

502.    Section 1877 of the Social Security Act, the Stark Law, is a limitation on physician referrals, prohibiting referrals for Medicaid and Medicare patients if the physician or an immediate family member has a financial relationship with that entity (42 U.S.C. 1395nn).

503.    However, Biotronik in Southern California has hired at least 15 children and family members of their physician customers. These include the following:

1) Lisa Belott (husband is Dr. Peter Belott in El Cajon, CA)

2) Jigna Doshi (husband is Dr. Shephal Doshi in Santa Monica, CA)

3) Clea Fuenzalida (father is Dr. Charles Fuenzalida in Aurora, CO)

4) Christian Marin (father is Dr. Jairo Marin in Santa Ana, CA)

5) Robert Masters (father is Dr. Robert Masters in Laguna Hills, CA)

6) Lucas Morales (father is Dr. Monty Morales in Tucson, AZ)

7)  Jason Pagano (father in law is Dr. Rex Winters in Cypress, CA)

8)  Andres Williams (father Dr. Jeffrey Williams in San Diego, CA. Andres also is Jayson Williams' brother)

9)  Jayson Williams (father is Dr. Jeffrey Williams in San Diego, CA, and Jayson has been fired twice and then rehired)

10) Mike Frumin (father is Dr. Howard Frumin, in Laguna Hill, CA)

11) Donald Bridges (brother is Dr. Duane Bridges, in Inglewood, CA)

12) Josh Tucker (father is Dr. Kelly Tucker, in Orange, CA)

13) Mike Rediker (father is Dr. Donald Rediker in Mission Viejo, CA)

14) Cameron Rimmer (father is Biotronik manager Rich Rimmer, Cameron had been doing Biotronik training cases in which physician customers are paid at Biotronik sales representative Andrew Nash's Phoenix, Arizona pacemaker training school)

15)  Rodrigo Said (father-in-law is a cardiologist in San Diego, CA)

16) Evan Stieber (father Dr. David Stieber is a cardiologist in Alaska)

17) Mahvish (Yunus) Saly (father is a cardiologist in Saginaw, MI)

18)  Behrang Ziaeian (Mother is a practice manager for a cardiology group that uses Biotronik)

504.     Biotronik in Arizona has hired multiple children and family members of their physician customers, including most importantly sales representative Robin Singh, the son of Arizona's most active implanter of pacemakers and defibrillators – Dr. Amarnauth Singh. In a conversation on December 4, 2015, Biotronik sales

manager Mike Iverson told Relator Jeffrey Bell that Robin Singh cannot be fired and is protected, due to his father being the top physician customer for Biotronik in Arizona. When Iverson had a problem with Robin Singh talking about Biotronik's business inappropriately, he went to Robin's father Dr. Amarnauth Singh and told him to tell Robin Singh that company "dirty laundry" stays internal and you can't talk to "our doctors about our sh**" (Exhibit 126).

505.    Biotronik has also hired Tony Fernandez, the son of Dr. Jose Fernandez, a Tucson, Arizona cardiologist who refers his patients for Biotronik implants, and who threatened the company that Biotronik would lose his business and that of his business partners at Pima Heart Center in Tucson. In a conversation on December 4, 2015, Biotronik sales manager Mike Iverson told Relator Jeffrey Bell that Dr. Fernandez "wanted me to hire his [Tony's] brother too." Dr. Fernandez specifically asked Iverson to give his younger son a job in California, in addition to having already hired his son Tony (Exhibit 126).

506.    For example, in 2013, Biotronik hired Clea Fuenzalida, the daughter of physician customer Dr. Charles Fuenzalida from Colorado. Originally, Ms. Fuenzalida worked as a field clinical staff member in California. Today, Ms. Fuenzalida works as a Biotronik sales associate in San Francisco, California. Her father inquired about a job with Biotronik for her with Biotronik's Director of Training at that time, Harold

Klein.

507.    For example, Dr. Asim Yunus's daughter Mahvish (Yunus) Saly has been employed by Biotronik since 2009. Dr. Yunus is a cardiologist working in Saginaw, Michigan, and his daughter is a Biotronik Field Clinical Specialist in New York City. Dr. Yunus has received over $114,000 in general payments and over $97,000 in associated research payments from Biotronik since 2013 (Exhibit 127).

508.    For example, Evan Stieber was employed as an "independent associate" under one of Biotronik's independent sales reps.  Evan had attended the PrepMD pacemaker trade school in Boston and failed out of the program.  He was then hired by St. Jude Medical (Biotronik's competition), to train with his brother, who was also employed by St. Jude.  His employment was terminated by St. Jude.  According to Biotronik sales manager Bob Marsella, who was aware of Evan's history of failing from pacing school and termination from St. Jude, Marsella was contacted by Evan's father, an implanting cardiologist, Dr. David Stieber, who asked Marsella to hire his son as a favor to him. After Evan Stieber was hired by Biotronik from approximately May 2016 to July 2016, Dr. Stieber began implanting Biotronik devices in Alaska where he practiced.  Evan attended many implants as a "trainee" during his time with Biotronik and was terminated due to performance issues.

### 6. Speaking fees as kickbacks

509.     Speaker panels were completely overseen by Biotronik's marketing department. Marketing would nominate and invite the speakers.

510.     Biotronik rewarded physicians with many of these kickbacks for implanting large quantities of Biotronik pacemakers and defibrillators or referring patients for those implants. Some physicians who implanted a large number of Biotronik's devices were given gifts including expensive meals and frequent, continuous catered meals for themselves and their large staffs at their offices.

511.     Biotronik established formal internal guidelines for the award of these benefits to physicians, in effect pushing "implant to play," quid pro quo-focused sales strategies which are based entirely on the number of implants performed by the physicians and the ability of the physician to influence other physicians to begin implanting Biotronik's devices. The recipients of these awards and benefits were selected by Biotronik marketers based on the recipients' ability to implant their pacemakers and defibrillators and to influence other physicians to do so.

512.     For example, a May 15, 2014 Biotronik contract was made for Dr. Leon Feldman to be paid $2,000 for a speaker dinner at the Spaghettini Restaurant in Seal Beach, California. When he spoke at the event, Dr. Leon Feldman was overheard by Relator Andrew Schmid stating, "excuse me if I stumble a couple times, I haven't

1    seen this presentation before." It was a PowerPoint slideshow on a new product

2    authored by Biotronik (Exhibit 128).

3          513.    For example, on October 27-28, 2017, Biotronik paid Dr. Robert Orr to

4    give presentations to a group of Biotronik personnel at the Winery Restaurant in

5    Newport Beach, California, followed the next day by giving a training to physicians

6    on the use of the Biotronik BioMonitor 2 (Exhibit 129).

7          514.    For example, a 2018 spreadsheet shows that Biotronik currently contracts

8    with 285 physician customers as paid speakers (Exhibit 130).

9          *7. Grant payments as kickbacks*

10         515.    Grant payments to physician customers and physician groups were

11   overseen by Biotronik's sales department. Sales managers and sales representatives

12   would personally review and approve grant requests from physician customers for

13   their personal use or for their affiliated groups in order to get more business from

14   those physicians.

15         516.    Biotronik rewarded physicians with grants as kickbacks for implanting

16   large quantities of Biotronik pacemakers and defibrillators or referring patients for

17   those implants. The recipients of these grants were selected by Biotronik sales staff

18   based on the recipients' ability to implant their pacemakers and defibrillators and to

19   influence other physicians to do so.

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 165

517.    For example, in a February 3, 2016 email Biotronik sales manager Bob Marsella promised customer Dr. Mazda Motallebi and Dr. Blau Gadhe that Biotronik would sponsor the Indian Medical Association of Southern California dinner.  Dr Blau Gadhe was the "top dog" at Caremore Medical (a Medicare only practice) and Dr. Mazda's boss. In the email, Marsella promised to sponsor a dinner without first going through the Biotronik grant committee, and he did it in order to improve the relationship with the "top dog", Dr. Gadhe. A newsletter from the Indian Medical Association made an acknowledgement thanking Bob Marsella and Biotronik for sponsoring the event.  CMS data shows that Biotronik made a $5000 payment to Dr. Gadhe a few weeks after Marsella sent this email (Exhibit 131).

518.    For example, on April 28, 2015, Biotronik representatives were asked by Dr. Rex Winters to distribute invitations to referring cardiologists and catheter lab staff all over town to come to Dr. Winters' referral marketing event, for which Relator Andrew Schmid's credit card was used to pay for a $137.25 breakfast.  Biotronik helped create a marketing plan for Dr. Winters, and Dr. Winters spoke on TAVR (heart valve replacement procedure) and Biotronik physician customer Dr. Alicia Montanez gave a generic talk about pacemakers.  Biotronik paid for food and beverages for the event, and Biotronik sales representative Bill Blair told Andrew that Dr. Winters received a $10,000 grant from Biotronik for the event (Exhibit 132).

519.     For example, on November 4, 2017, Dr. Kartik Thaker, an implanting cardiologist, asked Biotronik sales representative Bill Blair to sponsor the dinner for the Annual Convention of the Southern California Indian Medical Association.  In attendance were physicians of various specialties, and their guests or spouses. Blair told Relator Andrew Schmid that Biotronik sales manager Bob Marsella charged the catering for $5000 directly to his Biotronik American Express card.  Blair claimed that Marsella did not go thru the appropriate process of attaining approval from the financial grants committee, which is what he should have done according to the code of conduct/expense policy. Subsequently Blair told Dr. Thaker that in exchange for paying for the dinner, Dr. Thaker owed him Biotronik implant cases.  Subsequently Dr. Thaker used Biotronik pacemaking devices in numerous cases (Exhibit 133).

   *8. Investing with physician customers and vacationing with physician customers as kickbacks*

520.     Biotronik sales representatives also invested in side businesses with physician customers as a form of inducement to get them to purchase more Biotronik pacemaking and cardiac devices.

521.     Biotronik's Code of Business conduct specifically stated that "BIOTRONIK field personnel (including independent representatives) shall not directly engage health care professionals in business relationships" (See Exhibit 48).

522.    Biotronik sales representatives have entered into a number of business relationships with their physician customers. This includes most prominently Biotronik sales representative Andrew Nash of Phoenix, who runs multiple businesses including an insurance billing company that provides billing services and assistance to Biotronik physician customers as well as a business in which he conducts "remote monitoring" of pacemaker and defibrillator patients using expensive Biotronik wireless heart monitoring technology and in which he bills Medicare, Medicaid, and other payors on behalf of his physician customers and gets them paid for monitoring work that he and his employees do themselves.

523.    Biotronik pays their field clinical staff for time that they have spent promoting and supporting Andrew Nash's Beyond Reps, LLC business. Biotronik knowingly uses Beyond Reps LLC to help induce their physician customers to use Biotronik devices, due to the extra income that physicians earn from Medicare when using the Beyond Reps LLC remote monitoring services.

524.    In a conversation with Relator Jeff Bell on February 20, 2018, Beyond Reps representative Anthony Kumar stated that Biotronik is trying to get top physician customer Dr. Timothy Marshall to agree to allow Beyond Reps to do his pacemaker device home monitoring for him and bill insurers. Kumar states that he is only interested in signing up Medicare patients and that it will be an opportunity for

Dr. Marshall to generate revenue (Exhibit 134).

525.   For example, on February 21, 2018, a series of text messages was exchanged between Beyond Reps representative Anthony Kumar and a Biotronik field clinical staff member. Kumar was asking for the Biotronik field clinical staff member to send him all the information on a patient that was post-implant to Beyond Reps, and the messages show that the Biotronik field clinical staff are used to receiving instructions and orders on conveying patient information to Beyond Reps during their Biotronik work hours, and as part of their Biotronik field clinical duties (Exhibit 135).

526.   For example, as of July 2018 Anthony Kumar was working for both Biotronik and Beyond Reps and selling 7 other products to physicians (Exhibit 135).

527.   For example, as of July 2018 Antonio Fernandez was working for Biotronik and Beyond Reps and was receiving per diem payments under Biotronik sales manager Mike Iverson (Exhibit 135).

528.   For example, on the date of June 13, 2018 the online calendar for Biotronik Tucson noted that Beyond Reps couldn't cover Dr. Rajen Desai's clinic and Biotronik representatives are required to do it (Exhibit 136).

529.   For example, on the date of July 12, 2018 the online calendar for Biotronik Tucson noted a schedule for Biotronik personnel to cover a Beyond Reps clinic in Nogales (Exhibit 137).

530.     For example, on the date of December 14, 2018, the Tucson Biotronik sales calendar noted that Beyond Reps sales representative "Caroline" was scheduled to go with Biotronik field staff to service Dr. Peter Spooner's office (Exhibit 138).

531.     For example, on the date of December 18, 2018, the Tucson Biotronik sales calendar noted that Beyond Reps sales representative "Caroline" was scheduled to go with Biotronik field staff to service Dr. Ajay Tuli's office (Exhibit 138).

532.     For example, on the date of December 18, 2018, the Tucson Biotronik sales calendar noted that Beyond Reps sales representative "Caroline" was scheduled to go with Biotronik field staff to service Dr. Ajay Tuli's office and another physician customer's office – Dr. James Myer's (Exhibit 138).

533.     Biotronik also pays their field clinical staff for time that they have spent promoting and supporting former Biotronik sales manager's Impulse Dynamics (USA) Inc. business. For example, on June 20, 2018, the Tucson Biotronik sales calendar noted that Biotronik sales staff was doing an implant alongside former Biotronik sales manager Mike Iverson's new Impulse Dynamics product for top customer Dr. Darren Peress ("ESO") (Exhibit 139).

534.     For example, on June 20, 2018, the Tucson Biotronik sales calendar noted that Biotronik sales staff was doing another implant alongside former Biotronik sales manager Mike Iverson's new Impulse Dynamics product for top customer Dr.

Darren Peress ("ESO") (Exhibit 139).

535.    For example, on June 22, 2018, the Tucson Biotronik sales calendar noted that Biotronik sales staff was doing an implant alongside former Biotronik sales manager Mike Iverson's new Impulse Dynamics product for top customer Dr. Darren Peress ("ESO") (Exhibit 139).

536.    For example, on July 18, 2018, the Tucson Biotronik sales calendar noted that Biotronik sales representative Mike McCormick was taking a trial of former Biotronik sales manager Mike Iverson's new Impulse Dynamics product to top customer Pima Heart Group's East Side Office ("ESO") (Exhibit 139).

537.    For example, on December 18, 2018, the Tucson Biotronik sales calendar noted that Biotronik sales representative Mike McCormick was doing a clinic for top customer Dr. Daren Peress alongside former Biotronik sales manager Mike Iverson (Exhibit 139).

538.    In a conversation with Relator Jeff Bell on March 28, 2018, former Biotronik Tucson FCS Joe DeBoe stated that Biotronik sales representatives and FCS's are stealing heart lead wires from Biotronik and selling them to former Biotronik sales manager Mike Iverson's new company, Impulse Dynamics. The theft and sale of the heart lead wires involves former Biotronik sales representative Andrew Nash, along with FCS's Robin Singh and Ian Westerfield (Exhibit 140).

539.     Biotronik sales representatives have also entered into many other business relationships with physician customers. For example, Biotronik independent sales representative Michael McCormick is listed as a Member in corporate filings for Fit at the River II, LLC, a full-service fitness/cardiac rehabilitation facility located inside Tucson Heart Hospital. McCormick is listed as "Mick McCormick" in the corporate filing but lists the same address that he lists for his corporate filing for his Biotronik independent sales representative business, MKM Healthcare Solutions LLC: 6360 N. Placita Arista, Tucson, AZ 85718. Other Members of the LLC include the following physicians from Pima Heart Group: Dr. David Lapan, Dr. Monte Morales, Dr. Larry Lancaster, Dr. Sal Tirrito, Dr. Lawrence Temkin, Dr. John Boulet, Dr. Charles Katzenberg, and Dr. Gerald Winter (Exhibit 141).

540.     For example, on May 18, 2005 Biotronik sales representative Mike McCormick and Biotronik physician customer Dr. Rajen Desai filed Articles of Incorporation for a business called Boomer Cat Enterprises, LLC located in Tucson, AZ. The corporation was in good standing as of July 7, 2018 (Exhibit 142).

541.     For example, on March 11, 2013 Biotronik sales representative Jeff Germano and physician client Dr. Amarnauth Singh filed Articles of Incorporation for a business called Germano Medical LLC located in Peoria, AZ. The business was in good standing as of September 18, 2018 (Exhibit 143).

542.     Biotronik's Code of Business conduct also stated that "BIOTRONIK shall not provide or pay for any entertainment or recreational event or activity for any healthcare professional. Such activities include, but are not limited to: theater, sporting events, cruises or tours, golf, skiing, fishing or hunting, leisure or vacation trips." (See Exhibit 48).

543.     However, Biotronik sales representatives have repeatedly violated this policy and taken physician customers on vacation or paid for their expenses while on vacation together. For example, on information and belief, Bill Blair has repeatedly vacationed for approximately the past 3 years with physician customer Dr. Rex Winters at the Las Vegas Fantasy football draft, and at an annual Palm Springs wintertime Super Bowl golf weekend, where Blair has paid numerous expenses for Dr. Winters with Biotronik funds.

544.     For example, Biotronik invited and paid for travel for physician customers to attend meetings with Dr. Seth Worley in which he taught a brief 6-hour program on how to implant a certain type of cardiac lead wire. The travel included events in Hawaii (with a $4,300 travel budget for multiple physician customers to attend), San Diego, New Orleans, Virginia Beach, and Newport Beach, California. Biotronik invited physician customers to attend these meetings who already knew how to implant the lead wire, as an inducement (Exhibit 144).

545.     For example, Biotronik paid for customer Dr. Alicia Montanez to take thousands of dollars' worth of trips to Argentina (multiple payments from 2015-2016), New York City, San Diego, and San Francisco. In late 2015 Dr. Montanez attended and spoke at a South American electrophysiology conference.  Biotronik sales manager Bob Marsella and Biotronik sales representative Bill Blair made sure that Biotronik would pay for her airfare and accommodations, despite the fact that she was not being paid by Biotronik to speak (Exhibit 145).

546.     For example, on information and belief, Biotronik sales representative Michael McCormick has vacationed with physician customer Dr. James Myer in Hawaii and skiing together with Dr. Myer, Dr. Peter Spooner, and Dr. Rajen Desai in Lake Tahoe for approximately the past 2-3 years and paid for many of 'these physicians' vacation expenses with Biotronik funds. The Biotronik field staff calendar for Tucson from 2016-2018 shows multiple dates that McCormick was out on vacations with Dr. Myers, Dr. Spooner, and Dr. Desai in Hawaii or Lake Tahoe (Exhibit 146).

547.     Biotronik's Tucson, Arizona salesman Mike McCormick put vacation trips with physician customers on the Biotronik online business calendar. For example, for the dates of September 7-10, 2018 Mike McCormick made a calendar entry for a trip to Lake Tahoe, Nevada with physician customers Dr. James Myer, Dr.

Thomas Waggoner, Dr. Rajen Desai, Dr. Peter Spooner, and more (Exhibit 147).

548.    For example, for the dates of December 28, 2018, Mike McCormick made an online Biotronik calendar entry for a trip to Lake Tahoe for himself and physician customers (Exhibit 148).

549.    For example, for the date of June 20, 2018 Mike McCormick made an online Biotronik calendar entry for a Golf trip for himself and Dr. Monty Morales in Austin (Exhibit 149).

550.    For example, from 2015-2017 Biotronik held meetings in San Francisco and San Diego, California where Biotronik paid for travel for physician customers to attend and paid for physician customers such as Dr. Mazda Motallebi to speak (Exhibit 150).

551.    For example, for the dates of March 28-31, 2019, Mike McCormick made online Biotronik calendar entries for dinner each day for himself with Dr. Jitender Munjal, and Biotronik President Ryan Walters during Biotronik's paid trip to New York for Dr. Munjal (Exhibit 151).

*9. Paying physician customers to participate in sham research as kickbacks*

552.    Biotronik paid physicians to participate in research studies without requiring that they keep up with their own research paperwork, making the payments an inducement to implant devices rather than a legitimate payment for real research.

553.     For example, Dr. Prash Jayaraj of LA, CA is a Biotronik cardiologist customer who was engaged by Biotronik in their "Protego DF4 Post-approval Registry." Protego is an implantable cardiac defibrillator ("ICD") wire/cable that connects an implanted pulse generator in the chest region to the heart itself. Biotronik released a new defibrillator wire called the "Protego" and also initiated a clinical trial to collect five years of data on each enrolled patient in the study. Biotronik pays physicians several thousand dollars per patient over the duration of the study. Doctors that participate in the study are expected to implant the heart lead wires in patients who they will follow, in person, in a clinical setting, for five years. The purpose of following these patients is to  track the performance of the implanted wire, and to also evaluate the patient for any adverse effects, hospitalizations, infection rates, device complications, strokes, etc. It is necessary for physicians to follow these patients in their own clinic so that they can accurately report findings for the patients enrolled in the study.

554.     Dr. Jayaraj, also a paid Biotronik consultant, practices in Los Angeles. On occasion, he will implant ICDs at Lakewood Regional Medical Center when he is referred patients from Dr. Jamal Hussain and Dr. Milan Rawal. Dr. Jayaraj will obtain consent from these patients to participate in the clinical trial, despite that fact that he will not see these patients in the clinic. Instead, Dr. Jayaraj asks Biotronik sales rep

Bill Blair to obtain copies of the patients' device interrogations and/or medical records, so that he can submit the data to Biotronik for study payments, as if he had seen the patient in person himself.

555.    For example, an 8-30-14 email showing that Dr. Jayaraj asked Blair for help locating patient medical records from his referring doctors for three of the study patients in advance of a Biotronik clinical monitor conducting a site visit to review his study records (Exhibit 152).

556.    For example, a 5-1-15 Biotronik calendar meeting reminder was set to turn on remote monitoring for patients that Dr. Jayaraj has enrolled in the Biotronik study but doesn't ever see, to allow Jayaraj to collect all the clinical study data needed via the remote monitoring website (Exhibit 152).

557.    For example, a 6-4-15 email from Dr. Jayaraj to Andrew Schmid acknowledged that Jayaraj needed data for the Biotronik clinical trial (Exhibit 152).

558.    For example, a 10-5-16 email from Dr. Jayaraj to Andrew Schmid thanked Andrew for locating patient medical records and clinical trial data that Jayaraj will be paid by Biotronik for (Exhibit 152).

559.    For example, a 2013-2017 CMS OpenPayments record showed that Dr. Jayaraj was paid $183,816 in "Associated Research" payments from Biotronik from 2013-2017 (Exhibit 152).

560.     For example, on December 3, 2015, Biotronik sales rep Bill Blair and sales manager Bob Marsella instructed Relator Andrew Schmid to offer to enroll Dr. Arnold Seto of the VA Long Beach Medical Center to participate in a paid Biotronik left ventricular lead study ("LV Lead study"). Biotronik was paying physicians in excess of $2,000 to participate in this study (Exhibit 153).

561.     On original source information known by the Relators, these kickback schemes are carried out with other physicians nationally by Defendant Biotronik.

562.     Cash payments and payments for travel, meals, entertainment and other inducements to increase physicians' use of Biotronik cardiac devices is inappropriate and illegal. For example, paid meals would be inappropriate if they are tied directly or indirectly to the generation of federal health care program business for the manufacturer, or for the purposeful inducement of business.  See, e.g., 68 F.R. 2378 "these arrangements potentially implicate the anti-kickback statute if any one purpose of the arrangement is to generate business."

563.     On information and belief, these kickback schemes are carried out with other physicians nationally by Defendant Biotronik.

   *10. Buying carts and printers for physician customers*

564.     Biotronik has also been purchasing printers and printer carts for physician customers' offices as a gift to get or keep their business.

565.      Relator Jeffrey Bell overheard Biotronik sales representative Mike McCormick speak to John Augat (Biotronik FCS) at a Biotronik Tucson sales staff dinner meeting on February 20, 2019. Mr. McCormick stated that he tried to order a cart and a printer for Dr. Hymie Feitelson's office. Mr. McCormick said that Biotronik wouldn't pay for it because Mr. McCormick was an independent sales rep. So, Mr. McCormick stated that he ordered it under Mr. Augat's name, because Mr. Augat is a Biotronik employee. Relator Jeffrey Bell discovered that Biotronik is buying carts and printers for any physician customer's office that wants one and is probably having them shipped directly to the physician's offices as a free gift to the physicians. The printers seem to be wireless printers, and the purpose is to help the doctors print out letter-sized pages from the Biotronik programmers. The programmers are the devices that interrogate and calibrate the patient's Biotronik pacemaking device. Each purchase constitutes an estimated $400 kickback between the price of the cart and of the printer for each physician's office.

## VI. ILLEGALLY ACCESSING CONFIDENTIAL PATIENT DATA TO SWITCH DEVICES, AND PROGRAMMING COMPETITOR DEVICES

566.      Biotronik representatives aggressively took over the quarterly and semi-annual device checking and programming of pacemaker devices for their physician

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 179

customer's offices, in order to illegally access HIPAA-protected patient information and to effectuate switches from competitor devices to Biotronik devices. Biotronik sales representatives routinely accessed patients with competitor devices implanted, patient medical records, patient scheduling boards, and even physician software in order to switch some or all of a physician's patients to Biotronik pacemaker devices.

567.    Sales representatives accessed patient data for patients with pacemaker and defibrillator devices from other companies, such as Medtronic, Boston Scientific, St. Jude Medical, and The Sorin Group in order to pass false information to insurance payors and have the Medicaid or Medicare payment for the device implant approved. After implanting Biotronik devices, some Biotronik personnel accessed the new "home monitoring" features of the devices in order to increase profits for their physician customers while increasing their own commissions and income at the same time, and income through Beyond Reps LLC.

568.    Biotronik sales representative involvement in the device checking and programming process violated the patients' HIPAA rights and was designed to rapidly push the patient to be implanted with a Biotronik device.

569.    Biotronik managers instructed Biotronik sales representatives to sell physicians' offices on the following special benefit: Biotronik would do all of a physician's quarterly and semi-annual checks and re-programming and remote

1   monitoring of the patient's pacemaker devices, including the pacemaker devices of

2   competitors. This was a very valuable benefit to both the physicians and their office

3   staff, because physicians' and their office staff often do not have enough time to

4   undertake the extra hours of work required to check and re-program all of these

5   devices.

6       570.    In addition to taking over the scheduled pacemaking device checks in the

7   doctors' offices, Biotronik field clinical staff were also instructed to check devices of

8   patients who were hospital inpatients.  Biotronik independent sales representative Bill

9   Blair would get messages from his doctors saying a patient needed checked at the

10  hospital.  Biotronik field clinical staff would have to figure out what device the patient

11  had, and either get a pacemaker programmer from the catheter lab at that hospital or

12  borrow one from another hospital. Field clinical staff even would be instructed to

13  handle emergency room checks for non-Biotronik devices, sometimes even

14  encountering the other manufacturers' reps because they were also called to check the

15  patient (called by the emergency room nurse).  The scheduled office checks could be

16  as often as every three months, or even monthly so that some doctors could bill

17  Medicare every month until the battery was low enough for end-of-battery-life

18  replacement.  Biotronik field clinical staff were also instructed to handle all of the

19  "add-on checks," of other company pacemakers when at the doctor's office who had

20

called and asked them to check a Biotronik pacemaker.

571.    Blair would also instruct field clinical staff to go into the hospitals during their down time to stop by the catheter labs to see what was scheduled for the day, and take pictures of the scheduling boards, or to send a text summary of the cases with patient names.  Blair would also instruct field clinical staff to go through the schedule book at Lakewood Regional Medical Center, report back the implants that were scheduled, and in particular the ones that didn't have a vendor specified so he could go ask the doctor for the cases.

572.    Industry guidelines of the Heart Rhythm Society state that device checks should be performed in an office clinical visit only under the direct supervision of the cardiologist. However, every Thursday, Biotronik sales representative Bill Blair would instruct his team of Biotronik field clinical specialists to perform device clinics, working on pacemaker devices from all manufacturers, at Heartscape Cardiovascular clinic, in Cypress, California for Dr. Rex Winters.  Thursday is Dr. Winters "procedure day" when he would do heart catheterizations and other procedures in the hospital.  This rendered Dr. Winters unavailable personally or by phone. Blair's group would also do these device clinics for the Long Beach Memorial Care physicians Dr. Steve Appleby, Dr. Kheit Hoang and Dr. Aditya Prasad every Friday, often in the absence of a physician. The physicians would not be able to review the work done by

1   Blair's, and the Biotronik personnel were expected to make programming changes at

2   their own discretion (Exhibit 154).

3   573.    For example, St Jude Medical (a competing pacemaker company) had a

4   large recall of implantable cardiac defibrillator pacemaking devices. It is specifically a

5   Biotronik code of conduct violation to engage physicians in discussions about

6   competitor recalls. However, Biotronik personnel routinely screened St. Jude patients

7   during device check clinics for recalled devices. Biotronik sales representative Bill

8   Blair went as far as securing a list of Dr. Alicia Montanez's affected patients and their

9   cardiologists, so that he could take the information to those doctors and ask for them

10  to have the patient's devices replaced by Biotronik ICDs.  This was also a HIPAA

11  violation, and also very costly to Medicaid and Medicare because St. Jude would have

12  provided a free replacement. Biotronik also promoted a program where they would

13  reimburse a patient up to $2,500 dollars if they had their device replaced by a

14  Biotronik device (Exhibit 155).

15  574.    For example, Biotronik sales representative Andrew Nash routinely

16  texted the Biotronik field clinical staff and told them they had to send him pictures of

17  the scheduling boards at the various doctor's offices they visited each time they were

18  there. Biotronik independent sales representative Michael McCormick also instructed

19  Biotronik field staff to check hospital scheduling boards and inform him of all

20

implants being performed that day, so that he could try to influence the physician to change competitor devices to Biotronik devices. Both Nash and McCormick would gather HIPAA protected information on upcoming surgical implants of competitor devices into patients and contact the physicians and convince them to take more kickbacks in order to use a Biotronik implant instead.

575.    For example, Biotronik sales representatives made agreements with doctors to let Biotronik field representatives to come into their offices and handle all their pacemaker patients when they came in twice or more often each year to have their pacemaker devices checked. These patients had devices from Biotronik and from a variety of competitor companies, such as Medtronic, St. Jude, Boston Scientific, and The Sorin Group. This activity violated the FDA-approved procedure for competitor devices, which were supposed to be checked and programmed by the representatives of those companies.

576.    In a conversation with Biotronik sales representative Robin Singh on November 20, 2015, Relator Jeffrey Bell was told that Biotronik personnel were arranging for certain physician customers to make money from Medicare, Medicaid and other insurers by helping them do "home monitoring" of Biotronik pacemaker devices. He discussed what to do when some of the cardiologists did not want to do home monitoring or bill for it themselves – send that portion of the business to other

Biotronik physician customers: "We have to get some of the docs the home monitoring crap." "If they don't want to do it themselves, send it to an EP, Faitelson or Peress…" [Dr. Hymie Faitelson and Dr. Darren Peress are two physician customers who were credentialed as electrophysiologists, or "EPs".] He described how to get the physician customers paid by Medicare: "You can only do that thoracic impedance once a month, $31 dollars every single month. That's all your guys, they can bill Heart Failure Diagnostics" (Exhibit 156).

577.    However, Singh pointed out that this could create a problem for Biotronik with the doctors who did not do the home monitoring and did not get paid for it: "Part of the problem is that if somebody else is doing the home monitoring, that other doctor who does the in-office check might not get billed PAID for it. That's the only problem is that if some of your cardiologists don't get paid for it, they are going to get pissed" (Exhibit 156).

578.    Singh claimed that one of his physician customers was making $2,000 a month just by billing for home monitoring charges: ""Dude...for example Morales gets two grand every month. He's got over 100 patients. Code [CPT] is OPTIVOL it's $31 dollars. What he does is tells all the patients 'hey we are going to be monitoring your heart failure every month. You're going to see us bill your insurance $31 every month but you don't have a co-pay'. So, they let them know [patient]. If they see

1    anything, they don't have to pay it" (Exhibit 156).

2        579.    In a conversation with Biotronik field clinical specialist Joe Deboe on

3    June 14, 2017, Relator Jeffrey Bell was told that Robin Singh was doing remote

4    monitoring for physician customers and billing Medicare and other payors for the

5    remote monitoring service. Deboe claimed that Singh was sending out claims on

6    remote monitoring for devices that had not even been connected to the remote monitor

7    system for months at a time. "It's … illegal… you have to fill a pacer sheet out and

8    have the physician sign it to bill it." They aren't doing the remote monitoring, but they

9    are still billing Medicare on it. Additionally, the remote monitoring data was

10   intercepted by Biotronik employees on a daily basis, and they created super bills for

11   the physicians to use to bill patients to Medicare and other payers (Exhibit 157).

12       580.    Ultimately, a group of Biotronik personnel started a side company in

13   2016 called "Beyond Reps, LLC", to do remote monitoring directly for physicians and

14   submit bills for them. Defendant Beyond Reps, LLC was started by Biotronik sales

15   representative Andrew Nash, and on information and belief, Biotronik managers Mike

16   Iverson and Peter Elia and Biotronik independent sales representative Michael

17   McCormick are investors. They tried to get Relator Jeffrey Bell involved in this side

18   business, in which they would self-refer their own customers, promising him up to

19   $1,000 a month in income by getting his Biotronik physician customers to use their

20

1 service.

2     581.    In a conversation with Biotronik sales representative Andrew Nash on

3 July 12, 2017, Relator Jeffrey Bell was told that Defendant Beyond Reps' remote

4 monitoring and billing side business was known about by Biotronik managers Mike

5 Iverson and Peter Elia, and that Nash was actively selling the business to doctors

6 around the country. Nash called Relator Jeffrey Bell to try to get Relator Bell's

7 physician customer business (Exhibit 158).

8     582.    Nash said there was "no work by the physician", and yet they could bill

9 as if they did the work. "We bill the technical [billing component], and the physician

10 bills the professional [billing component]." Nash said Relator Jeffrey Bell's physician

11 company was leaving $200,000 "on the table every year" by not signing up with

12 Defendant Beyond Reps, and that Relator Bell himself could make $1,000 per month

13 as a commission.  Nash said Relator Jeffrey Bell's physician customer could bill for it

14 even though the customer did not do remote monitoring -he saw his patients in the

15 clinic face-to-face (Exhibit 158).

16     583.    In a conversation with Biotronik sales representative Jeff Germano on

17 July 18, 2017, Relator Jeffrey Bell was told that Beyond Reps was charging Medicare

18 a "global fee" for the doctor for doing the remote monitoring, although the doctor was

19 not involved and should not have been billing the global fee: "Tony Fernandez is

20

following every device that everyone has. No thanks… Beyond Reps was started as, here's an iPad, anybody in the office can check a device with this iPad. Somehow, I don't know how that works, and then you can bill for the Global Fee [Medicare billing code] and then you have to kick $10-11 bucks a check to Beyond Reps. [Laughing] Well our company [Biotronik] just like all the other companies just bills global and they make us check 'em anyway, or they just put a nurse in the room and they're like, yeah, fine, nurse is pressing buttons and putting in the Paceart [pacemaker tracking system] done deal global billing, free Biotronik pacer rep. I don't have to pay sh** to anybody". He indicated that Relator Jeffrey Bell could make $1,000 a month if he sent his physician customers to Beyond Reps to have remote monitoring checked and billed for by Dr. Jose Fernandez's son, Tony Fernandez, but said that he wouldn't do it himself because Fernandez was a "liability". Germano said that Fernandez was getting paid by Biotronik for this work through a "temp agency", in order to try to keep the side business at arm's length (Exhibit 159).

584.    In a conversation with Biotronik field clinical specialist Joe DeBoe on November 9, 2017, Relator Jeffrey Bell was told that Tony Fernandez was being paid between $300-$500 per day by Biotronik using a temporary agency because they did not want to have it on the books. Fernandez was calling doctors for Defendant Beyond Reps and telling them that Beyond Reps needed to check a patient's pacemaker for

1    that doctor (Exhibit 160).

2      585.    For example, Biotronik sales representative Bill Blair routinely texted the

3    Biotronik field clinical staff and told them they had to send him pictures of the

4    scheduling boards at the various doctor's offices they visited each time they were

5    there. He would gather HIPAA protected information on upcoming surgical implants

6    of competitor devices into patients and contact the physicians and convince them to

7    take more kickbacks in order to use a Biotronik implant instead.

8      586.    For example, Biotronik sales representative Bill Blair made agreements

9    with doctors to let Biotronik field representatives to come into their offices and handle

10    all their pacemaker patients when they came in twice or more often each year to have

11    their pacemaker devices checked. These patients had devices from Biotronik and from

12    a variety of competitor companies, such as Medtronic, St. Jude, Boston Scientific, and

13    The Sorin Group. This activity violated the FDA-approved procedure for competitor

14    devices, which were supposed to be checked and programmed by the representatives

15    of those companies.

16      587.    Biotronik sales representative Bill Blair also set up with some physician

17    customers for Biotronik field clinical staff to do all the work to receive transmissions

18    from Biotronik home monitoring and loop recorder devices that were implanted in

19    patients. Field clinical staff were instructed and trained by Biotronik's Home

20

Monitoring department to review the remote monitoring and loop recorder reports from patients. Relator Andrew Schmid has personally been instructed to sort hundreds of home monitoring and loop recorder transmissions for one of Bill Blair's physician customers to try to find a medical indication to implant a new Biotronik pacemaking device or upgrade to a new one. In Southern California, the Biotronik sales representatives "diagnose" the home monitoring and loop recorder reports themselves and make recommendations to physician customers to implant new Biotronik devices.

588.   For example, at Dr. Rex Winters' office, Biotronik sales representative Bill Blair has a login to Dr. Winters' medical records system, which he uses to look for future patients for Biotronik device implants. Bill Blair hired Dr. Winters' son-in-law, Jason Pagano, in order to maintain this close level of access. Blair uses that close relationship to do all of the device checks for Dr. Winters, and to even borrow the programming devices from other companies to take to other doctor's offices for their device checks. Blair also had access to the login and the pacemaking device "programmers" at Dr. Winters' office prior to the hiring of Pagano. Blair agreed to hire Pagano before he finished a college degree that was not health related, in order to maintain and improve this relationship with Dr. Winters (Exhibit 161).

589.   For example, on September 6, 2018, the Tucson Biotronik sales calendar noted that Biotronik FCS Justin DiLeone was going to top customer Pima Heart

Group's Benson, Arizona office to check devices from competitors Medtronic ("MDT"), Boston Scientific ("BSC"), and St. Jude ("STJ") (Exhibit 162).

590.    For example, on January 16, 2019, the Tucson Biotronik sales calendar noted that Biotronik was going to top customer Pima Heart Group's Green Valley, Arizona office ("GVO") to check devices from competitor Sorin (Exhibit 162).

591.    For example, on January 29, 2019, the Tucson Biotronik sales calendar noted that Biotronik field staff were going to the Tucson VA center to do a device check, where Biotronik is not allowed to support devices (Exhibit 162).

592.    For example, on February 14, 2019, the Tucson Biotronik sales calendar noted that Biotronik was going to top customer Dr. Monty Morales's clinic to check devices from competitor Sorin (Exhibit 162).

## VII. BIOTRONIK HAS CAUSED AND IS CAUSING FALSE CLAIMS TO BE SUBMITTED FOR REIMBURSEMENT TO THE UNITED STATES AND THE STATES

593.    Illegally marketed devices are not eligible to be purchased by Medicare, Medicaid or any other health insurance program funded by the United States.  At all relevant times, Biotronik has been aware that the federal government was the ultimate purchaser of the numerous Subject Devices. Biotronik knew the United States

routinely paid hospitals for Subject Devices with labeling bearing the Biotronik product names BioMonitor 2-AF, Edora, Eluna, Entovis, Iforia, Ilivia, Intica, Inventra, Iperia, Itrevia among others. Thus, Biotronik knew that Medicare would receive numerous claims for reimbursement for their misbranded products. Biotronik were also aware that Medicare and all other federally funded programs were not supposed to pay for illegally marketed products. Consequently, every claim presented to Medicare (or any other health care program financed by the federal government) for Subject Devices for which the Biotronik paid illegal inducements for was a false claim, and each claim was knowingly caused by Biotronik.

594.    Each of these statements were used by Biotronik to market or distribute the Subject Devices were false and resulted in claims for the use of the devices being submitted to Medicare, Medicaid and other federal payment programs.

595.    As a result of Biotronik's actions, thousands of false claims relating the Subject Devices, including unnecessary surgical procedures and office visits, have been presented and paid by the United States. This has resulted in the United States expending hundreds of millions of dollars for false Medicare, Medicaid, and federal insurance claims that should have never been paid.

## VIII. RETALIATION

*A. Retaliation Against Relator Jeffrey Bell*

596.     In or about June 2015, Relator Jeffrey Bell became aware that there were company-wide problems at Biotronik with kickbacks to physicians.  When he reported this illegal activity to Biotronik management, Biotronik retaliated by:

      a. Refusing to pay Relator Jeffrey Bell his contractually-required commissions on sales to physicians in his sales territory

      b. Re-assigning Relator Jeffrey Bell's commissions to other Biotronik sales representatives

      c. Requiring Relator Jeffrey Bell to work hours and days that were not required under his contract and not required of other company sales representatives

      d. Reneging on an offer to pay Relator Jeffrey Bell a large, ongoing commission for recruiting a competing sales representative with a large group of physician customers

      e. Refusing to acknowledge or address that certain Biotronik employees had previously made death threats against Relator Jeffrey Bell

      f. Mis-classifying Relator Jeffrey Bell as an Independent Contractor

597.     To comply with the relevant laws and regulations, medical device

companies like Biotronik must be able to account for all inducements given to physicians. In or about June 2015, Relator Jeffrey Bell found out that there were company-wide irregularities at Biotronik with respect to excessive, targeted use of these payments to physician customers.

598.    Thereafter, Relator Jeffrey Bell complained and reported to Biotronik management, both orally and in writing, of these illegal business practices, which violated the Medicare and Medicaid anti-kickback laws and other relevant statutes and regulations. Specifically, Relator Jeffrey Bell complained about the Biotronik payments to physicians for "training" while he underwent training on the Biotronik pacemakers from the corporate training manager. Relator Jeffrey Bell stated that the Biotronik system of giving some high-volume doctors access to more training payments than others based on their higher use of Biotronik pacemakers and brand loyalty appeared to be excessive, unethical and possibly illegal. Relator Jeffrey Bell also complained to his sales manager about how Biotronik sales representatives were "paying Medical assistants ("MA's"), as it could run afoul of laws on quid pro quo arrangements.

599.    In retaliation for these actions, Relator Jeffrey Bell's sales manager at Biotronik and other Biotronik personnel began a campaign to harass and intimidate Relator Bell and reduce their payment of contractually obligated sales commissions to

1   him. Relator Jeffrey Bell's commissions for pacemaker implants by the physicians in

2   his contractual territory were taken away after he reported illegal business practices to

3   Biotronik. Relator Jeffrey Bell stated that Biotronik owed him money from prior

4   implants to his sales manager and to Biotronik corporate headquarters orally and by

5   email, and Biotronik ignored his requests to pay him. Under defendant Biotronik's

6   system, the sales manager was responsible for approving the commissions. Over a

7   period of nearly three years when he wasn't getting the proper commissions, Relator

8   Jeffrey Bell has lost approximately $1.625 million or more in income compared to the

9   income he should have made under his contract, due to all the ways that Biotronik has

10  retaliated against him, reassigned his commissions to other employees, and strangled

11  his income. Relator Jeffrey Bell learned that his sales manager at the time told

12  Biotronik to pay his commissions to other sales personnel, in retaliation for his

13  complaints about illegal activities.

14      600.    Relator Jeffrey Bell was also required to work more hours than other

15  sales representatives at Biotronik after his complaints about illegal activities. Relator

16  Jeffrey Bell's manager thereafter did not allow Relator Bell to utilize company field

17  staff to cover his clinic days or his on-call days for physician customers, although he

18  was promised this advantage by his sales manager as terms of signing his contract,

19  and although all other sales representatives for Biotronik received this advantage.

20

601.     Relator Jeffrey Bell was also subjected to death threats from sales personnel who were being paid and/or recruited by Biotronik to compete with his business in his territory. Biotronik management refused to acknowledge or address the death threats with the sales personnel when they became Biotronik employees, and in fact retaliated against Relator Jeffrey Bell for taking the matter to police.

602.     Biotronik sales manager Mike Iverson stated to Relator Jeffrey Bell that he does not have many rights since he is considered an independent contractor and he is not afforded the protection of state and federal employment and anti-discrimination laws. Iverson stated during a meeting with Biotronik attorney Dec 7, 2017 that Relator Jeffrey Bell will have more protections if he became an employee. Biotronik offered him a base salary plus commissions plus benefits and expenses to sign a contract as a direct Biotronik employee. Mike Iverson and Biotronik attorney Haley Bjerk offered this contract and admitted that Relator Jeffrey Bell is one of a number of independent sales representatives that have been mis-classified as non-employees for several years, even though the company demanded that they act as employees, basically admitting to a corporate tax evasion scheme of mis-classification of independent contractors.

### 1. Death threats against Relator Jeffrey Bell

603.     Prior to working as an independent sales representative for Biotronik, Relator Jeffrey Bell worked as a sales representative for The Sorin Group ("Sorin"), a

medical device company that competes with Biotronik for pacemaker and implantable cardiac device sales. Relator Jeffrey Bell was assigned to the Tucson, Arizona territory for Sorin, just as he later covered Tucson for Biotronik.

604.    On September 17, 2014, at 7:23pm, while Relator Jeffrey Bell was working for Sorin, he received a series of three text messages saying that he would die, and that the sender of the text messages would be glad when he was dead. Relator Jeffrey Bell considered these text messages to be death threats, and immediately suspected that they may be coming from another Sorin employee. Shortly afterwards, Relator Jeffrey Bell met with Tim Dougherty (President of US Sales for The Sorin Group) and Aamir Mahmood (Director for The Sorin Group) and informed them of the death threats (Exhibit 163).

605.    Relator Jeffrey Bell also complained immediately about the death threats to the local police. The police took many months to really start investigating, until Relator Jeffrey Bell finally had to file a complaint with police internal affairs. When the local Sheriff's office investigated the death threats, Relator Jeffrey Bell hired a licensed private investigator and the investigator found that the phone number for one of the death threat text messages came from a phone owned by Sorin sales representative Jason Kindler. Relator Jeffrey Bell became suspicious that the death threats were sent by his own employee, a field clinical specialist named Tony

Fernandez, who was working for Sorin and getting paid on the side by Biotronik. During this time Fernandez was trying to get out of his contract and take a position with Biotronik in the same territory. Biotronik sales representative Michael McCormick solicited Fernandez to come to work at Biotronik.

606.    At that time, Robin Singh, a Biotronik sales representative, was paying Kindler and Fernandez to help him take implants and commissions from Relator Jeffrey Bell's Sorin physician customers. Kindler and Fernandez were complaining about Relator Jeffrey Bell to others in the industry, claiming that he was making too much money at Sorin. Fernandez and Kindler were writing emails back and forth to each other to fabricate a complaint they sent to Sorin Human Resources (Exhibit 164).

607.    Also, at the same time, Biotronik was negotiating with Sorin to pay $175,000.00 for Sorin to release Fernandez from his employment agreements with Relator Jeffrey Bell and with Sorin without Relator Bell's knowledge. Relator Jeffrey Bell paid Fernandez over $15,000.00 in payroll during that time period, even though Fernandez was negotiating with Biotronik for a position as a rep, and even though Fernandez was helping to arrange for Relator Bell's cases to be transferred to Biotronik and Relator Bell's pacemaker clinics for his customers were being covered by Biotronik associates.  Fernandez was negotiating with Biotronik to receive commissions from his father's pacemaker implant referrals as well, Dr. Jose

1  Fernandez (Exhibit 165).

2      608.    Relator Jeffrey Bell incurred significant lawyers' fees due to the threat of

3  Fernandez's fabrications at that time, and due to fighting off Biotronik's interference

4  with Relator Bell's own employee (Fernandez), and Biotronik's unwillingness to

5  recognize the contract and non-compete agreement that Fernandez had signed between

6  Relator and Sorin. During a conversation at Starbucks on Oracle and Rudasill roads in

7  Tucson, Biotronik sales manager Mike Iverson informed Relator Jeffrey Bell that he

8  instructed Relator Bell's former employee Tony Fernandez to "Do whatever you can

9  to get out of your contract, include make up things" he also stated that "I cannot hire

10  you because of the agreement in place and you must try and get out of the contract"

11  (Exhibit 166).

12      609.    Near the end of November 2014, Relator Jeffrey Bell approached Sorin

13  to discuss another contract including other states where Relator Bell intended to help

14  grow Sorin's business. Since his contract would be up in May 2015 it was not

15  uncharacteristic for the parties to discuss future contracts 6 months prior. However,

16  Sorin apparently intended to drop many of their contracts with sales representatives at

17  that time, and Sorin made Relator Jeffrey Bell aware that he should attempt to find a

18  new contract with another pacemaker company (Exhibit 167).

19      610.    In March 2015, Relator Jeffrey Bell reached out to Biotronik sales

20

manager Mike Iverson about getting a contract with Biotronik, because Sorin was terminating all contracts in the area with their sales representatives. Contracts were just being eliminated, and Reps had to scramble to find a company to contract with. Biotronik and Sorin had a no-hire agreement between both companies that prevented any Sorin employees from gaining employment at Biotronik.

611.    In April 2015, Relator Jeffrey Bell received a non-renewal notice from Sorin regarding his contract that was scheduled to end in May without any further instructions. Relator Jeffrey Bell's territory was the Number 1 pacemaker sales territory in the country for Sorin at the time.

612.    On or about May 12, 2015, Relator Jeffrey Bell got a contract from Biotronik to be an independent sales representative. Relator Jeffrey Bell negotiated the contract for about 2 days and signed it on May 14th. Relator Jeffrey Bell immediately notified his physician customers that he was now representing Biotronik.

613.    Relator Jeffrey Bell began hearing negative things being said from Biotronik team members about himself to physician customers and their staffs. When he inquired, he found that the source of slander and libel was coming from Tony Fernandez and Jason Kindler. In addition, he heard negative things from Dr. Jose Fernandez (Cardiologist, Tony Fernandez's father) about Relator Jeffrey Bell from team members. Dr. Fernandez was stating that he did not want Relator Jeffrey Bell to

1  check his patients or participate in any clinics with his group, which Dr. Fernandez

2  stated publicly was due to the negotiations for a job with Biotronik for his son.

3       614.    In August or September 2015, the local Sheriff who was investigating the

4  death threats started calling Biotronik employees, questioning them about the death

5  threats. Biotronik sales manager Mike Iverson told Biotronik sales personnel not to

6  work with or talk to the Sheriff's office, and not to talk to Relator Bell. Iverson then

7  called Relator Jeffrey Bell and told him how angry he was, that Biotronik did not

8  "need" a police investigation, because Biotronik had just finished settling an

9  investigation by the US Department of Justice for making illegal kickback payments

10  to physicians. Iverson called him that day and complained that Relator Jeffrey Bell

11  was trying to ruin Iverson's business. During that same time period, Relator Jeffrey

12  Bell complained to Iverson that "if you guys are paying doctors like is being said,

13  that's illegal and is going to ruin our business". Relator Jeffrey Bell told Iverson at

14  that point, "you are covering up for these guys [other Biotronik sales

15  representatives]". He had also complained to Iverson about reps trying to pay off

16  medical assistants at physician's offices ("MA's"), and that physicians were

17  complaining to Relator Jeffrey Bell about Robin Singh doing that.

18       615.    Relator Jeffrey Bell told Iverson that it could be considered illegal to tell

19  Biotronik personnel not to cooperate with an investigation by the Sheriff or other

20

1  authorities.

2  616.    In retaliation, sales manager Mike Iverson and sales representative

3  Michael McCormick told everyone on the Biotronik sales team in Arizona in

4  November 2015, not to talk to Relator Jeffrey Bell. Field staff members were told not

5  to take Relator Jeffrey Bell's on-call days, not to cover his pacemaker clinics for his

6  physician customers, and not to have a friendly relationship with Relator Bell, or

7  Iverson would fire them. Iverson claimed falsely to Biotronik personnel that Relator

8  Jeffrey Bell randomly sues other people in court.

9       *2. Requiring Relator Jeffrey Bell to Work More Hours and Days than other*

10      *Sales Representatives*

11  617.    Relator Jeffrey Bell had a non-compete clause from his previous Sorin

12  sales contract for one year from his starting date at Biotronik. Relator Jeffrey Bell was

13  not allowed to call on doctors or talk about Biotronik products with customers. During

14  that year he had a financial guarantee from Biotronik for three months, and then he

15  was selling other, non-pacemaker cardiac products. Relator Jeffrey Bell was not

16  supposed to sell or service pacemakers during that one year. The pacemaker

17  companies work out deals with each other to end these non-compete clauses early

18  sometimes (Exhibit 168).

19  618.    By early June 2015, a few weeks into his employment as a Biotronik

20
_____

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 202

independent sales representative, Relator Jeffrey Bell started getting calls from Biotronik sales reps and field staff as well as a local hospital, which was instructed to call Relator Bell as primary contact, who asked him to cover pacemaker cases and on-call shifts at local hospitals, which would have violated his Sorin non-compete agreement. Biotronik sales manager Mike Iverson started requesting that Relator Jeffrey Bell cover clinics during that month, even though his Biotronik contract and his Sorin non-compete agreement stated that he was not allowed to be on-call or to cover clinics.

619. On June 8, 2015, Relator Jeffrey Bell was required by Biotronik and sales manager Mike Iverson to cover a clinic day with about 15 patients in Sierra Vista, Arizona, at Cochise Cardiology clinic. From that time forward, Mike Iverson continued to require that Relator Jeffrey Bell cover all the pacemaker clinics for customers in his area, which violated his Biotronik contract and his Sorin non-compete agreement (Exhibit 169).

620. Since that time, Relator Jeffrey Bell has been having to cover all his physicians' clinics primarily and been having to take nearly all his on-call hours for local physicians. He basically gets no field support unless there is some type of emergency. Other sales representatives get extensive field support, and Phoenix sales representative Andrew Nash does not take any calls from physicians or have to cover

clinics.

621.     In addition, Relator Jeffrey Bell has not been allowed to take vacation days, although other sales representatives in the state are not limited on the number of vacation days they are allowed to take.

622.     Relator Jeffrey Bell started having to pay field specialists $175 at a time to take on-call shifts for him, because Biotronik stated they have to be paid if Relator Bell was not taking call. As stated by Iverson prior to contracting with Biotronik, Relator Jeffrey Bell was guaranteed that he would not have to be on-call and never mentioned that Relator Bell had to pay the Biotronik field clinical staff to cover his on-call days. So, putting him on the call schedule was retaliatory, costing Relator Jeffrey Bell money out of his pocket (Exhibit 170).

623.     Also, Biotronik put Relator Jeffrey Bell on call for every single holiday when everyone else took the holidays off in the field starting on about January 1, 2016 and continuing until about July 2016 (Exhibit 171).

624.     Biotronik sales manager Mike Iverson has also not allowed Relator Jeffrey Bell to hire help in the field to take calls for his customer's patients or to do pacemaker checks, but the same field representative that Iverson refused to approve Relator Bell hiring the person.

625.     Biotronik sales reps and field staff do not include Relator Jeffrey Bell on

patient scheduling text message chains to try to hide cases where commission credit is stolen from Relator Bell's doctors and paid to Biotronik sales rep Michael McCormick instead.

*3. Biotronik Retaliated Against Relator Jeffrey Bell for Telling Management that Training Payments to Physicians were Excessive, and that Payments to Medical Assistants were Illegal*

626.     On July 29, 2015, Relator Jeffrey Bell was first sent to Phoenix to start training on implanting Biotronik pacemakers with Biotronik physician customers. In Phoenix, Relator Jeffrey Bell was sent to do training cases with Dr. Amarnauth Singh and Dr. Andy Tran, with Jeff Germano as the Biotronik sales representative. Relator Jeffrey Bell was also sent to Las Vegas for training, where Relator Bell did training cases with Dr. William Resh and another physician. Relator Jeffrey Bell got fully certified on Biotronik products a bit later in the year. Biotronik paid its physician customers hundreds of dollars per to do "training" of employees, even though some, like Relator Jeffrey Bell, had extensive experience with pacemakers and with Biotronik pacemakers already, and did not require much, if any, training.

627.     On August 1, 2015, Relator Jeffrey Bell went to Las Vegas for a day and a half to do twelve training cases on Biotronik pacemakers. Biotronik corporate training manager Tammy Hirsch was his certified trainer. Relator Jeffrey Bell had to

get certified on 3 each of pacemakers and implantable defibrillators, but Biotronik made him do a lot more cases, about 20, until Relator Bell told Hirsch that the company was doing an excessive number of training cases.

628.    Biotronik training manager Tammy Hirsch had a room at the Vegas hotel, and brought a training simulator, and was going have Relator Jeffrey Bell do training cases on the training simulator to sign him off on doing enough training cases. Hirsch later contacted him again and told him that the training simulator cases would not count towards his certification, and that he needed to do more live training cases with doctors, at which point Relator Jeffrey Bell told her that it seemed excessive and inappropriate to continue paying doctors to do "training" cases with him. Relator Jeffrey Bell had already been selling and servicing pacemakers and high-powered heart devices since 2001 and did not require extensive training on Biotronik products. The continued training meant that physicians were being paid by Biotronik to have Relator Jeffrey Bell stand behind them in surgery, with no commensurate effort to earn the "training pay" on their part.

629.    Therefore, at that time on August 1, 2015, Relator Jeffrey Bell directly stated to a Biotronik manager (Tammy Hirsch) that the company was paying doctors an excessive number of times to "train" Biotronik employees. Ms. Hirsch did not indicate any disagreement with his statement. Having been put on notice that Relator

1   Jeffrey Bell considered their payment of physicians to violate legal standards for

2   propriety, the company proceeded to retaliate against Relator Bell in a broad number

3   of ways, including withholding large amounts of money from him, demanding that he

4   do work that was not required of other independent sales representatives, and

5   withholding vacation days.

6       630.    Retaliation after August 1, 2015:

7               g.  Not getting appropriately paid on commissions, as sales

8                   representative Michael McCormick was actively taking credit for

9                   Relator Jeffrey Bell's pacemaker cases by instructing field clinical

10                  staff to write him as the representative of credit, and sales manager

11                  Mike Iverson turned a blind eye (Exhibit 172).

12              h.  Biotronik sales representative Robin Singh and other people on the

13                  sales team, including Tony Fernandez and Jason Kindler were

14                  making up things about Relator Jeffrey Bell, telling doctors and

15                  others that Relator Bell was commonly suing people, even though

16                  he had not sued anyone. Biotronik management did nothing to

17                  address these issues, or the prior death threats made against Relator

18                  Jeffrey Bell by personnel who became Biotronik employees.

19              i.  Before August 2015, Relator Jeffrey Bell was repeatedly paged

20

from the hospitals to take calls, even though he couldn't take calls on pacemaker patients due to his non-compete 1-year period with Sorin. Biotronik sales representative Robin Singh and field staff Jason Kindler and Tony Fernandez passed his personal cell phone number on to the hospitals so they would call him for emergency needs at all hours.

j.   Sales manager Mike Iverson relocated to California soon after Relator Jeffrey Bell's Biotronik contract began, without even mentioning it to Relator Bell.

k.   Relator Jeffrey Bell has not received vacation days even though he is supposed to be allowed to take unlimited vacation. This is due to Relator Jeffrey Bell having to cover all his physician's pacemaker clinic days as he has done since beginning employment on May 15, 2015. This would seem to make Relator Jeffrey Bell an employee of the company and not an independent contractor.

l.   By contrast, sales representative Michael McCormick takes any and all vacations since Mike Iverson and the team covers his territory and he is a protected entity of Biotronik.

631.   Relator Jeffrey Bell was aware of a Biotronik colleague named Mike

Schmid who was required to do 50-60 "training" cases, even though he was a competitive hire with 2 years' experience who had told the company that he refused to do more training cases, and told them that it was an illegal method by which Biotronik was paying its physician customers.

632.    In December 2015, Relator Jeffrey Bell had a meeting with sales manager Mike Iverson, to discuss the fact that one of the Tucson physician customers had complained about a Biotronik sales representative paying kickbacks to office medical assistants. Relator Jeffrey Bell told Mike Iverson that this was a problem, that they can't be paying people in that manner, and that it was illegal. Also, Relator Jeffrey Bell brought up the issues of Biotronik employees trying to harass him.

*4. Biotronik Retaliated Against Relator Jeffrey Bell by Refusing to Pay Contractually Obligated Sales Commissions*

633.    In or about September 2015, Biotronik sales manager Mike Iverson knew that Relator Jeffrey Bell was supposed to start receiving commission credit for cases that month, but the cases that were done were being put in sales representative Michael McCormick's name. McCormick was getting payment credit and getting cases, and Relator Jeffrey Bell tried to track those down and force the company to pay him the appropriate amount of commissions. That has never been resolved and is still happening to this day. Relator Jeffrey Bell reported the lack of paid commissions at

least a dozen times to Mike Iverson by email, by phone, and in person (Exhibit 173).

634.     In April 2016,  Relator Jeffrey Bell's annual income went down roughly 70% in the first year with Biotronik compared to his Sorin income the year before. This loss of income occurred because Tony Fernandez went to Biotronik and took his dad's business (Dr. Jose Fernandez), and Dr. Fernandez got the Pima Heart Group doctors to quit working with Relator Jeffrey Bell, so that the commissions could be steered to Biotronik rep Michael McCormick, who had an established financial relationship with Tony. Dr. Fernandez told doctors that Relator Jeffrey Bell was a bad person and not to work with him. That was a loss of business from 2-4 doctors for Relator Bell, about $300,000 in income from that clinic.

635.     On December 7, 2017, Relator Jeffrey Bell met with Mike Iverson and an attorney for Biotronik, and prior to the meeting sent to Iverson some "bulk sale" cases that Biotronik sales representative Michael McCormick and others were getting paid on instead of Relator Bell: 20 cases total and about $30,000 in income for Relator Bell. The meeting was initiated by a Biotronik attorney because Biotronik admitted they have misclassified Relator Jeffrey Bell as an independent contractor. There are another number of cases that Michael McCormick was stealing, that Relator Jeffrey Bell has tracked down and not gotten paid on. McCormick was instructing Biotronik employee Robin Singh and the other clinical specialists to put cases in McCormick's

name in hospital records, even though all these customers were Relator Jeffrey Bell's by contract (Exhibit 174).

636.    Biotronik personnel also took Relator Jeffrey Bell's "spiff" payments (a promotional payment from a manufacturer to an individual salesperson) for short-dated sales of pacemakers and other devices that were near their end of shelf-life. Relator Jeffrey Bell was forced to give up 25% of his spiffs on short-dated implants, and ultimately other reps demanded 50% of his spiffs on these short-dated implants (Exhibit 175).

637.    Biotronik gave all new physicians in the Tucson area to Biotronik sales representative Michael McCormick for commission credit instead of to Relator Jeffrey Bell, even though McCormick was not doing business with those customers prior to being given credit. Relator Jeffrey Bell should have gotten an equitable share of those new customers, due to the fact they complained about or otherwise would not do business with McCormick.

638.    Biotronik continues to retaliate against Relator Jeff Bell to this day. Since he first joined the company and after complaining about illegal business practices, Relator Bell has continuously been subjected to contractually agreed commissions being taken away and given to other sales representatives, especially Mike McCormick of Biotronik Tucson. Relator Bell has also been continuously required to

1  work additional on-call and pacemaker check hours that are not part of his contract

2  and that the company does not require of other sales representatives. Additionally, he

3  has been shut out of communication with his teammates in Tucson, and yet is required

4  to give them partial spiff payments on sales that are legitimately his.

5      639.    For example, on Relator Jeff Bell's December 2018 sales commission

6  statement, Defendant Biotronik refused to pay him on $35,066 worth of

7  "Commissionable Sales" with the statement that they were "Unpaid/No-Po Invoices"

8  with no further explanation, in violation of his contract terms (pg. 5). Additionally,

9  Biotronik took $10,731 worth of "Commissionable Sales" away from him as "rebates"

10  (pg. 3)  (Exhibit 176).

11      640.    For example, on Relator Jeff Bell's January 2019 sales commission

12  statement, Defendant Biotronik refused to pay him on $9,966 worth of

13  "Commissionable Sales" with the statement that they were "Unpaid/No-Po Invoices"

14  with no further explanation, in violation of his contract terms (pg. 5). Additionally,

15  Biotronik took $1,647 worth of commissions directly away from him as "reversing a

16  shortfall" (pg. 4)  (Exhibit 177).

17      641.    For example, on Relator Jeff Bell's February 2019 sales commission

18  statement, Biotronik refused to pay him on $810 worth of "Commissionable Sales"

19  with no further explanation, in violation of his contract terms (pg. 2). In this case, the

20

company had originally credited him with the sale of the heart lead wires on a pacemaking device change for a doctor that was  his customer contractually, on which he should have also gotten commission credit for the pacemaking device but did not. Ultimately, the company removed both the commission credit for the pacemaking device AND the commission credit for the heart lead wires (Exhibit 178).

*5. Biotronik Reneged on an Offer to Pay Relator Jeffrey Bell a Large, Ongoing Commission for Recruiting a Competing Sales Representative with a Large Group of Physician Customers*

642.    Prior to May 2015, Biotronik sales manager Mike Iverson reached out to Relator Jeffrey Bell and asked him to help recruit a sales representative named Louis Sanchez to join Biotronik from Medtronic medical device company in New Mexico. Relator Jeffrey Bell had been friends with Sanchez with since 2001 from his days at Medtronic. Iverson offered Relator Jeffrey Bell an incentive and a commission override on all of the new recruit's sales if Biotronik successfully recruited the New Mexico representative.

643.    On or about August 10, 2015, about this date, Mike Iverson texted Relator Jeffrey Bell and said, "I would like to take a run at Louis Sanchez", the Medtronic sales rep in Albuquerque, New Mexico who Relator Bell was friends with. Iverson wanted Relator Jeffrey Bell to try to recruit Sanchez to bring his $14 million

1    per year in pacemaker business with local doctors from Medtronic to Biotronik.

2    644.    On September 15, 2015, Iverson texted Relator Jeffrey Bell and asked if

3 there were any updates on Louis Sanchez. In October, Mike Iverson asked Relator

4 Jeffrey Bell to set up a dinner meeting with Sanchez. Sanchez had an agreement with

5 Medtronic that would end at the end of 2016, and Iverson wanted Relator Jeffrey Bell

6 to lock him up for Biotronik to come over at the end of the Medtronic agreement. On

7 February 2, 2016, Relator Jeffrey Bell received an email from Iverson stating that

8 based on a meeting on January 18, 2016, Biotronik would be willing to offer an

9 override of 7% in the first year, and 5% per year thereafter for anyone who

10 successfully signed on with Biotronik. Based on $14 million per year in income that

11 Sanchez was generating in New Mexico, that would result in $980,000 the first year,

12 and $700,000 per year thereafter for Relator Jeffrey Bell (Exhibit 179).

13    645.    On August 26, 2016, Relator Jeffrey Bell worked to set up a dinner

14 between Iverson and Louis Sanchez to recruit him as a Biotronik rep from Medtronic

15 when his Medtronic contract ended the following January. On August 29, 2016,

16 Iverson asked Relator Jeffrey Bell if there was a plan for the dinner with Louis

17 Sanchez.

18    646.    On September 21, 2016, Iverson asked Relator Jeffrey Bell how much

19 money and percentage of sales Sanchez would want in order to sign on with Biotronik

20

from Medtronic, and how many people he would bring with him for field clinical help from Medtronic. Relator Jeffrey Bell relayed to Iverson that Sanchez wanted $2 million guaranteed for the first year, and commissions that would be open for negotiation after that, probably around 30% based on his business volume and the percent that similar reps with similar business were getting from the company. Within the week, Iverson verbally agreed to Relator Jeffrey Bell to Sanchez's terms of $2 million per year in guaranteed income from Biotronik to sign on with Biotronik.

647.    On November 7, 2016, Iverson texted Relator Jeffrey Bell letting him know the Sanchez contract would be ready by November 11, 2016. On November 11, 2016, Relator Jeffrey Bell asked for an update on the contract process. On November 12, 2016, Iverson texted Relator Jeffrey Bell and stated that Biotronik would not be doing business in New Mexico and would not be working further to recruit Luis Sanchez. Relator Jeffrey Bell felt betrayed, because his income from recruiting Sanchez for Biotronik would have been 7% for Sanchez's first year, and 5% per year thereafter. This would have amounted to as much as $980,000 the first year for Relator Jeffrey Bell, and up to $700,000 each year thereafter (Exhibit 180).

### B. Retaliation Against Relator Andrew Schmid

648.    During the summer of 2017, Relator Andrew Schmid told Biotronik sales representative Bill Blair that he wasn't comfortable following Blair's instructions to

inappropriately run diagnostic tests at customer physician's offices on non-Biotronik

pacemakers. Relator Andrew Schmid felt that the activity was unethical and

potentially illegal. Also, during the summer of 2017, Relator Andrew Schmid was

offered a job with Johnson & Johnson/Biosense Webster ("J&J"), a company that

does not make pacemakers and does not compete with Biotronik in any manner.

649.    On the morning of July 7, 2017, Relator Andrew Schmid accepted the

employment offer from J&J.  Relator Andrew Schmid met with his Biotronik field

clinical staff teammates, and told them he was resigning to go work for J&J. That

afternoon, Relator Andrew Schmid met with Biotronik sales manager Bob Marsella to

resign.

650.    Relator Andrew Schmid and Marsella had a conversation for about 20

minutes until Marsella said "why are we meeting? do you want a raise, do you want to

move, do you want to quit?" Relator Andrew Schmid told him he was resigning, and

that Relator Schmid would be working for JNJ/Biosense in Denver. Relator Andrew

Schmid told Marsella that Relator Schmid was moving to be closer to family, get a

bigger house, etc. Relator Andrew Schmid told Marsella that he would be resigning in

two weeks, but the next week he needed to urgently make a trip to Colorado. Marsella

threw down his fork and said "you're f***ing me.  I pulled you out of the ashes when

your last position was eliminated and now you're f***ing me.  One of our top guys

1  just had a heart attack and now you're trying to leave.  I have a 20-million-dollar

2  business to run.  I'm going to contact the Biotronik legal department and see what

3  legal recourse I have," and then he stormed off.

4      651.    About 20 minutes later, Relator Andrew Schmid received a text message

5  from Biotronik sales manager Bob Marsella that read "per our conversation today, I

6  suggest you read your employment agreement when you get home.  I will be emailing

7  you a response shortly.  Bob."  A follow-up text message from Marsella stated,

8  "please see the email I just sent you, I suggest you call our attorney to discuss your

9  employment agreement and obligations" and he sent Relator Andrew Schmid the

10  phone number of the corporate counsel, Haley Bjerk (Exhibit 181).

11      652.    Later that day, Marsella sent an email to Relator Andrew Schmid stating,

12  "I understand that you are wanting to resign from your position with Biotronik.  You

13  are on a term of year Employment Agreement thru July 15, 2018.  Therefore, we do

14  not accept your resignation and you need you to get back to work.  You are

15  contractually obligated to remain in your role until such date.  Our legal department

16  will be contacting Biosense Webster to let them know that you are on a term and cease

17  any further communication with you regarding employment" (Exhibit 182).

18      653.    Later that week, Relator Andrew Schmid met with Biotronik sales

19  representative Bill Blair, who expressed disbelief that Relator Schmid wanted to leave

20

the company and hadn't reached out to Blair to help.  There was a little stress because on an earlier text message, Relator Andrew Schmid had said he wasn't comfortable running diagnostics on non-Biotronik pacemakers (Exhibit 183).

654.     On July 11, 2017, Relator Andrew Schmid got the following email from J&J rescinding his job offer: "We are writing about the conditional offer of employment Biosense Webster recently extended to you.  After extending that offer, we learned that your employment agreement with your current employer, Biotronik, prevents you from accepting employment with Biosense Webster.  Therefore, we regret to inform you that Biosense Webster is rescinding its conditional offer of employment.  Should Biotronik provide you with a written release from your obligations under your Biotronik employment agreement and should we have a position open at such time, we will be happy to reconsider your application" (Exhibit 184).

655.     Based on this email from J&J, it was clear to Relator Andrew Schmid that Biotronik had retaliated against him for reporting fraudulent diagnosing of other companies' devices. Biotronik followed up their threat and contacted his potential employer in order to stop him from leaving Biotronik. Because Relator Andrew Schmid's wife was in the middle of a high-risk pregnancy at the time, and Relator Andrew Schmid himself had a seizure disorder requiring medication and treatment,

1 Relator Schmid needed a job and health insurance for the family. Relator Andrew

2 Schmid was unable to leave Biotronik once J&J rescinded its offer.

3     656.     During the rest of that week, the JNJ hiring manager gave Relator

4 Andrew Schmid an opportunity to resolve the issue, before reposting the job. Relator

5 Andrew Schmid made a call to Biotronik sales manager Bob Marsella to request a

6 release from the contract. Marsella said that Relator Andrew Schmid signed the

7 contract and needed to stay with Biotronik until a replacement is found, or the contract

8 expires.  He assured Relator Andrew Schmid that his and his family's wellbeing is of

9 the upmost importance, but that Relator Schmid made a commitment that must be

10 fulfilled until he was replaced.

11     657.     At the end of the week, Relator Andrew Schmid called sales

12 representative Bill Blair to ask for his help in obtaining a release.  He said that it's

13 more complicated now that attorneys are involved.  Relator Andrew Schmid told Blair

14 that he needed to be with family because his wife has a high-risk pregnancy, will go

15 on bed rest etc. Blair paused and said, "I didn't know all that, lemme talk to Bob

16 [Marsella]". Relator Andrew Schmid also told Blair that he would be willing to work

17 with the newest teammate who was in training every day, all day, and work up to the

18 bitter end.  Relator Andrew Schmid was willing to quit working for Biotronik in

19 California on a Friday and start with J&J in Colorado the next Monday, with only two

20

days to relocate.

658.     Relator Andrew Schmid had to take FMLA leave for a period of eleven weeks to deal with his increasingly frequent epileptic seizures which resulted from Biotronik's retaliatory actions against him. Relator Andrew Schmid's physician ordered him to limit his work hours to 40 hours per week when returning to work, with no "on-call" status at nights and on weekends. However, upon returning to work on October 2, 2017, Biotronik required him to be on-call after hours as retaliation (Exhibit 185).

659.     Relator Andrew Schmid requested from Biotronik sales manager Bob Marsella that he not work for sales representative Bill Blair's team when returning to work due to his unethical and illegal activities, but Marsella required him to return to work for Blair immediately.

660.     In retaliation for speaking up about Biotronik's unethical and illegal activities, Biotronik then kept Relator Andrew Schmid off the group-text thread by which the field clinical staff members in Orange County, California shared their daily schedule and work assignments. Relator Andrew Schmid also was not allowed to associate with any other Biotronik employees and was required to get his work assignments directly from Bill Blair. Sales representative Bill Blair told Relator Andrew Schmid that his actions had eroded their trust and "friendship", indicating that

1    he would continue to retaliate against Relator Andrew Schmid for communicating

2    about Blair's unethical and illegal activities. After returning to work, Relator Andrew

3    Schmid was isolated, and essentially told that he couldn't communicate and/or be

4    friendly with the rest of the field clinical staff team.

5        661.    Also, once coming back to work on sales representative Bill Blair's team,

6    there were two different nights when Jason Pagano (customer Dr. Winters' son-in-

7    law) should have been on call, and in fact Relator Andrew Schmid was placed on

8    call.  Pagano received preferential treatment, and Relator Andrew Schmid was

9    retaliated against. One of those nights was the first night of Thanksgiving weekend,

10   and when the designated holidays call-in person had the call-in responsibility, but

11   Blair told Relator Andrew Schmid "you are on call that night" (Exhibit 186).

12       662.    In another instance where Biotronik retaliated against Relator Andrew

13   Schmid, a hospital called Relator Schmid to schedule a Biotronik staff member to

14   check a pacemaker on an inpatient for the 9:00 am on the morning of November 2,

15   2017. Relator Andrew Schmid had scheduled a doctor's appointment for his daughter

16   due to concerns about a possible tumor at 9:00 am that morning and advised sales

17   representative Bill Blair of the conflict. Even though another field clinical staff

18   member was scheduled to be next to the hospital and available that morning, Blair

19   required Relator Andrew Schmid to cover the 9 am pacemaker check.

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN
CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 221

663.    Biotronik's retaliation against Relator Andrew Schmid continued.  After complaining about doing checks on other manufacturers' devices, Relator Schmid was forced to cover excessive "on call" weekends disproportionate to other similarly-situated employees, and Biotronik refused to pay Relator Schmid for many weekends where he was required to be "on call" by the company. Relator Andrew Schmid was constructively terminated on March 13, 2019 after suffering retaliation since the summer of 2017.

## IX. CONCLUSION

664.    Defendants' fraudulent activities, as set forth in this Complaint, have resulted in significant fraud on government health care systems. These concerted, national schemes for fraudulent promotion of Biotronik's devices have resulted in millions of dollars in unnecessary and fraudulent claims for reimbursement, increasing the cost of healthcare and wasting taxpayer money.

## X. CAUSES OF ACTION

## FIRST CAUSE OF ACTION

## False Claims Act: Presentation of False Claims 31 U.S.C. § 3729(a)(l)(A)

665.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

666.    By presenting physicians and hospitals with false information about their

devices for uses that were not cleared or approved by the FDA, Defendants caused physicians and facilities to submit numerous bills for Biotronik's devices and associated surgical procedures and associated hospital and outpatient facility charges, that were ineligible for reimbursement by Government Health Care Programs. Defendants knowingly caused physicians and healthcare facilities, expressly or impliedly, to make false certifications about Biotronik's devices.  Defendants therefore caused the submission of false claims for payment by Government Health Care Programs.  Had the United States known the preceding facts, the United States would not have provided reimbursement for such devices, or the associated surgical procedures, hospital and outpatient facility charges. This course of conduct violated the False Claims Act, 31 U.S.C. § 3729(a)(l)(A).

667.    The United States, unaware of the falsity of the claims, and in reliance on the accuracy thereof, made payment upon the false or fraudulent claims and was therefore damaged.

<u>SECOND CAUSE OF ACTION</u>

(False Claims Act: Making or Using False Record or Statement to Cause Claim to be Paid) (31 U.S.C. § 3729(a)(l)(B))

668.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 223

669.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein Defendants have knowingly made, used, or caused to be made or used, false records or statements - i.e., the false certifications and representations made or caused to be made by Defendants - material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(l)(B).

THIRD CAUSE OF ACTION

(Violations of Anti-Kickback Statute) (42 U.S.C. § 1320a-7a)

670.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows:

671.     By engaging in the conduct described in the foregoing Paragraphs, Defendants have violated 42 U.S.C. § 1320a-7a and 42 C.F.R. § 1001.952(f).

672.     Defendants have knowingly caused to be submitted claims to the United States Government and to Government Health Care Programs as a result of the payment of kickbacks. The payment of kickbacks to induce purchases constitutes remuneration to increase the level of business in violation of the anti-kickback statute.

673.     Pursuant to paragraph (g) of 42 U.S.C. § 1320a-7b, a claim for payment to a Federal Health Care Program that includes items or services resulting from a violation of The Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act.

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 224

674.     As a result of the conduct set forth in this cause of action, the Government suffered harm as a result of paying or reimbursing for medical procedures, associated hospital and outpatient facility charges which, had the Government known were utilized as a result of the kickbacks, the Government would not otherwise have paid for and/or reimbursed.

<u>FOURTH CAUSE OF ACTION</u>

(Violations of Retaliation Statute) (42 U.S.C. § 3730(h))

675.     This is a civil action by the Plaintiff, UNITED STATES, and Relator Jeffrey Bell, on behalf of the UNITED STATES and on behalf of Relator Jeffrey Bell, against the Defendants under the False Claims Act, 31 U.S.C. §§3729-32.

676.     Relator Jeffrey Bell realleges and incorporates the allegations above as if fully set for herein and further alleges as follows :

677.     Defendant Biotronik retaliated by harassing Relator Jeffrey Bell and taking actions to prevent Relator Jeffrey Bell from properly carrying out job responsibilities as a result of lawful acts done in furtherance of this action, including reporting violations of the anti-kickback statutes to Biotronik management and refusing to engage in Biotronik's scheme to provide kickbacks to physicians and to induce the submission of false claims'.

678.     As a direct and proximate result of Biotronik's unlawful and

discriminatory constructive discharge and Defendants' various acts of retaliation described herein, Relator Jeffrey Bell has suffered emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator Jeffrey Bell's efforts to obtain alternative employment, and seek injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION

(Violations of Retaliation Statute) (42 U.S.C. § 3730(h))

679.

680.    This is a civil action by the Plaintiff, UNITED STATES, and Relator Andrew Schmid, on behalf of the UNITED STATES and on behalf of Relator Andrew Schmid, against the Defendants under the False Claims Act, 31 U.S.C. §§3729-32.

681.    Relator Andrew Schmid realleges and incorporates the allegations above as if fully set for herein and further alleges as follows:

682.    Defendant Biotronik retaliated by harassing Relator Andrew Schmid and taking actions to prevent Relator Andrew Schmid from properly carrying out job

responsibilities as a result of lawful acts done in furtherance of this action, including reporting violations of the anti-kickback statutes to Biotronik management and refusing to engage in Biotronik's scheme to provide kickbacks to physicians and to induce the submission of false claims.

683.     As a direct and proximate result of Biotronik's unlawful and discriminatory constructive discharge and Defendants' various acts of retaliation described herein, Relator Andrew Schmid has suffered emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator Andrew Schmid's efforts to obtain alternative employment, and seek injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

### PRAYER FOR RELIEF UNDER THE FEDERAL FALSE CLAIMS ACT

684.     Relators respectfully request this Court to enter judgment against Defendants, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 et seq. provides;

(b) That civil penalties at the maximum amount allowed by law be imposed for each and every false claim that Defendants presented to the United States;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relators necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this action.

(e) That the Court award damages, as to Relator's respective claims for retaliation, for emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relators efforts to obtain alternative employment, and seek injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

(Arkansas Medicaid Fraud False Claims Act) (A.C.A. § 20-77-901 et seq.)

685.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

686.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Arkansas.  Upon information and belief, Defendants' actions described herein occurred in the State of Arkansas as well.

687.     This is a qui tam action brought by Relators and the State of Arkansas to recover treble damages and civil penalties under the Arkansas Medicaid Fraud False Claims Act, A.C.A. § 20-77-901 et seq.

688.     The Arkansas Medicaid Fraud False Claims Act § 20-77-902 provides liability for any person who- Knowingly makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under the Arkansas Medicaid program; At any time knowingly makes or causes to be made any false statement or representation of a material fact for use in determining rights to a benefit or payment;

689.     In addition, A.C.A. § 20-77-902(7)(A) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for recommending the purchase, lease, or

order of any good, facility, service, or item for which payment may be made under the Arkansas Medicaid program.

690.    Defendants violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) (2) & (7)(A) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

691.    Defendants furthermore violated the Arkansas Medicaid Fraud False Claims Act § 20-77-902(1) & (2) and knowingly caused thousands of false claims to be made, used and presented to the State of Arkansas from at least 2011 to the present by its violation of federal and state laws, including A.C.A. § 20-77-902(7)(A), the Anti-Kickback Act and Stark Act Requirements, as described herein.

692.    The State of Arkansas, by and through the Arkansas Medicaid program and other State health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

693.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Arkansas is connection with Defendants' fraudulent and illegal practices.

694.    Had the State of Arkansas known that Defendants were violating the

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 230

federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

695.     As a result of Defendants' violations of § 20-77-902(1) (2) & (7)(A), the State of Arkansas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

696.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint and brought this action pursuant to A.C.A. § 20-77-911(a) on behalf of themselves and the State of Arkansas.

697.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Arkansas in the operation of its Medicaid program.

698.     Pursuant to the Arkansas Medicaid Fraud False Claims Act, the State of Arkansas and Relators are entitled to the following damages as against Defendants:

699.     To the STATE OF ARKANSAS: Three times the amount of actual damages which the State of Arkansas has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the

State of Arkansas; prejudgment interest; and all costs incurred in bringing this action.

700.     To RELATORS: The maximum amount allowed pursuant to A.C.A. § 20-77-911(a) and /or any other applicable provision of law; reimbursement for reasonable expenses which Relators incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

<u>SEVENTH CAUSE OF ACTION</u>

(California False Claims Act) (Cal. Gov't Code § 12650 et seq.)

701.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

702.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of California.  Upon information and belief, Defendants' actions described herein occurred in the State of California as well.

703.     This is a qui tam action brought by Relators and the State of California to recover treble damages and civil penalties under the California False Claims Act, Cal. Gov't. Code § 12650 et seq.

704.     Cal. Gov't Code § 12651(a) provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the state

of any political division thereof, a false claim for payment or approval; knowingly makes, uses, or causes to be made or used a false record of statement to get a false claim paid or approved by the state or by any political subdivision; conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state of by any political subdivision; is a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery of the false claim.

705.    In addition, the payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code §§ 650 and 650.1 and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

706.    Defendants violated Cal Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

707.    Defendants furthermore violated Cal. Gov't Code § 12651(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of California from at least 2011 to the present by its violation of federal and state laws, including Cal. Bus. & Prof. Code §§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2, the Anti-Kickback Act and Stark Act Requirements, as

described herein.

708.     The State of California, by and through the California Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

709.     Compliance with applicable Medicare, Medi-Cal and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of California in connection with Defendants' fraudulent and illegal practices.

710.     Had the State of California known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

711.     As a result of Defendants' violations of Cal. Gov't Code § 12651(a), the State of California has been damaged in an amount far in excess of millions of dollars exclusive of interest.

712.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Cal. Gov't Code § 12652(c) on behalf of themselves and the State of California.

713.    This Court is requested to accept supplemental jurisdiction over this related state claim as it is predicated upon the same exact facts as the federal claim, and merely asserts separate damages to the State of California in the operation of its Medicaid program.

714.    Pursuant to the California False Claims Act, the State of California and Relators are entitled to the following damages as against Defendants:

715.    To the STATE OF CALIFORNIA: Three times the amount of actual damages which the State of California has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants presented or caused to be presented to the State of California; prejudgment interest; and all costs incurred in bringing this action.

716.    To RELATORS: The maximum amount allowed pursuant to Cal. Gov't Code § 12652 and /or any other applicable provision of law; reimbursement for reasonable expenses which Relators incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## EIGHTH CAUSE OF ACTION

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 235

(California Insurance Frauds Prevention Act) (Cal. Ins. Code § 1871.7 et seq.)

717.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

718.    This is a claim for treble damages and penalties under the California Insurance Fraud Prevention Act.

719.    By virtue of the acts described above, Defendants knowingly utilized a scheme by which they improperly procured "runners, cappers, steerers, and other persons" to procure patients who held private insurance contracts and against whom Defendants could cause the filing of claims for payment. See Cal. Ins. Code § I871.7(a).

720.    Defendants knowingly presented, or caused to be presented, false or fraudulent claims to the private insurers in California, or for patients in California those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

721.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in California, or for patients in California covered by those insurers, to approve or pay such false and fraudulent claims.

722.    By virtue of the acts described above, the Defendants conspired to violate

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 236

the California Insurance Fraud Prevention Act and each patient's private health insurance contract.

723.    The private insurers in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

724.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

725.    By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

726.    Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

727.    The State of California is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, used, presented, or caused to be made, used, or presented by Defendants.

728.    WHEREFORE, Relators request the following relief:

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 237

729.     That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less than $5,000.00 and not more than $10,000.00 for each violation of Cal. Ins. Code § 1871.7(a) and (b);

730.     At least thirty percent (30%) and up to forty percent (40%) of the proceeds of this action to the Relators if the State of California elects to intervene, and forty percent (40%) to fifty percent (50%) if it does not;

731.     Relators' attorneys' fees, litigation and investigation costs, and other related expenses; and

732.     Such other relief as the Court deems just and appropriate.


NINTH CAUSE OF ACTION

(Colorado Medicaid False Claims Act)(Col. Rev. Stat. §§ 25.5-4-303.5 et seq.)

733.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

734.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Colorado.  Upon information and belief, Defendants' actions described

herein occurred in the State of Colorado as well.

735.    This is a qui tam action brought by Relators and the State of Colorado to recover treble damages and civil penalties under the Colorado Medicaid False Claims Act, Colorado Revised Statutes § 25.5-4-303.5. et seq.

736.    Colorado Revised Statutes § 25.5-4-305 provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; has possession, custody, or control of property or money used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and knowingly delivers, or causes to be delivered, less than all of the money or property; authorizes the making or delivery of a document certifying receipt of property used, or to be used, by the state in connection with the "Colorado Medical Assistance Act" and, intending to defraud the state, makes or delivers the receipt without completely knowing that the information on the receipt is true; knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state in connection with the "Colorado Medical Assistance Act" who lawfully may not sell or pledge the property; knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or

property to the state in connection with the "Colorado Medical Assistance Act", or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state in connection with the "Colorado Medical Assistance Act"; conspires to commit a violation of paragraphs (a) to (f) of this subsection.

737.    Defendants violated Colorado Revised Statutes § 25.5-4-305 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

738.    Defendants furthermore violated Colorado Revised Statutes § 25.5-4-305 and knowingly caused thousands of false claims to be made, used and presented to the State of Colorado from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

739.    The State of Colorado, by and through the State of Colorado Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

740.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Colorado in

1   connection with Defendants' fraudulent and illegal practices.

2   741.    Had the State of Colorado known that Defendants were violating the

3   federal and state laws cited herein, it would not have paid the claims submitted by

4   health care providers and third-party payers in connection with Defendants' fraudulent

5   and illegal practices.

6   742.    As a result of Defendants' violations of Colorado Revised Statutes §

7   25.5-4-305 the State of Colorado has been damaged in an amount far in excess of

8   millions of dollars exclusive of interest.

9   743.    Relators have direct and independent knowledge of the allegations of this

10  Complaint, who has brought this action pursuant to Colorado Revised Statutes § 25.5-

11  4-306(2) on behalf of itself and the State of Colorado.

12  744.    This Court is requested to accept supplemental jurisdiction of this related

13  state claim as it is predicated upon the exact same facts as the federal claim, and

14  merely asserts separate damage to the State of Colorado in the operation of its

15  Medicaid program.

16  745.    Pursuant to the Colorado Medicaid False Claims Act, the State of

17  Colorado and Relators are entitled to the following damages as against Defendants:

18  746.    To the STATE OF COLORADO: Three times the amount of actual

19  damages which the State of Colorado has sustained as a result of Defendants'

20

fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Colorado; prejudgment interest; and all costs incurred in bringing this action.

747.    To RELATORS: The maximum amount allowed pursuant to Colorado Revised Statutes § 25.5-4-306(4) and /or any other applicable provision of law; reimbursement for reasonable expenses which Relators incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## TENTH CAUSE OF ACTION

(Connecticut False Claims Act for Medical Assistance Programs)(Connecticut General Statutes § 17b-301b. et seq.)

748.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

749.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Connecticut.  Upon information and belief, Defendants' actions described herein occurred in the State of Connecticut as well.

750.    This is a qui tam action brought by Relators and the State of Connecticut to recover treble damages and civil penalties under the Connecticut False Claims Act

for Medical Assistance Programs, Connecticut General Statutes § 17b-301b. et seq.

751.     Connecticut General Statutes § 17b-301b. provides liability for any person who: knowingly presents or causes to be presented to an officer or employee of the state a false or fraudulent claim for payment or approval under a medical assistance program administered by the Department of Social Services; knowingly make, use or cause to be made or used, a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services; conspires to defraud the state by securing the allowance or payment of a false or fraudulent claim under a medical assistance program administered by the Department of Social Services.

752.     Defendants violated Connecticut General Statutes § 17b-301b from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

753.     Defendants furthermore violated Connecticut General Statutes § 17b-301b and knowingly caused thousands of false claims to be made, used and presented to the State of Connecticut from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

754.     The State of Connecticut, by and through the State of Connecticut Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

755.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Connecticut in connection with Defendants' fraudulent and illegal practices.

756.     Had the State of Connecticut known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

757.     As a result of Defendants' violations of Connecticut General Statutes § 17b-301b the State of Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

758.     Relators have direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Connecticut General Statutes § 17b-301d on behalf of itself and the State of Connecticut.

759.     This Court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Connecticut in the operation of its Medicaid program.

760.    Pursuant to the Connecticut False Claims Act for Medical Assistance Programs, the State of Connecticut and Relators are entitled to the following damages as against Defendants:

761.    To the STATE OF CONNECTICUT: Three times the amount of actual damages which the State of Connecticut has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Connecticut; prejudgment interest; and all costs incurred in bringing this action.

762.    To RELATORS: The maximum amount allowed pursuant to Connecticut General Statutes § 17b-301 and /or any other applicable provision of law; reimbursement for reasonable expenses which Relators incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## ELEVENTH CAUSE OF ACTION

(Delaware Medicaid False Claims Act) (6 Del. C. § 1201 et seq.)

763.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

764.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Delaware.  Upon information and belief, Defendants' actions described herein occurred in Delaware as well.

765.     This is a qui tam action brought by Relators and the State of Delaware to recover treble damages and civil penalties under the Delaware Medicaid False Claims Act, 6 Del. C. § 1201 et seq.

766.     6 Del. C. § 1201 et seq. provides liability for any person who: knowingly presents, or causes to be presented, directly or indirectly, to an officer or employee of the Government a false or fraudulent claim for payment or approval; knowingly makes, uses or causes to be made or used, directly or indirectly, a false record or statement to get a false or fraudulent claim paid or approved; conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, increase or decrease an obligation to pay or transmit money or property to or from the Government.

767.     Further, 31 Del. C. § 1005 provides that— It shall be unlawful for any

person to offer or pay any remuneration (including any kickback, bribe or rebate) directly or indirectly, in cash or in kind to induce any other person . . . [t]o purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any property, facility, service, or item of medical care or medical assistance for which payment may be made in whole or in part under any public assistance program.

768.    Defendants violated 6 Del. C. § 1201 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Delaware from at least 2011 to the present by its violation of federal and state laws, including 31 Del. C. §1005, and Anti-Kickback Act and the Stark Act Requirements, as described herein.

769.    The State of Delaware, by and through the Delaware Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

770.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Delaware in connection with Defendants' fraudulent and illegal practices.

771.    Had the State of Delaware known that Defendants were violating the

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 247

federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

772.    As a result of Defendants' violations of 6 Del C. § 1201(a), the State of Delaware has been damaged in an amount far in excess of millions of dollars exclusive of interest.

773.    Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

774.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 6 Del. C. § 1203(b) on behalf of themselves and the State of Delaware.

775.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Delaware in the operation of its Medicaid program.

776.    Pursuant to the Delaware Medicaid False Claims Act, the State of

Delaware and Relators are entitled to the following damages as against Defendants:

777.     To the STATE OF DELAWARE: Three times the amount of actual damages which the State of Delaware has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Delaware; prejudgment interest; and all costs incurred in bringing this action.

778.     To RELATORS: The maximum amount allowed pursuant to 6 Del C. § 1205, and /or any other applicable provision of law; reimbursement for reasonable expenses which Relators incurred in connection with this action; and an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## TWELFTH CAUSE OF ACTION

(District of Columbia Procurement Reform Amendment Act) (D.C. § 2-308.13 et seq.)

779.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

780.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the District of Columbia.  Upon information and belief, Defendants' actions described

herein occurred in the District of Columbia as well.

781.    This is a qui tam action brought by Relators and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act, D.C. § 2-308.13 et seq.

782.    D.C. Code § 2-30814(a) provides liability for any person who: knowingly presents, or causes to be presented, to an officer or employee of the District a false claim for payment or approval; knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim paid or approved by the District; conspires to defraud the District by getting a false claim allowed or paid by the District; is the beneficiary of an inadvertent submission of a false claim to the District, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the District.

783.    In addition, D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for the following: Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program; or recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program.

784.    Defendants violated D. C. Code § 4-802(c) from at least 2011 to the

present by engaging in the fraudulent and illegal practices described herein.

785.    Defendants furthermore violated D. C. Code § 2-308.14(a) and knowingly caused thousands of false claims to be made, used and presented to the District of Columbia from at least 2011 to the present by its violation of federal and state laws, including D. C. Code § 4-802(c), the Anti-Kickback Act and the Stark Act, as described herein.

786.    The District of Columbia, by and through the District of Columbia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

787.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the District of Columbia in connection with Defendants' fraudulent and illegal practices.

788.    Had the District of Columbia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

789.    As a result of Defendants' violations of D.C. Code § 2-308.14(a) the

District of Columbia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

790.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to D.C. Code § 2-308.15(b) on behalf of himself and the District of Columbia.

791.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the District of Columbia in the operation of its Medicaid program.

792.    Pursuant to the District of Columbia Procurement Reform Amendment Act, the District of Columbia and Relators are entitled to the following damages as against Defendants:

793.    To the DISTRICT OF COLUMBIA: Three times the amount of actual damages which the District of Columbia has sustained as a result of Defendants' fraudulent and illegal practices; a civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the District of Columbia; prejudgment interest; and all costs incurred in bringing this action.

794.    To RELATORS: The maximum amount allowed pursuant to D. C. Code

§ 2-308.15(f) and /or any other applicable provision of law; reimbursement for reasonable expenses which Relators incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

<u>THIRTEENTH CAUSE OF ACTION</u>

(Florida False Claims Act) (Fla. Stat. §§ 68.081 et seq.)

795.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

796.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Florida.  Upon information and belief, Defendants' actions described herein occurred in the State of Florida as well.

797.    This is a qui tam action brought by Relators and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, West's F.S.A. § 68.081 et seq.

798.    The Florida False Claims Act provides liability for any person who: knowingly presents or causes to be presented to an officer or employee of an agency a false claim for payment or approval; knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by

an agency; conspires to submit a false claim to an agency or to deceive an agency for the purpose of getting a false or fraudulent claim allowed or paid.

799.   Defendants violated the Florida FCA from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein. Defendants furthermore violated the Florida FCA and knowingly caused thousands of false claims to be made, used and presented to the State of Florida from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

800.   The State of Florida, by and through the State of Florida Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

801.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with Defendants' fraudulent and illegal practices.

802.   Had the State of Florida known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent

and illegal practices.

803.     As a result of Defendants' violations of the Florida FCA the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

804.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Florida FCA on behalf of themselves and the State of Florida.

805.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program.

806.     Pursuant to the Florida False Claims Act, the State of Florida and Relators are entitled to the following damages as against Defendants:

807.     To the STATE OF FLORIDA: Three times the amount of actual damages which the State of Florida has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Florida; Prejudgment interest; and all costs incurred in bringing this action.

808.     To RELATORS: The maximum amount allowed pursuant to West's

F.S.A. § 68.085 and /or any other applicable provision of law; Reimbursement for

reasonable expenses which Relators incurred in connection with this action; An award

of reasonable attorneys' fees and costs; and such further relief as this court deems

equitable and just.

<u>FOURTEENTH CAUSE OF ACTION</u>

(Georgia State False Medicaid Claims Act)(Ga. Code Ann. § 49-4-168 et seq.)

809.    Relators re-allege and incorporate by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

810.    Additionally, Relators state that the course of conduct described in this

Complaint was a nationwide practice of Defendants.  Defendants conduct business in

the State of Georgia.  Upon information and belief, Defendants' actions described

herein occurred in Georgia as well.

811.    This is a qui tam action brought by Relators and the State of Georgia to

recover treble damages and civil penalties under the Georgia State False Medicaid

Claims Act, Ga. Code Ann. § 49-4-168  et seq.

812.    Ga. Code Ann. § 49-4-168.1 et seq. provides liability for any person who:

Knowingly presents or causes to be presented to the Georgia Medicaid program a

false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes

to be made or used, a false record or statement to get a false or fraudulent claim paid

or approved by the Georgia Medicaid program; Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid; Knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay, repay or transmit money or property to the State of Georgia.

813.    Defendants violated Ga. Code Ann. § 49-4-168.1 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Georgia from 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

814.    The State of Georgia, by and through the Georgia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

815.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Georgia in connection with Defendants' fraudulent and illegal practices.

816.    Had the State of Georgia known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by

health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

817.    As a result of Defendants' violations of Ga. Code Ann. § 49-4-168.1, the State of Georgia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

818.    Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

819.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Ga. Code Ann., § 49-4-168.2(b) on behalf of themselves and the State of Georgia.

820.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Georgia in the operation of its Medicaid program.

821.    Pursuant to the Georgia State False Medicaid Claims Act, the State of Georgia and Relators are entitled to the following damages as against Defendants:

822.     To the STATE OF GEORGIA: Three times the amount of actual damages which the State of Georgia has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty on not less than $5,500 and not more than $ 11,000 for each false claim which Defendants caused to be presented to the State of Georgia; Prejudgment interest; and all costs incurred in bringing this action.

823.     To RELATORS: The maximum amount allowed pursuant to Ga. Code Ann., § 49-4-168.2(i), and/ or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## FIFTEENTH CAUSE OF ACTION

(Hawaii False Claims Act)(Haw. Rev. Stat. § 661.21 et seq.)

824.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

825.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Hawaii.  Upon information and belief, Defendants' actions described herein occurred in Hawaii as well.

826.     This is a qui tam action brought by Relators and the State of Hawaii to

recover treble damages and civil penalties under the Hawaii False Claims Act, Haw. Rev. Stat. § 661.21 et seq.

827.    Haw. Rev. Stat. § 661-21(a) provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the state a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; Conspires to defraud the state by getting a false or fraudulent claim allowed or paid; or is a beneficiary of an inadvertent submission of a false claim to the State, who subsequently discovers the falsity of the claim, and fails to disclose the false claim to the State within a reasonable time after discovery of the false claim.

828.    Defendants violated Haw. Rev. Stat. § 661.21(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Hawaii from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

829.    The State of Hawaii, by and through the Hawaii Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

830.    Compliance with applicable Medicare, Medicaid and the various other

federal state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Hawaii in connection with Defendants' fraudulent and illegal practices.

831.    Had the State of Hawaii known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

832.    As a result of Defendants' violations of Haw. Rev. Stat. § 661-21(a) the State of Hawaii has been damaged in an amount far in excess of millions of dollars exclusive of interest.

833.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Haw. Rev. Stat. § 661-25(a) on behalf of themselves and the State of Hawaii.

834.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Hawaii in the operation of its Medicaid program.

835.    Pursuant to the Hawaii False Claims Act, the State of Hawaii and Relators are entitled to the following damages as against Defendants:

836.    To the STATE OF HAWAII: Three times the amount of actual damages which the State of Hawaii has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Hawaii; Prejudgment interest; and all costs incurred in bringing this action.

837.    To RELATORS: The maximum amount allowed pursuant to Haw. Rev. Stat. § 661-27 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; and such further relief as this Court deems equitable and just.

<u>SIXTEENTH CAUSE OF ACTION</u>

(Illinois Whistleblower Reward and Protection Act)(740 ILCS 175 et seq.)

838.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

839.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.   Defendants conduct business in the State of Illinois.  Upon information and belief, Defendants' actions described herein occurred in Illinois as well.

840.    This is a qui tam action brought by Relators and the State of Illinois to recover treble damages and civil penalties under the Illinois Whistleblower Reward

and Protection Act, 740 ILCS 175 et seq.

841.   740 ILCS 175/3(a) provides liability for any person who: knowingly presents, or causes to be presented, to an officer or employee of the State of a member of the Guard a false or fraudulent claim for payment or approval; knowingly makes, uses, of causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the State; Conspires to defraud the State by getting a false or fraudulent claim allowed or paid.

842.   In addition, 305 ILCS 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item of service for which payment may be made in whole or in part under the Illinois Medicaid program.

843.   Defendants violated 305 ILCS 5/8A-3(b) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

844.   Defendants furthermore violated 740 ILCS 175/3(a) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Illinois from at least 2011 to the present by its violation of federal and state laws, including 305 ILCS 5/8A-3(b), the Anti-Kickback Act and the Stark Act, as described herein.

845.     The State of Illinois, by and through the Illinois Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

846.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Illinois in connection with Defendants' fraudulent and illegal practices.

847.     Had the State of Illinois known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

848.     As a result of Defendants' violations of 740 ILCS 175/3(a), the State of Illinois has been damaged in an amount far in excess of millions of dollars exclusive of interest.

849.     Relators are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to 740 ILCS 175/3(b) on behalf of themselves and the State of Illinois.

850.     This court is requested to accept supplemental jurisdiction of this related

state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Illinois in the operation of its Medicaid program.

851. Pursuant to the Illinois Whistleblower Reward and Protection Act, the State of Illinois and Relators are entitled to the following damages as against Defendants:

852. To the STATE OF ILLINOIS: Three times the amount of actual damages which the State of Illinois has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Illinois; Prejudgment interest; and all costs incurred in bringing this action.

853. To RELATORS: The maximum amount allowed pursuant to 740 ILCS/4(d) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## SEVENTEENTH CAUSE OF ACTION

(Illinois Insurance Claims Fraud Prevention Act) (740 ILCS 92/1 et seq.)

854. Relators re-allege and incorporate by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

855.     This is a claim for treble damages and penalties under the Illinois Insurance Claims Fraud Prevention Act.

856.     By virtue of the acts described above, Defendants knowingly offered and/or paid remuneration to physicians to induce the procurement of patients for Defendants' devices for which Defendants could cause the filing of claims for payment from the patients' insurers. See 740 Ill. Comp. Stat. § 92/5(a).

857.     Defendants knowingly presented or caused to be presented false or fraudulent claims to the private insurers in Illinois, or for patients in Illinois those insurers covered, for payment or approval in violation of each patient's private health insurance contract.

858.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements and omitted material facts to induce the private insurers in Illinois, or for patients in Illinois covered by those insurers, to approve or pay such false and fraudulent claims.

859.     By virtue of the acts described above, the Defendants conspired to violate the Illinois Insurance Claims Fraud Prevention Act and each patient's private health insurance contract.

860.     The private insurers in Illinois, or those insurers that covered patients in

Illinois, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by Defendants, paid and continue to pay the claims that are non-payable as a result of Defendants' illegal conduct.

861.    Defendants knowingly submitted and/or caused to be made or used false records or false statements in order to avoid or decrease their respective obligations to return overpayments to these private insurance companies.

862.    By reason of Defendants' acts, these private insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

863.    Each claim for reimbursement that was a result of the Defendants' scheme represents a false or fraudulent record or statement and a false or fraudulent claim for payment.

864.    The State of Illinois is entitled to the maximum penalty of $10,000.00 for each and every false or fraudulent claim, record, or statement made, 'used, presented, or caused to be made, used, or presented by Defendants.

865.    WHEREFORE, Relators request the following relief:

866.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that the private insurance companies have sustained because of Defendants' actions, plus a civil penalty of not less tl1an

1   $5,000,00 and not more than $10,000.00 for each violation of 740 Ill. Comp. Stat. §§

2   92/5(a) and (b);

3       867.    No less than thirty percent (30%) of the proceeds of this action to the

4   Relators if the State of Illinois elects to intervene, and no less than forty percent (40%)

5   if it does not;

6       868.    Relators' attorneys' fees, litigation and investigation costs, and other

7   related expenses; and

8       869.    Such other relief as the Court deems just and appropriate.

9                        <u>EIGHTEENTH CAUSE OF ACTION</u>

10   (Indiana False Claims and Whistleblower Protection Act)(IC 5-11-5.5 et seq.)

11      870.    Relators re-allege and incorporate by reference each of the paragraphs

12   above as if fully set forth herein and further alleges as follows.

13      871.    Additionally, Relators state that the course of conduct described in this

14   Complaint was a nationwide practice of Defendants.   Defendants conduct business in

15   the State of Indiana.  Upon information and belief, Defendants' actions described

16   herein occurred in Indiana as well.

17      872.    This is a qui tam action brought by Relators and the State of Indiana to

18   recover treble damages and civil penalties under the Indiana False Claims and

19   Whistleblower Protection Act, IC 5-11-5.5 et seq.

20

873.    IC 5-11-5.5-2 provides liability for any person who: presents a false claim to the state for payment or approval; makes or uses a false record or statement to obtain payment or approval of a false claim from the state; with intent to defraud the state, delivers less money or property to the state than the amount recorded on the certificate or receipt the person receives from the state; with intent to defraud the state, authorizes issuance of a receipt without knowing that the information on the receipt is true; receives public property as a pledge of an obligation on a debt from an employee who is not lawfully authorized to sell or pledge the property; makes or uses a false record or statement to avoid an obligation to pay or transmit property to the state; conspires with another person to perform an act described in subdivisions (a) through (f); or causes or induces another person to perform an act described in subdivisions (a) through (f).

874.    In addition, IC 12-15-24-1 & IC 12-15-24-2 prohibits the provision of a kickback or bribe in connection with the furnishing of items or services or the making or receipt of the payment under the Indiana Medicaid program.

875.    Defendants violated IC 12-15-24-1 & IC 12-15-24-2 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

876.    Defendants furthermore violated IC 5-11-5.5-2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of

Indiana from at least 2011 to the present by its violation of federal and state laws, including IC 12-15-24-1 & IC 12-15-24-2, the Anti-Kickback Act and the Stark Act, as described herein.

877.     The State of Indiana, by and through the Indiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

878.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Indiana in connection with Defendants' fraudulent and illegal practices.

879.     Had the State of Indiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

880.     As a result of Defendants' violations of IC 5-11-5.5-2, the State of Indiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

881.     Relators are private persons with direct and independent knowledge of

the allegation of this Complaint, who have brought this action pursuant to IC 5-11-5.5-4 on behalf of themselves and the State of Indiana.

882.     This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Indiana in the operation of its Medicaid program.

883.     Pursuant to the Indiana False Claims and Whistleblower Protection Act, the State of Indiana and Relators are entitled to the following damages as against Defendants:

884.     To the STATE OF INDIANA: Three times the amount of actual damages which the State of Indiana has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Indiana; Prejudgment interest; and all costs incurred in bringing this action.

885.     To RELATORS: The maximum amount allowed pursuant to IC 5-11-5.5-6 and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## NINETEENTH CAUSE OF ACTION

(Iowa False Claims Act) (Iowa Code § 685.1 et seq.)

886.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

887.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.   Defendants conduct business in the State of Iowa.  Upon information and belief, Defendants' actions described herein occurred in Iowa as well.

888.    This is a qui tam action brought by Relators and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act, Iowa Code § 685.1 et seq.

889.    Iowa Code § 685.2 provides liability for any person who: Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; Conspires to commit a violation of paragraphs (a), (b), (d)-(g); Has possession, custody, or control of property or money used, or to be used, by the state and knowingly delivers, or causes to be delivered, less than all of that money or property; Is authorized to make or deliver a document certifying receipt of property used, or to be used, by the state and, intending to defraud

the state, makes or delivers the receipt without completely knowing that the information on the receipt is true; Knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the state, or a member of the Iowa national guard, who lawfully may not sell or pledge property; Knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the state, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the state.

890.     Defendants violated Iowa Code § 685.2 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

891.     Defendants furthermore violated Iowa Code § 685.2 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Iowa from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

892.     The State of Iowa, by and through the Iowa Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

893.     Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein with an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Iowa in connection with Defendants' fraudulent and illegal practices.

894.    Had the State of Iowa known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

895.    As a result of Defendants' violations of Iowa Code § 685.2, the State of Iowa has been damaged in an amount far in excess of millions of dollars exclusive of interest.

896.    Relators are private persons with direct and independent knowledge of the allegation of this Complaint, who have brought this action pursuant to Iowa Code § 685.3(2)(a) on behalf of themselves and the State of Iowa.

897.    This court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Iowa in the operation of its Medicaid program.

898.    Pursuant to the Iowa False Claims Act, the State of Iowa and Relators are entitled to the following damages as against Defendants:

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 274

899.     To the STATE OF IOWA: Three times the amount of actual damages which the State of Iowa has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty for each false claim which Defendants caused to be presented to the State of Iowa; Prejudgment interest; and all costs incurred in bringing this action.

900.     To RELATORS: The maximum amount allowed pursuant to Iowa Code § 685.3(4)(a)(1) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; an award of reasonable attorneys' fees and costs; and  such further relief as this Court deems equitable and just.

<u>TWENTIETH CAUSE OF ACTION</u>

(Louisiana Medical Assistance Programs Integrity Law) (La Rev. Stat. Ann § 437.1 et seq.)

901.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

902.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Louisiana.  Upon information and belief, Defendants' actions described herein occurred in Louisiana as well.

903.     This is a qui tam action brought by Relators and the State of Louisiana to recover treble damages and civil penalties under the Louisiana Medical Assistance Programs Integrity Law, La Rev. Stat. Ann § 437.1 et seq.

904.     La. Rev. Stat. Ann. § 438.3 provides: No person shall knowingly present or cause to be presented a false or fraudulent claim; No person shall knowingly engage in misrepresentation to obtain, or attempt to obtain, payment from medical assistance programs funds; No person shall conspire to defraud, or attempt to defraud, the medical assistance programs through misrepresentation or by obtaining, or attempting to obtain, payment for a false or fraudulent claim.

905.     In addition, La. Rev. Stat. Ann.§ 438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes, rebated, etc., directly or indirectly, overtly or covertly, in cash or in kind, for furnishing health care goods or services paid for in whole or in part by the Louisiana medical assistance programs.

906.     Defendants violated La. Rev. Stat. Ann § 438.2(A) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

907.     Defendants furthermore violated La. Rev. Stat. Ann. § 438.3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Louisiana from at least 2011 to the present by its violation of

federal and state laws, including La. Rev. Stat. Ann. § 438.2(A), the Anti-Kickback Act and Stark Act, as described herein.

908.     The State of Louisiana, by and through the Louisiana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

909.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Louisiana in connection with Defendants' fraudulent and illegal practices.

910.     Had the State of Louisiana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

911.     As a result of Defendants' violations of La. Rev. Stat. Ann. § 438.3 the State of Louisiana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

912.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to La. Rev.

Stat. Ann. § 439.1(A) on behalf of themselves and the State of Louisiana.

913.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Louisiana in the operation of its Medicaid program.

914.     Pursuant to the Louisiana Medical Assistance Programs Integrity Law, the State of Louisiana and Relators are entitled to the following damages as against Defendants:

915.     To the STATE OF LOUISIANA: Three times the amount of actual damages which the State of Louisiana has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not more than $10,000 for each false claim which Defendants caused to be presented to the State of Louisiana; Prejudgment interest; and all costs incurred in bringing this action.

916.     To RELATORS: The maximum amount allowed pursuant to La. Rev. Stat. § 439.4(A) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award or reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

<u>TWENTY-FIRST CAUSE OF ACTION</u>

(Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act)( Annotated Code of Maryland § 2-601 *et seq.*)

917.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

918.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Maryland. Upon information and belief, Defendants' actions described herein occurred in Maryland as well.

919.    This is a qui tam action brought by Relators and the State of Maryland to recover treble damages and civil penalties under the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, Annotated Code of Maryland § 2-601 et seq.

920.    Annotated Code of Maryland § 2-602 provides liability for any person who-

921.    Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval;

922.    Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim;

923.    Conspires to commit a violation under this subtitle;

924.    Has possession, custody, or control of money or other property used by

or on behalf of the State under a State health plan or a State health program and knowingly delivers or causes to be delivered to the State less than all of that money or other property;

925.    Knowingly makes any other false or fraudulent claim against a State health plan or a State health program.

926.    Defendants violated the Annotated Code of Maryland § 2-602 from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

927.    Defendants furthermore violated the Annotated Code of Maryland § 2-602 and knowingly caused thousands of false claims to be made, used and presented to the State of Maryland from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

928.    The State of Maryland, by and through the State of Maryland Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

929.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of Maryland in connection with Defendants' fraudulent and illegal practices.

930.    Had the State of Maryland known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

931.    As a result of Defendants' violations of the Annotated Code of Maryland § 2-602 the State of Maryland has been damaged in an amount far in excess of millions of dollars exclusive of interest.

932.    Relators have direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to the Annotated Code of Maryland § 2-604 on behalf of themselves and the State of Maryland.

933.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Maryland in the operation of its Medicaid program.

934.    Pursuant to the Maryland Medicaid False Claims Against State Health Plans and State Health Programs Act, the State of Maryland and Relators are entitled to the following damages as against Defendants:

935.    To the STATE OF MARYLAND:

936.    Three times the amount of actual damages which the State of Maryland has sustained as a result of Defendants' fraudulent and illegal practices;

937.    A civil penalty of not less than the amount of the actual damages the State health plan or State health program incurs as a result of the violation, and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Maryland;

938.    Prejudgment interest; and

939.    All costs incurred in bringing this action.

940.    To RELATOR:

941.    The maximum amount allowed pursuant to the Annotated Code of Maryland § 2-605 and /or any other applicable provision of law;

942.    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

943.    An award of reasonable attorneys' fees and costs; and

944.    Such further relief as this court deems equitable and just.

## TWENTY-SECOND CAUSE OF ACTION

(Massachusetts False Claims Act)(Mass. Gen. Laws Ann. Chap 12 § 5(A) et seq.)

945.    Relators re-allege and incorporate by reference each of the paragraphs

above as if fully set forth herein and further alleges as follows.

946.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the Commonwealth of Massachusetts. Upon information and belief, Defendants' actions described herein occurred in Massachusetts as well.

947.    This is a qui tam action brought by Relators and State of Massachusetts for treble damages and penalties under Massachusetts False Claims Act, Mass. Gen. Laws Ann. Chap 12 § 5(A) et seq.

948.    Mass. Gen. Laws Ann. Chap 12 § 5B provides liability for any person who: Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to obtain payment or approval of a claim by the commonwealth or any political subdivision thereof; Conspires to defraud the commonwealth or any political subdivision thereof through the allowance or payment of a fraudulent claim; Is a beneficiary of an inadvertent submission of a false claim to the common wealth or political subdivision thereof, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the commonwealth or political subdivision within a reason able time after discovery of the false claim.

949.    In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the

solicitation, receipt or offering of any remuneration, including any bribe ore rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

950.     Defendants violated Mass. Gen. Laws Ann. Chap. 118E § 41 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

951.     Defendants furthermore violated Mass. Gen. Laws Ann. Chap 12 § 5B and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Massachusetts from at least 2011 to the present by its violation of federal and state laws, including Mass. Gen. Laws Ann. Chap. 118E § 41, the Anti-Kickback Act and the Stark Act, as described herein.

952.     The State of Massachusetts, by and through the Massachusetts Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

953.     Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of

Massachusetts in connection with Defendants' fraudulent and illegal practices.

954.    Had the State of Massachusetts known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

955.    As a result of Defendants' violations of Mass. Gen. Laws Ann. Chap. 12 § 5B the State of Massachusetts has been damaged in an amount far in excess of millions of dollars exclusive of interest.

956.    Relators are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to Mass. Gen. Laws Ann Chap. 12 § 5(c)(2) on behalf of themselves and the State of Massachusetts.

957.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Massachusetts in the operation of its Medicaid program.

958.    Pursuant to the Massachusetts False Claims Act, the State of Massachusetts and Relators are entitled to the following damages as against Defendants:

959.    To the STATE OF MASSACHUSETTS: Three times the amount of

actual damages which that State of Massachusetts has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Massachusetts; Prejudgment interest; and all costs incurred in bringing this action.

960.     To RELATORS: The maximum amount allowed pursuant to Mass. Gen. Laws Ann. Chap. 12 § 5F and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

/ / /

/ / /

## TWENTY-THIRD CAUSE OF ACTION

(Michigan Medicaid False Claim Act) (M.C.L.A. 400.601 et seq.)

961.

962.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

963.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.    Defendants conduct business in

Michigan. Upon information and belief, Defendants' actions described herein occurred in Michigan as well.

964.    This is a qui tam action brought by Relators and State of Michigan for treble damages and penalties under Michigan Medicaid False Claim Act, M.C.L.A. 400.601 et seq.

965.    M.C.L.A. 400.607 provides liability for any person who, among other things: Causes to be made or presented to an employee or officer of this state a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, as amended, being sections 400.1 to 400.121 of the Michigan Compiled Laws, upon or against the state, knowing the claim to be false; Presents or causes to be made or presented a claim under the social welfare act, Act No. 280 of the Public Acts of 1939, which he or she knows falsely represents that the goods or services for which the claim is made were medically necessary in accordance with professionally accepted standards.

966.    In addition, M.C.L.A. 400.604 prohibits the solicitation, receipt or offering of a kickback or bribe in connection with the furnishing of goods or services for which payment is or may be made in whole or in part pursuant to the Michigan Medicaid program.

967.    Defendants violated M.C.L.A. 400.604 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

968.    Defendants furthermore violated M.C.L.A. 400.607 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Michigan from at least 2011 to the present by its violation of federal and state laws, including M.C.L.A. 400.604, the Anti-Kickback Act and the Stark Act, as described herein.

969.    The State of Michigan, by and through the Michigan Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

970.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Michigan in connection with Defendants' fraudulent and illegal practices.

971.    Had the State of Michigan known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

972.    As a result of Defendants' violations of M.C.L.A. 400.607 the State of Michigan has been damaged in an amount far in excess of millions of dollars

exclusive of interest.

973.     Relators are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to M.C.L.A. 400.610a on behalf of themselves and the State of Michigan.

974.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Michigan in the operation of its Medicaid program.

975.     Pursuant to the Michigan Medicaid False Claim Act, the State of Michigan and Relators are entitled to the following damages as against Defendants:

976.     To the STATE OF MICHIGAN: Three times the amount of actual damages which that State of Michigan has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Michigan; Prejudgment interest; and all costs incurred in bringing this action.

977.     To RELATORS: The maximum amount allowed pursuant to M.C.L.A. 400.610a(9) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; an award of reasonable attorneys' fees and costs; and such further relief as this court deems

equitable and just.

## TWENTY-FOURTH CAUSE OF ACTION

(Minnesota False Claims Act) (Minnesota Statutes § 15C.01 et seq.)

978.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

979.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in Minnesota.  Upon information and belief, Defendants' actions described herein occurred in Minnesota as well.

980.     This is a qui tam action brought by Relators and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act, Minnesota Statutes § 15C.01 et seq.

981.     Minnesota Statutes § 15C.02 provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the state or a political subdivision a false or fraudulent claim for payment or approval; Knowingly makes or uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a political subdivision; Knowingly conspires to either present a false or fraudulent claim to the state or a political subdivision for payment or approval or makes, uses, or causes to be made or

used a false record or statement to obtain payment or approval of a false or fraudulent claim.

982.    Defendants violated Minnesota Statutes § 15C.02 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

983.    Defendants furthermore violated Minnesota Statutes § 15C.02 and knowingly caused thousands of false claims to be made, used and presented to the State of Minnesota from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

984.    The State of Minnesota, by and through the State of Minnesota Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

985.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Minnesota in connection with Defendants' fraudulent and illegal practices.

986.    Had the State of Minnesota known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent

1 and illegal practices.

2      987.    As a result of Defendants' violations of Minnesota Statutes § 15C.02 the

3 State of Minnesota has been damaged in an amount far in excess of millions of dollars

4 exclusive of interest.

5      988.    Relators have direct and independent knowledge of the allegations of this

6 Complaint, who has brought this action pursuant to Minnesota Statutes § 15C.05 on

7 behalf of themselves and the State of Minnesota.

8      989.    This Court is requested to accept supplemental jurisdiction of this related

9 state claim as it is predicated upon the exact same facts as the federal claim, and

10 merely asserts separate damage to the State of Minnesota in the operation of its

11 Medicaid program.

12      990.    Pursuant to the Minnesota False Claims Act, the State of Minnesota and

13 Relators are entitled to the following damages as against Defendants:

14      991.    To the STATE OF MINNESOTA: Three times the amount of actual

15 damages which the State of Minnesota has sustained as a result of Defendants'

16 fraudulent and illegal practices; A civil penalty of not less than $5,500, and not more

17 than $11,000 for each false claim which Defendants caused to be presented to the

18 State of Minnesota; Prejudgment interest; and all costs incurred in bringing this

19 action.

20

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 292

992.     To RELATORS: The maximum amount allowed pursuant to Minnesota Statutes § 15C.12 and § 15C.13 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## TWENTY-FIFTH CAUSE OF ACTION

(Missouri Health Care Payment Fraud and Abuse Act) (Missouri Revised Statutes § 191.900 et seq.)

993.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

994.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Missouri.  Upon information and belief, Defendants' actions described herein occurred in the State of Missouri as well.

995.     This is a qui tam action brought by Relators and the State of Missouri to recover treble damages and civil penalties under the Missouri Health Care Payment Fraud and Abuse Act, Missouri Revised Statutes § 191.900 et seq.

996.     The Missouri Health Care Payment Fraud And Abuse Act § 191-905(1) provides liability for any person: Knowingly presenting to a health care payer a claim

for a health care payment that falsely represents that the health care for which the health care payment is claimed was medically necessary, if in fact it was not; Knowingly concealing the occurrence of any event affecting an initial or continued right under a medical assistance program to have a health care payment made by a health care payer for providing health care; Knowingly concealing or failing to disclose any information with the intent to obtain a health care payment to which the health care provider or any other health care provider is not entitled, or to obtain a health care payment in an amount greater than that which the health care provider or any other health care provider is entitled; Knowingly presenting a claim to a health care payer that falsely indicates that any particular health care was provided to a person or persons, if in fact health care of lesser value than that described in the claim was provided.

997.    The Missouri Health Care Payment Fraud and Abuse Act § 191-905(2) provides liability if any person shall knowingly solicit or receive any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for -

998.    Referring another person to a health care provider for the furnishing or arranging for the furnishing of any health care; or

999.    Purchasing, leasing, ordering or arranging for or recommending

purchasing, leasing or ordering any health care.

1000.     The Missouri Health Care Payment Fraud And Abuse Act § 191-905(3) provides liability if any person shall knowingly offer or pay any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer another person to a health care provider for the furnishing or arranging for the furnishing of any health care.

1001.     Defendants violated the Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1002.     Defendants furthermore violated Missouri Health Care Payment Fraud and Abuse Act § 191-905(1) & (2) & (3) and knowingly caused thousands of false claims to be made, used and presented to Missouri from at least 2011 to the present by its violation of federal and state laws, including Missouri Revised Statutes § 191-905(3), the Anti-Kickback Act and Stark Act Requirements, as described herein.

1003.     Missouri, by and through the Missouri Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1004.     Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Missouri in connection with Defendants' fraudulent and illegal practices.

1005.   Had the State of Missouri known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1006.   As a result of Defendants' violations of § 191-905(1) & (2) & (3), the State of Missouri has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1007.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Missouri Revised Statutes § 191.907 on behalf of themselves and the State of Missouri.

1008.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Missouri in the operation of its Medicaid program.

1009.   Pursuant to the Missouri Health Care Payment Fraud and Abuse Act, the State of Missouri and Relators are entitled to the following damages as against

Defendants:

1010.    To the STATE OF MISSOURI: Three times the amount of actual damages which the State of Missouri has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Missouri; Prejudgment interest; and all costs incurred in bringing this action.

1011.    To RELATORS: The maximum amount allowed pursuant to Missouri Revised Statutes § 191.907 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## TWENTY-SIXTH CAUSE OF ACTION

(Montana False Claims Act) (MT ST 17-8-401 et seq.)

1012.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1013.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in Montana. Upon information and belief, Defendants' actions described herein occurred

in Montana as well.

1014.    This is a qui tam action brought by Relators and State of Montana for treble damages and penalties under Montana False Claims Act, MT ST 17-8-401 et seq.

1015.    MT ST 17-8-403 provides liability for any person: knowingly presenting or causing to be presented to an officer or employee of the governmental entity a false claim for payment or approval; knowingly making, using, or causing to be made or used a false record or statement to get a false claim paid or approved by the governmental entity; conspiring to defraud the governmental entity by getting a false claim allowed or paid by the governmental entity.

1016.    In addition, MT ST 45-6-313 prohibits the solicitation, receipt or offering any remuneration, including but not limited to a kickback, bribe, or rebate, other than an amount legally payable under the medical assistance program, for furnishing services or items for which payment may be made under the Montana Medicaid program.

1017.    Defendants violated MT ST 45-6-313 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1018.    Defendants furthermore violated MT ST 17-8-403 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of

Montana from at least 2011 to the present by its violation of federal and state laws, including MT ST 45-6-313, the Anti-Kickback Act and the Stark Act, as described herein.

1019.   The State of Montana, by and through the Montana Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

1020.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Montana in connection with Defendants' fraudulent and illegal practices.

1021.   Had the State of Montana known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1022.   As a result of Defendants' violations of MT ST 17-8-403 the State of Montana has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1023.   Relators are private persons with direct and independent knowledge of

the allegations of the Compliant, who have brought this action pursuant to MT ST 17-8-406 on behalf of themselves and the State of Montana.

1024.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of Montana in the operation of its Medicaid program.

1025.    Pursuant to the Montana False Claims Act, the State of Montana and Relators are entitled to the following damages as against Defendants:

1026.    To the STATE OF MONTANA: Three times the amount of actual damages which that State of Montana has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of between $5,500 and $11,000 (adjusted for inflation) for each false claim which Defendants caused to be presented to the State of Montana; Prejudgment interest; and all costs incurred in bringing this action.

1027.    To RELATORS: The maximum amount allowed pursuant to MT ST 17-8-410 and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## TWENTY-SEVENTH CAUSE OF ACTION

(Nevada False Claims Act) (N.R.S. § 357.010 et seq.)

1028.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1029.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.   Defendants conduct business in the State of Nevada.  Upon information and belief, Defendants' actions described herein occurred in Nevada as well.

1030.    This is a qui tam action brought by Relators and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act, N.R.S. § 357.010 et. seq.

1031.    N.R.S. § 357.040(1) provides liability for any person who: Knowingly presents or causes to be presented a false claim for payment or approval; Knowingly makes or uses, or causes to be made or used, a false record or statement to obtain payment or approval of a false claim; Conspires to defraud by obtaining allowance or payment of a false claim; Is a beneficiary of an inadvertent submission of a false claim and, after discovering the falsity of the claim, fails to disclose the falsity to the state or political subdivision within a reasonable time.

1032.    In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or

receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

1033.    Defendants violated N.R.S. § 422.560 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1034.    Defendants furthermore violated N.R.S. § 357.040(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2011 to the present by its violation of federal and state laws, including N.R.S. § 422.560, the Anti-Kickback Act and the Stark Act, as described herein.

1035.    The State of Nevada, by and through the Nevada Medicaid program and other health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

1036.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Nevada in connection with Defendants' fraudulent and illegal practices.

1037.    Had the State of Nevada known that Defendants were violating the

federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1038.    As a result of Defendants' violations of N.R.S. § 357.040(1) the State of Nevada has been damaged in an amount far in excess or millions of dollars exclusive of interest.

1039.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N.R.S. § 357.080(1) on behalf of themselves and the State of Nevada.

1040.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Nevada in the operation of its Medicaid program.

1041.    Pursuant to the Nevada False Claims Act, the State of Nevada and Relators are entitled to the following damages as against Defendants:

1042.    To the STATE OF NEVADA: Three times the amount of actual damages which the State of Nevada has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Nevada;

Prejudgment interest; and all costs incurred in bringing this action.

1043.    To RELATORS: The maximum amount allowed pursuant to N.R.S § 357.210 and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## TWENTY-EIGHTH CAUSE OF ACTION

(New Jersey False Claims Act) (N.J.S.A. 2A:32C-1 et seq.)

1044.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1045.    Additionally, Defendants conduct business in the New Jersey.  Upon information and belief, Defendants' actions described herein occurred in New Jersey as well.

1046.    This is a qui tam action brought by Relators and State of New Jersey for treble damages and penalties under New Jersey False Claims Act, N.J.S.A. 2A:32C-1 et seq.

1047.    N.J.S.A. 2A:32C-3 provides liability for any person who: Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim

for payment or approval; Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State.

1048.    In addition, N.J.S.A. 30:4D-17 prohibits solicitation, offers, or receipt of any kickback, rebate or bribe in connection with the furnishing of items or services for which payment is or may be made in whole or in part under the New Jersey Medicaid program, or the furnishing of items or services whose cost is or may be reported in whole or in part in order to obtain benefits or payments under New Jersey Medicaid.

1049.    Defendants violated N.J.S.A. 30:4D-17 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1050.    Defendants furthermore violated N.J.S.A. 2A:32C-3 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2011 to the present by its violation of federal and state laws, including N.J.S.A. 30:4D-17, the Anti-Kickback Act and the Stark Act, as described herein.

1051.    The State of New Jersey, by and through the New Jersey Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-

party payers in connection therewith.

1052.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of New Jersey in connection with Defendants' fraudulent and illegal practices.

1053.   Had the State of New Jersey known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1054.   As a result of Defendants' violations of N.J.S.A. 2A:32C-3 the State of New Jersey has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1055.   Relators are private persons with direct and independent knowledge of the allegations of the Compliant, who have brought this action pursuant to N.J.S.A. 2A:32C-5 on behalf of themselves and the State of New Jersey.

1056.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon that exact same facts as the federal claim, and merely asserts separate damage to the State of New Jersey in the operation of its Medicaid program.

1057.   Pursuant to the New Jersey False Claims Act, the State of New Jersey and Relators are entitled to the following damages as against Defendants:

1058.   To the STATE OF NEW JERSEY: Three times the amount of actual damages which that State of New Jersey has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the State of New Jersey; Prejudgment interest; and all costs incurred in bringing this action.

1059.   To RELATORS: The maximum amount allowed pursuant to N.J.S.A. 2A:32C-7and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## TWENTY-NINTH CAUSE OF ACTION

(New Mexico Medicaid False Claims Act, and New Mexico Fraud Against Taxpayers Act) (N. M. S. A. 1978, § 27-14-1 et seq., and N. M. S. A. 1978, § 44-9-1 et seq.)

1060.   Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1061.   Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in

the State of New Mexico.  Upon information and belief, Defendants' actions described herein occurred in the State of New Mexico as well.

1062.    This is a qui tam action brought by Relators and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Medicaid False Claims Act, N. M. S. A. 1978, § 27-14-1 et seq. and the New Mexico Fraud Against Taxpayers Act, N. M. S. A. 1978, § 44-9-1 et seq.

1063.    N. M. S. A. 1978, § 27-14-4 provides liability for any person who: Presents, or causes to be presented, to the state a claim for payment under the Medicaid program knowing that the person receiving a Medicaid benefit or payment is not authorized or is not eligible for a benefit under the Medicaid program; Makes, uses or causes to be made or used a record or statement to obtain a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false; Conspires to defraud the state by getting a claim allowed or paid under the Medicaid program knowing that such claim is false or fraudulent.

1064.    N.M.S.A. 1978 § 44-9-3 provides liability for any person who-

1065.    knowingly presents, or causes to be presented, to an employee, officer or agent of the state or to a contractor, grantee or other recipient of state funds a false or fraudulent claim for payment or approval; knowingly makes or uses, or causes to be made or used, a false, misleading or fraudulent record or statement to obtain or

support the approval of or the payment on a false or fraudulent claim; conspires to defraud the state by obtaining approval or payment on a false or fraudulent claim; conspires to make, use or cause to be made or used, a false, misleading or fraudulent record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the state.

1066.    Defendants violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1067.    Defendants furthermore violated N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 and knowingly caused thousands of false claims to be made, used and presented to the State of New Mexico from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and Stark Act, as described herein.

1068.    The State of New Mexico, by and through the State of New Mexico Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1069.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief,

also an express condition of payment of claims submitted to the State of New Mexico in connection with Defendants' fraudulent and illegal practices.

1070.   Had the State of New Mexico known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1071.   As a result of Defendants' violations of N. M. S. A. 1978, § 27-14-4 and N.M.S.A. 1978 § 44-9-3 the State of New Mexico has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1072.   Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to N. M. S. A. 1978, § 27-14-7 and N. M. S. A. 1978, § 44-9-5 on behalf of themselves and the State of New Mexico.

1073.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of New Mexico in the operation of its Medicaid program.

1074.   Pursuant to the New Mexico Medicaid False Claims Act and the New Mexico Fraud Against Taxpayers Act, the State of New Mexico and Relators are

entitled to the following damages as against Defendants:

1075.     To the STATE OF NEW MEXICO: Three times the amount of actual damages which the State of New Mexico has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of New Mexico; Prejudgment interest; and all costs incurred in bringing this action.

1076.     To RELATORS: The maximum amount allowed pursuant to N. M. S. A. 1978, § 27-14-9 and N. M. S. A. 1978, § 44-9-7 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTIETH CAUSE OF ACTION

(New York False Claims Act) (N.Y. State Fin. Law § 187 et seq.)

1077.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1078.     Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the New York.  Upon information and belief, Defendants' actions described herein

occurred in New York as well.

1079.    This is a qui tam action brought by Relators and State of New York for treble damages and penalties under New York False Claims Act, N.Y. State Finance Law § 187 et seq.

1080.    N.Y. State Finance Law § 189 provides liability for any person who: Knowingly presents, or causes to be presented, to any employee, officer or agent of the state or a local government, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state or a local government; Conspires to defraud the state or a local government by getting a false or fraudulent claim allowed or paid.

1081.    Defendants violated § 189 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1082.    Defendants furthermore violated § 189 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Nevada from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

1083.    The State of New York, by and through the New York Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and

1   illegal practices, paid the claims submitted by health care providers and third-party

2   payers in connection therewith.

3       1084.    Compliance with applicable Medicare, Medicaid and the various other

4   federal and state laws cited herein was an implied, and upon information and belief,

5   also an express condition of payment of claims submitted to the State of New York in

6   connection with Defendants' fraudulent and illegal practices.

7       1085.    Had the State of New York known that Defendants were violating the

8   federal and state laws cited herein, it would not have paid the claims submitted by

9   health care providers and third-party payers in connection with Defendants' fraudulent

10  and illegal practices.

11      1086.    As a result of Defendants' violations of § 189 the State of New York has

12  been damaged in an amount far in excess of millions of dollars exclusive of interest.

13      1087.    Relators are private persons with direct and independent knowledge of

14  the allegations of the Compliant, who have brought this action pursuant to N.Y. State

15  Finance Law § 190(2) on behalf of themselves and the State of New York.

16      1088.    This Court is requested to accept supplemental jurisdiction of this related

17  state claim as it is predicated upon that exact same facts as the federal claim, and

18  merely asserts separate damage to the State of New York in the operation of its

19  Medicaid program.

20

1089.    Pursuant to the New York False Claims Act, the State of New York and Relators are entitled to the following damages as against Defendants:

1090.    To the STATE OF NEW YORK: Three times the amount of actual damages which that State of New York has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendants caused to be presented to the State of New York; Prejudgment interest; and all costs incurred in bringing this action.

1091.    To RELATORS: The maximum amount allowed pursuant to N.Y. State Finance Law § 190(6) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## THIRTY-FIRST CAUSE OF ACTION

(North Carolina False Claims Act) (North Carolina General Statutes § 51-1-605 et seq.)

1092.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1093.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.    Defendants conduct business in

the State of North Carolina.  Upon information and belief, Defendants' actions described herein occurred in the State of North Carolina as well.

1094.   This is a qui tam action brought by Relators and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act, North Carolina General Statutes § 51-1-605 et seq.

1095.   North Carolina General Statutes § 51-1-607 provides liability for any person who: Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; Conspires to commit a violation of subdivisions of this section.

1096.   Defendants violated North Carolina General Statutes § 51-1-607 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1097.   Defendants furthermore violated North Carolina General Statutes § 51-1-607 and knowingly caused thousands of false claims to be made, used and presented to the State of North Carolina from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

1098.   The State of North Carolina, by and through the State of North Carolina

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 315

Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1099.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of North Carolina in connection with Defendants' fraudulent and illegal practices.

1100.   Had the State of North Carolina known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1101.   As a result of Defendants' violations of North Carolina General Statutes § 51-1-607 the State of North Carolina has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1102.   Relators have direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to North Carolina General Statutes § 51-1-608 on behalf of themselves and the State of North Carolina.

1103.   This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and

merely asserts separate damage to the State of North Carolina in the operation of its Medicaid program.

1104.     Pursuant to the North Carolina False Claims Act, the State of North Carolina and Relators are entitled to the following damages as against Defendants:

1105.     To the STATE OF NORTH CAROLINA: Three times the amount of actual damages which the State of North Carolina has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of North Carolina; Prejudgment interest; and all costs incurred in bringing this action.

1106.     To RELATORS: The maximum amount allowed pursuant to North Carolina General Statutes § 51-1-610 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTY-SECOND CAUSE OF ACTION

(Oklahoma Medicaid False Claims Act) (63 Okl. St. Ann. § 5053 et seq.)

1107.     Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1108.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Oklahoma.  Upon information and belief, Defendants' actions described herein occurred in the State of Oklahoma as well.

1109.    This is a qui tam action brought by Relators and the State of Oklahoma to recover treble damages and civil penalties under the Oklahoma Medicaid False Claims Act, 63 Okl. St. Ann. § 5053 et seq.

1110.    63 Okl. St. Ann. § 5053.1 provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the State of Oklahoma, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; Conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

1111.    In addition, 56 Okl. St. Ann. § 1005 prohibits solicitation or acceptance of a benefit, pecuniary benefit, or kickback in connection with goods or services paid or claimed by a provider to be payable by the Oklahoma Medicaid Program.

1112.    Defendants violated 56 Okl. St. Ann. § 1005 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1113.    Defendants furthermore violated 63 Okl. St. Ann. § 5053.1 and

knowingly caused thousands of false claims to be made, used and presented to the State of Oklahoma from at least 2011 to the present by its violation of federal and state laws, including 56 Okl. St. Ann. § 1005, the Anti-Kickback Act, and Stark Act, as described herein.

1114.    The State of Oklahoma, by and through the State of Oklahoma Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1115.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Oklahoma in connection with Defendants' fraudulent and illegal practices.

1116.    Had the State of Oklahoma known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1117.    As a result of Defendants' violations of 63 Okl. St. Ann. § 5053.1 the State of Oklahoma has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1118.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 63 Okl. St. Ann. § 5053.2(B) on behalf of themselves and the State of Oklahoma.

1119.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Oklahoma in the operation of its Medicaid program.

1120.    Pursuant to the Oklahoma Medicaid False Claims Act, the State of Oklahoma and Relators are entitled to the following damages as against Defendants:

1121.    To the STATE OF OKLAHOMA: Three times the amount of actual damages which the State of Oklahoma has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendants caused to be presented to the State of Oklahoma; Prejudgment interest; and all costs incurred in bringing this action.

1122.    To RELATORS: The maximum amount allowed pursuant 63 Okl. St. Ann. § 5053.4 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 320

## THIRTY-THIRD CAUSE OF ACTION

(Rhode Island False Claims Act) (Gen. Laws 1956, § 9-1.1-1 et seq.)

1123.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1124.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.   Defendants conduct business in the State of Rhode Island.  Upon information and belief, Defendants' actions described herein occurred in the State of Rhode Island as well.

1125.    This is a qui tam action brought by Relators and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act, Gen. Laws 1956, § 9-1.1-1 et seq.

1126.    Gen. Laws 1956, § 9-1.1-3 provides liability for any person who: knowingly presents, or causes to be presented, to an officer or employee of the state or a member of the guard a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the state; conspires to defraud the state by getting a false or fraudulent claim allowed or paid.

1127.    In addition, Gen. Laws 1956, § 40-8.2-3 prohibits the solicitation, receipt, offer, or payment of any remuneration, including any kickback, bribe, or rebate,

directly or indirectly, in cash or in kind, to induce referrals from or to any person in return for furnishing of services or merchandise or in return for referring an individual to a person for the furnishing of any services or merchandise for which payment may be made, in whole or in part, under the Rhode Island Medicaid program.

1128.    Defendants violated Gen. Laws 1956, § 40-8.2-3 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1129.    Defendants furthermore violated Gen. Laws 1956, § 9-1.1-3 and knowingly caused thousands of false claims to be made, used and presented to the State of Rhode Island from at least 2011 to the present by its violation of federal and state laws, including Gen. Laws 1956, § 40-8.2-3, the Anti-Kickback Act, and Stark Act, as described herein.

1130.    The State of Rhode Island, by and through the State of Rhode Island Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1131.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Rhode Island in connection with Defendants' fraudulent and illegal practices.

1132.    Had the State of Rhode Island known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1133.    As a result of Defendants' violations of Gen. Laws 1956, § 9-1.1-3 the State of Rhode Island has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1134.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Gen. Laws 1956, § 9-1.1-4(b) on behalf of themselves and the State of Rhode Island.

1135.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Rhode Island in the operation of its Medicaid program.

1136.    Pursuant to the Rhode Island False Claims Act, the State of Rhode Island and Relators are entitled to the following damages as against Defendants:

1137.    To the STATE OF RHODE ISLAND: Three times the amount of actual damages which the State of Rhode Island has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more

than $10,000 for each false claim which Defendants caused to be presented to the State of Rhode Island; Prejudgment interest; and all costs incurred in bringing this action.

1138.    To RELATORS: The maximum amount allowed pursuant Gen. Laws 1956, § 9-1.1-4(d) and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTY-FOURTH CAUSE OF ACTION

(Tennessee Medicaid False Claims Act) (Tenn. Code Ann. § 71-5-181 et seq.)

1139.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1140.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.    Defendants conduct business in the State of Tennessee.  Upon information and belief, Defendants' actions described herein occurred in Tennessee as well.

1141.    This is a qui tam action brought by Relators and the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq.

1142.    Section 71-5-182(a)(1) provides liability for any person who: Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent; Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for and approved by the state knowing such record or statement is false; Conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

1143.    Defendants violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Tennessee from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and the Stark Act, as described herein.

1144.    The State of Tennessee, by and through the Tennessee Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

1145.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Tennessee in connection with Defendants' fraudulent and illegal practices.

1146.    Had the State of Tennessee known that Defendants violated the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1147.    As a result of Defendants' violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1148.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Tenn. Code Ann. § 71-5-183(a)(1) on behalf of themselves and the State of Tennessee.

1149.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

1150.    Pursuant to the Tennessee Medicaid False Claims Act, the State of Tennessee and Relators are entitled to the following damages as against Defendants:

1151.    To the STATE OF TENNESSEE: Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,000 and not more

than $25,000 for each false claim which Defendants caused to be presented to the State of Tennessee; Prejudgment interest; and all costs incurred in bringing this action.

1152.    To RELATORS: The maximum amount allowed to Tenn. Code Ann. §71-5-183(d) and/or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this Court deems equitable and just.

## THIRTY- FIFTH CAUSE OF ACTION

(Texas False Claims Act) (V.T.C.A. Hum. Res. Code § 36.001 et seq.)

1153.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1154.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Texas.  Defendants' actions described herein occurred in Texas as well.

1155.    This is a qui tam action brought by Relators and the State of Texas to recover double damages and civil penalties under the Texas False Claims Act, V.T.C.A. Hum. Res. Code § 36.001 et seq.

1156.    V.T.C.A. Hum. Res. Code § 36.002, in relevant part, provides liability for any person who: knowingly makes or causes to be made a false statement or

misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized; knowingly applies for and receives a benefit or payment on behalf of another person under the Medicaid program and converts any part of the benefit or payment to a use other than for the benefit of the person on whose behalf it was received;  except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;  except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program;  knowingly enters into an agreement, combination, or conspiracy to defraud the state by obtaining or aiding

another person in obtaining an unauthorized payment or benefit from the Medicaid program or a fiscal agent;  knowingly makes, uses, or causes the making or use of a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to this state under the Medicaid program.

1157.    Defendants violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused hundreds of thousands of false claims to be made, used and presented to the State of Texas from at least 2011 to the present by its violation of federal and state laws, including, the Anti-Kickback Act and the Stark Act, as described herein.

1158.    The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third-party payers in connection therewith.

1159.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' fraudulent and illegal practices.

1160.    Had the State of Texas known that Defendants were violating the federal and state laws cited herein, it wound not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal

practices.

1161.     As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1162.     Defendants did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

1163.     Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of themselves and the State of Texas.

1164.     This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program.

1165.     Pursuant to the Texas False Claims Act, the State of Texas and Relators are entitled to the following damages as against Defendants:

1166.     To the STATE OF TEXAS: Damages at two times the value of any

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 330

1    payment or monetary or in-kind benefit provided under the Medicaid program,

2    directly or indirectly, as a result of the unlawful acts set forth above, as provided by

3    the Texas Human Resources Code § 36.052(a)(3) & (4), and a civil penalty of: (1) Not

4    less than $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section

5    3729(a), if that amount exceeds $5,500, and not more than $15,000 or the maximum

6    amount imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds

7    $15,000, for each unlawful act committed by the person that results in injury to an

8    elderly person, as defined by Section 48.002(a)(1), a disabled person, as defined by

9    Section 48.002(a)(8)(A), or a person younger than 18 years of age; or (2) Not less than

10   $5,500 or the minimum amount imposed as provided by 31 U.S.C. Section 3729(a), if

11   that amount exceeds $5,500, and not more than $11,000 or the maximum amount

12   imposed as provided by 31 U.S.C. Section 3729(a), if that amount exceeds $11,000,

13   for each unlawful act committed by the person that does not result in injury to a

14   person described by Paragraph (A); Pre- and post-judgment interest, Tex. Hum. Res.

15   Code § 36.052(a)(2).

16      1167.    To RELATORS: The maximum amount allowed pursuant to V.T.C.A.

17   Hum Res. Code § 36.110(a), and/or any other applicable provision of law;

18   Reimbursement for reasonable expenses and costs which Relators incurred in

19   connection with this action, Tex Hum Res. Code §§ 36.007 & 36.110(c); Reasonable

20

attorneys' fees which Relators necessarily incurred in bringing and pressing this case, Tex Hum Res. Code §§ 36.007 & 36.110(c); and such further relief as this Court deems equitable and just.

## THIRTY-SIXTH CAUSE OF ACTION

(Vermont False Claims Act) (32 V.S.A. 630 *et seq*.)

1168.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1169.    Relators re-allege and incorporate the allegations above as if fully set for herein and further alleges as follows.

1170.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants. Defendants conduct business in the State of Vermont. Upon information and belief, Defendants' actions described herein occurred in the State of Vermont as well.

1171.    This is a qui tam action brought by Relators and the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act, 32 V.S.A. 630 et seq.

1172.    32 V.S.A. 631 provides liability for any person who shall-

1173.    Knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval.

1174.    Knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.

1175.    Conspires to commit a violation of this subsection.

1176.    Defendants violated 32 V.S.A. 630 et seq. from at least 2005 to the present by engaging in the fraudulent and illegal practices described herein.

1177.    Defendants furthermore violated 32 V.S.A. 630 et seq. and knowingly caused thousands of false claims to be made, used and presented to the State of Vermont from at least 2005 to the present by its violation of federal and state laws, including 32 V.S.A. 630 et seq., the Anti-Kickback Act, and Stark Act, as described herein.

1178.    The State of Vermont, by and through the State of Vermont Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1179.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Vermont in connection with Defendants' fraudulent and illegal practices.

1180.    Had the State of Vermont known that Defendants were violating the

federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1181.    As a result of Defendants' violations of 32 V.S.A. 630 et seq. the State of Vermont has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1182.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to 32 V.S.A. 632(b)(1) on behalf of themselves and the State of Vermont.

1183.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Vermont in the operation of its Medicaid program.

1184.    Pursuant to the Vermont False Claims Act, the State of Vermont and Relators are entitled to the following damages as against Defendants:

1185.    To the STATE OF VERMONT:

1186.    Three times the amount of actual damages which the State of Vermont has sustained as a result of Defendants' fraudulent and illegal practices;

1187.    A civil penalty of not less than $5,500 and not more than $11,000 for

each false claim which Defendants caused to be presented to the State of Vermont;

1188.    Prejudgment interest; and

1189.    All costs incurred in bringing this action.

1190.    To RELATOR:

1191.    The maximum amount allowed pursuant 32 V.S.A. 635(b) and /or any other applicable provision of law;

1192.    Reimbursement for reasonable expenses which Relators incurred in connection with this action;

1193.    An award of reasonable attorneys' fees and costs; and

1194.    Such further relief as this court deems equitable and just.

## THIRTY-SEVENTH CAUSE OF ACTION

(Virginia Fraud Against Taxpayers Act) (Va. Code Ann. § 8.01-216.1et seq.)

1195.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1196.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the Commonwealth of Virginia.  Upon information and belief, Defendants' actions described herein occurred in the Commonwealth of Virginia as well.

1197.    This is a qui tam action brought by Relators and the Commonwealth of

Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq.

1198.    Va. Code Ann. § 8.01-216.3 provides liability for any person who: Knowingly presents, or causes to be presented, to an officer or employee of the Commonwealth a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Commonwealth; Conspires to defraud the Commonwealth by getting a false or fraudulent claim allowed or paid.

1199.    Defendants violated Va. Code Ann. § 8.01-216.3 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1200.    Defendants furthermore violated Va. Code Ann. § 8.01-216.3 and knowingly caused thousands of false claims to be made, used and presented to the Commonwealth of Virginia from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act and Stark Act, as described herein.

1201.    The Commonwealth of Virginia, by and through the Commonwealth of Virginia Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and third payers in connection therewith.

1202.    Compliance with applicable Medicare, Medicaid and the various other

federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the Commonwealth of Virginia in connection with Defendants' fraudulent and illegal practices.

1203.    Had the Commonwealth of Virginia known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1204.    As a result of Defendants' violations of Va. Code Ann. § 8.01-216.3 the Commonwealth of Virginia has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1205.    Relators are private persons with direct and independent knowledge of the allegations of this Complaint, who have brought this action pursuant to Va. Code Ann. § 8.01-216.5(A) on behalf of himself and the Commonwealth of Virginia

1206.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the Commonwealth of Virginia in the operation of its Medicaid program.

1207.    Pursuant to the Virginia Fraud Against Taxpayers Act, the Commonwealth of Virginia and Relators are entitled to the following damages as

against Defendants:

1208.    To the COMMONWEALTH OF VIRGINIA: Three times the amount of actual damages which the Commonwealth of Virginia has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendants caused to be presented to the Commonwealth of Virginia; Prejudgment interest; and all costs incurred in bringing this action.

1209.    To RELATORS: The maximum amount allowed pursuant to Va. Code Ann. § 8.01-216.7 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTY-EIGHTH CAUSE OF ACTION

(Washington False Claims Act) (Washington Revised Code § 74 66-005 et seq.)

1210.    Relators re-allege and incorporate by reference each of the paragraphs above as if fully set forth herein and further alleges as follows.

1211.    Additionally, Relators state that the course of conduct described in this Complaint was a nationwide practice of Defendants.  Defendants conduct business in the State of Washington. Upon information and belief, Defendants' actions described

herein occurred in the State of Washington as well.

1212.    This is a qui tam action brought by Relators and the State of Washington to recover treble damages and civil penalties under the Washington False Claims Act, Washington Revised Code § 74 66-005 et seq.

1213.    Washington Revised Code § 74 66-020 provides liability for any person who: Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; Conspires to commit one or more of the violations in this subsection.

1214.    Defendants violated Washington Revised Code § 74 66-020 from at least 2011 to the present by engaging in the fraudulent and illegal practices described herein.

1215.    Defendants furthermore violated Washington Revised Code § 74 66-020 and knowingly caused thousands of false claims to be made, used and presented to the State of Washington from at least 2011 to the present by its violation of federal and state laws, including the Anti-Kickback Act, and the Stark Act, as described herein.

1216.    The State of Washington, by and through the State of Washington Medicaid program and other state health care programs, and unaware of Defendants' fraudulent and illegal practices, paid the claims submitted by health care providers and

third payers in connection therewith.

1217.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Washington in connection with Defendants' fraudulent and illegal practices.

1218.    Had the State of Washington known that Defendants were violating the federal and state laws cited herein, it would not have paid the claims submitted by health care providers and third-party payers in connection with Defendants' fraudulent and illegal practices.

1219.    As a result of Defendants' violations of Washington Revised Code § 74 66-020 the State of Washington has been damaged in an amount far in excess of millions of dollars exclusive of interest.

1220.    Relators have direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to Washington Revised Code § 74 66-050 on behalf of themselves and the State of Washington.

1221.    This Court is requested to accept supplemental jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Washington in the operation of its Medicaid program.

1222.    Pursuant to the Washington False Claims Act, the State of Washington and Relators are entitled to the following damages as against Defendants:

1223.    To the STATE OF WASHINGTON: Three times the amount of actual damages which the State of Washington has sustained as a result of Defendants' fraudulent and illegal practices; A civil penalty of not less than $5,500, and not more than $11,000 for each false claim which Defendants caused to be presented to the State of Washington; Prejudgment interest; and all costs incurred in bringing this action.

1224.    To RELATORS: The maximum amount allowed pursuant to Washington Revised Code § 74 66-070 and /or any other applicable provision of law; Reimbursement for reasonable expenses which Relators incurred in connection with this action; An award of reasonable attorneys' fees and costs; and such further relief as this court deems equitable and just.

## THIRTY-NINTH CAUSE OF ACTION

(Tortious Interference – Relator Jeffrey Bell vs Biotronik)

1225.    Relator Jeffrey Bell incorporates by reference as though fully set forth herein each and every allegation set forth above in this Complaint. As a separate and distinct cause of action, Relator Jeffrey Bell complains against Defendants as follows:

1226.    Relator Jeffrey Bell had a valid contract and economic expectancy with

both Sorin and Tony Fernandez.

1227.    Biotronik had knowledge of Relator Jeffrey Bell's contracts and
expectancies with Sorin and Tony Fernandez.

1228.    Biotronik intended to interfere with Relator Jeffrey Bell's contracts and
expectancies with Sorin and Tony Fernandez.

1229.    Biotronik actually and improperly interfered with Jeffrey Bell's contracts
and expectancies with Sorin and Tony Fernandez.

1230.    As result, Relator Jeffrey Bell was harmed and accordingly Relator
Jeffrey Bell seeks all possible damages for emotional pain and mental anguish,
together with serious economic hardship, including increased medical expenses, lost
wages and special damages associated with Relator's efforts to obtain alternative
employment, and seek injunctive and other equitable relief, attorney's fees and costs,
and all other forms of damages (including without limitation punitive damages based
on Defendants' intentional, malicious, and reckless conduct), restitution,
compensation, penalties or other relief available under the law in an amount to be
proven at trial.

## FORTIETH CAUSE OF ACTION

(Tortious Interference – Relator Andrew Schmid vs Biotronik)

1231.    Relator Andrew Schmid incorporates by reference as though fully set

forth herein each and every allegation set forth above in this Complaint. As a separate and distinct cause of action, Relator Andrew Schmid complains against Defendants as follows:

1232.    Relator Andrew Schmid had a valid contract and economic expectancy with Johnson & Johnson/Biosense Webster.

1233.    Biotronik had knowledge of Relator Andrew Schmid's contracts and expectancies with Johnson & Johnson/Biosense Webster.

1234.    Biotronik intended to interfere with Relator Andrew Schmid's contracts and expectancies with Johnson & Johnson/Biosense Webster.

1235.    Biotronik actually and improperly interfered with Andrew Schmid's contracts and expectancies with Johnson & Johnson/Biosense Webster.

1236.    As result, Relator Andrew Schmid was harmed and accordingly Relator Andrew Schmid seeks all possible damages for emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator's efforts to obtain alternative employment, and seek injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be

proven at trial.

## FORTY-FIRST CAUSE OF ACTION

(Breach of Contract – Relator Jeffrey Bell vs. Defendant Biotronik)

1237.    Relator Jeffrey Bell incorporates by reference as though fully set forth herein each and every allegation set forth above in this Complaint. As a separate and distinct cause of action, Relator Jeffrey Bell complains against Defendants as follows:

1238.    There was a valid contract between Defendant Biotronik and Relator Jeffrey Bell.

1239.    The Relator Jeffrey Bell performed all the conditions and obligations imposed on him as specified by the contract except for those conditions that are excused by Defendant Biotronik's breaches.

1240.    The Defendant Biotronik failed to perform as specified by the contract.

1241.    The Relator Jeffrey Bell suffered an economic loss as a result of Defendant Biotronik 's breach of contract.

1242.    Wherefore, Relator Jeffrey Bell is entitled to recover all damages and other appropriate relief, including attorney's fees and costs.

## FORTY-SECOND CAUSE OF ACTION

(Breach of Contract – Relator Andrew Schmid vs. Defendant Biotronik)

1243.    Relator Andrew Schmid incorporates by reference as though fully set

forth herein each and every allegation set forth above in this Complaint. As a separate and distinct cause of action, Relator Andrew Schmid complains against Defendants as follows:

1244.    There was a valid contract between Defendant Biotronik and Relator Andrew Schmid.

1245.    The Relator Andrew Schmid performed all the conditions and obligations imposed on him as specified by the contract except for those conditions that are excused by Defendant Biotronik's breaches.

1246.    The Defendant Biotronik failed to perform as specified by the contract.

1247.    The Relator Andrew Schmid suffered an economic loss as a result of Defendant Biotronik 's breach of contract.

1248.    Wherefore, Relator Andrew Schmid is entitled to recover all damages and other appropriate relief including attorney's fees and costs.

## FORTY-THIRD CAUSE OF ACTION

(Breach of Implied Covenant – Jeffrey Bell vs. Defendant Biotronik)

1249.    Defendant Biotronik has breached the implied covenant of good faith and fair dealing implicit in its contract with Relator Jeffrey Bell.

1250.    Relator Jeffrey Bell performed all the conditions and obligations imposed on him as specified by the contract except for those conditions that are excused by

Defendant Biotronik's breaches.

1251.    Relator Jeffrey Bell suffered an economic loss as a result of Defendant Biotronik 's breach of the implied covenant of good faith and fair dealing.

1252.    As a direct and proximate result of Biotronik's breach of the implied covenant, Relator Jeffrey Bell has suffered emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator Jeffrey Bell's efforts to obtain alternative employment, and Relator Bell seeks injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

## FORTY-FOURTH CAUSE OF ACTION

(Breach of Implied Covenant – Andrew Schmid vs. Defendant Biotronik)

1253.    Defendant Biotronik has breached the implied covenant of good faith and fair dealing implicit in its contract with Relator Andrew Schmid.

1254.    The Relator Andrew Schmid performed all the conditions and obligations imposed on him as specified by the contract except for those conditions that are

excused by Defendant Biotronik's breaches.

1255.    The Relator Andrew Schmid suffered an economic loss as a result of Defendant Biotronik 's breach of the implied covenant of good faith and fair dealing.

1256.    As a direct and proximate result of Biotronik's breach of the implied covenant, Relator Andrew Schmid has suffered emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator's efforts to obtain alternative employment, and Relator Andrew Schmid seeks injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

## FORTY-FIFTH CAUSE OF ACTION

### (Retaliation – Cal. Gov. Code Sec. 12653 - Relator Jeffrey Bell)

1257.    Relator Jeffrey Bell was a contractor and/or employee of Biotronik;

1258.    Relator Jeffrey Bell alleged Biotronik defrauded the State of California of money, property, or services by submitting a false or fraudulent claim to the government for payment or approval;

1259.    Relator Jeffrey Bell acted as set forth above to attempt to stop and curtail

Biotronik's wrongful, fraudulent, illegal and misleading conduct.

1260.    Biotronik retaliated against Relator Jeffrey Bell as set forth above.

1261.    Relator Jeffrey Bell's actions as set forth above to attempt to stop and curtail Biotronik's wrongful, fraudulent, illegal and misleading conduct were a substantial motivating reason for Biotronik's decision to retaliate against Relator Jeffrey Bell.

1262.    As result, Relator Jeffrey Bell was harmed and accordingly Relator Jeffrey Bell seeks all possible damages for emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator's efforts to obtain alternative employment, and seek injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

## FORTY-SIXTH CAUSE OF ACTION

(Retaliation – Cal. Gov. Code Sec. 12653 - Relator Andrew Schmid)

1263.    Relator Andrew Schmid was a contractor and/or employee of Biotronik;

1264.    Relator Andrew Schmid alleged Biotronik defrauded the State of

California of money, property, or services by submitting a false or fraudulent claim to the government for payment or approval;

1265.     Relator Andrew Schmid acted as set forth above to attempt to stop and curtail Biotronik's wrongful, fraudulent, illegal and misleading conduct.

1266.     Biotronik retaliated against Relator Andrew Schmid as set forth above.

1267.     Relator Andrew Schmid's actions as set forth above to attempt to stop and curtail Biotronik's wrongful, fraudulent, illegal and misleading conduct were a substantial motivating reason for Biotronik's decision to retaliate against Relator Andrew Schmid.

1268.     As result, Relator Andrew Schmid was harmed and accordingly Relator Andrew Schmid seeks all possible damages for emotional pain and mental anguish, together with serious economic hardship, including increased medical expenses, lost wages and special damages associated with Relator's efforts to obtain alternative employment, and seek injunctive and other equitable relief, attorney's fees and costs, and all other forms of damages (including without limitation punitive damages based on Defendants' intentional, malicious, and reckless conduct), restitution, compensation, penalties or other relief available under the law in an amount to be proven at trial.

## FORTY-SEVENTH CAUSE OF ACTION

(Violation of California Labor Code § 1102.5 - Relator Jeffrey Bell)

1269.    Relator Jeffrey Bell incorporates by reference as though fully set forth herein each and every allegation set forth above in this Complaint. As a separate and distinct cause of action, Relator Jeffrey Bell complains against Defendants as follows:

1270.    California Labor Code § 1102.5(b) forbids an employer, or any person acting on behalf of the employer, to retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties. (See also California Labor Code § 1102.5(c)-(d).)

1271.    Defendants through their agents, superintendents, managers or employees, retaliated against Relator Jeffrey Bell for informing them that their practices violate the law and for Relator Jeffrey Bell's attempts to refuse to engage in such practices.

1272.    Defendants knowingly caused, suffered, or permitted agents, superintendents, managers or employees to commit a violation of Labor Code § 1102.5(b)-(d), or failed to take all reasonable steps within their power to prevent such violations.

1273.    As a direct and proximate result of Defendants' retaliatory conduct, Relator Jeffrey Bell has been harmed and has suffered loss of employment opportunities, loss of dignity, great humiliation, and emotional injuries manifesting physical illness and severe emotional distress.

1274.    Defendants' actions have caused and continue to cause Relator Jeffrey Bell substantial losses in earnings, significant reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, costs of suit, and embarrassment and anguish, all to his damage in an amount according to proof.

1275.    By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination- and harassment-free workplace for himself and the public at large, Relator Jeffrey Bell has incurred and continues to incur legal expenses and attorney fees. Relator Jeffrey Bell is therefore entitled to reasonable attorneys' fees and litigation expenses per Code of Civil Procedure § 1021.5 and Government Code § 12965(b).

## FORTY-EIGHTH CAUSE OF ACTION

(Violation of California Labor Code § 1102.5 - Relator Andrew Schmid)

1276.     Relator Andrew Schmid incorporates by reference as though fully set forth herein each and every allegation set forth above in this Complaint. As a separate and distinct cause of action, Relator Andrew Schmid complains against Defendants as follows:

1277.     California Labor Code § 1102.5(b) forbids an employer, or any person acting on behalf of the employer, to retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties. (See also California Labor Code § 1102.5(c)-(d).)

1278.     Defendants through their agents, superintendents, managers or

employees, retaliated against Relator Andrew Schmid for informing them that their practices violate the law and for Relator Andrew Schmid's attempts to refuse to engage in such practices.

1279.   Defendants knowingly caused, suffered, or permitted agents, superintendents, managers or employees to commit a violation of Labor Code § 1102.5(b)-(d), or failed to take all reasonable steps within their power to prevent such violations.

1280.   As a direct and proximate result of Defendants' retaliatory conduct, Relator Andrew Schmid has been harmed and has suffered loss of employment opportunities, loss of dignity, great humiliation, and emotional injuries manifesting physical illness and severe emotional distress.

1281.   Defendants' actions have caused and continue to cause Relator Andrew Schmid substantial losses in earnings, significant reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, costs of suit, and embarrassment and anguish, all to his damage in an amount according to proof.

1282.   By reason of Defendants' unlawful conduct, and in order to enforce the important right to a discrimination- and harassment-free workplace for himself and the public at large, Relator Andrew Schmid has incurred and continues to incur legal

expenses and attorney fees. Relator Andrew Schmid is therefore entitled to reasonable attorneys' fees and litigation expenses per Code of Civil Procedure § 1021.5 and Government Code § 12965(b).

<u>PRAYER FOR RELIEF</u>

1283.     Relators respectfully request this Court to enter judgment against Defendants for every form of damages, restitution, compensation, penalties, equitable and injunctive relief, and costs and attorney's fees available under the law, including, without limitation, each form of relief set forth above, as well as any further relief that the Court finds appropriate in the interest of justice, in an amount to be proven at trial.

<u>DEMAND FOR JURY TRIAL</u>

Relators hereby demand a trial by jury as to all issues.

Relators

By: <u>*/s/ John R. Parker, Jr.*</u>

CUTTER LAW P.C.
C. Brooks Cutter
John. R. Parker, Jr.
401 Watt Avenue
Sacramento, CA 95864
Tel. 916-448-9800
Fax. 916-669-4499

---

FIRST AMENDED COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730 (B) (2) - 354